# EXHIBIT D

```
 1   STATE OF MINNESOTA                          DISTRICT COURT

 2   COUNTY OF HENNEPIN                  FOURTH JUDICIAL DISTRICT

 3                                       DIVISION I, MINNEAPOLIS

 4   ----------------------------------------------------------------

 5   Guava LLC,

 6                Plaintiff(s),        FILE NO:  27-CV-12-20976

 7        vs.

 8   Spencer Merkel et al.,

 9                Defendant(s).

10   ----------------------------------------------------------------

11       The above-entitled proceeding came duly on for hearing

12   before the Honorable Tanya M. Bransford, one of the Judges of the

13   above-named  Court  on  June,  30  2014,  at  Hennepin  County

14   Government  Center,  City  of  Minneapolis,  County  of  Hennepin,

15   State of Minnesota.

16                          APPEARANCES:

17           EDWARD SHEU, Attorney at Law, appeared for and on

18   behalf of the Judgment Creditor.

19           MICHAEL DUGAS, Attorney at Law, appeared for and on

20   behalf of the Himself.

21           PAUL HANSMEIER, Attorney at Law, appeared for and on

22   behalf of Alpha Law Firm, LLC.

23               Lynn R. Burkett, Official Court Reporter

24                  Kimberlee Shelton, Law Clerk

25
```

```
 1              (WHEREUPON, the following proceedings were duly
 2        had.)
 3              THE COURT:  Okay.  We're present in the matter of
 4        Guava LLC vs. Merkel.  It is Court File No. 27-CV-12-20976
 5        and we're here initially for a continuation of the hearing
 6        that was scheduled earlier where it was an appearance for
 7        examination of debtors.  Since then there have been
 8        subsequent motions filed.  I don't know if the Counsel
 9        wanted to proceed with the motions first or finish the
10        appearance for examination debtors.
11              MR. HANSMEIER:  Your Honor, there's a time
12        sensitivity to one of the motions that was on file so if the
13        Court would allow we prefer to take motions first.
14              THE COURT:  Okay.  Okay, I see that there's a
15        Alpha Law Firm's Motion for Relief from the Court's May 27,
16        2014 Order and there's also Alpha Law Firm's Motion for
17        Sanctions.  I believe those are the two motions that are
18        before the Court.  Counsel, do you want to identify
19        yourselves for the record.
20              MR. HANSMEIER:  Paul Hansmeier, H-a-n-s-m-e-i-e-r
21        for Alpha Law Firm, LLC and to make one clarification for
22        the record, I believe that Mr. Dugas also has a motion
23        joining Alpha Law Firm's Motion for Relief from the Court's
24        May 27, 2014 Order.  It's a bit short.
25              THE COURT:  Oh yes, I see it after--okay.  Well
```

```
 1        Mr. Dugas, it just says incorporates and adopts the
 2        arguments made by Alpha Law Firm.
 3                  MR. SHEU:  Your Honor, Edward Sheu on behalf of
 4        Best & Flanagan, LLP and I would just note I don't see Mr.
 5        Dugas' saying it didn't get filed I didn't get served with
 6        it.
 7                  THE COURT:  What I see was filed was the
 8        Memorandum of Law in support of Michael Dugas' motion.  It
 9        looks like that was filed on June 17th at 8:35 in the
10        morning.
11                  MR. SHEU:  Your Honor, I didn't get served with
12        it.  I don't know if--
13                  THE COURT:  But basically it just says I join in
14        with all the arguments.  So that's the short version, but it
15        said that in about five paragraphs but that's basically what
16        it said.
17                  MR. SHEU:  Okay.
18                  THE COURT:  I don't think they have any--
19                  MR. SHEU:  I won't claim any.
20                  THE COURT:  Well I mean we can make a copy for
21        you, but it just said he added that it made a negative
22        impact on his career.
23                  MR. SHEU:  Okay.
24                  THE COURT:  Well saying that would be an
25        understatement.
```

```
1              MR. SHEU:  I probably would like to see a copy.

2              MR. DUGAS:  Your Honor, Michael Dugas for myself.

3    I can serve a copy of my motion Memorandum on Mr. Sheu by

4    tomorrow.

5              THE COURT:  Well I think you wanted to argue it

6    now though.

7              MR. DUGAS:  Yes.

8              THE COURT:  Okay so he needs a copy right now so

9    my clerk will just print it off.

10             MR. SHEU:  Thank you.

11             THE COURT:  So it might have been--I don't

12   understand all these problems with service because usually

13   if you're, if you're in for E-filing I thought you just

14   press a button and then you get the service.

15             MR. SHEU:  That was my understanding too, Your

16   Honor.

17             THE COURT:  So I don't understand.

18             MR. DUGAS:  Yeah mines as well.

19             THE COURT:  Because if you E-filed the document

20   it was E-filed like you didn't press the next button so that

21   Mr. Sheu would get the service.  I mean I haven't had to do

22   it I'm being a little bit more simplistic, but I thought it

23   was a rather simple step but it's not automatic I understand

24   like it is in Federal Court.

25             MR. SHEU:  It's not automatic, Your Honor, and
```

1    from speaking to Mr. Hansmeier last week apparently he

2    served and filed the Reply and didn't serve it although he

3    did email a copy but I guess you do have to push two

4    buttons.

5              THE COURT:  Right, you have to do something else

6    affirmatively.

7              MR. SHEU:  Thank you.

8              THE COURT:  But we're still apparently trying to

9    adjust so typically my staff files it, presses that it's

10   served and sends everyone email copies just to make sure

11   because then you get it as soon as we email it to you

12   because sometimes in filing it takes a little bit of time,

13   there's still a little delay it's not instantaneous before

14   they receive it and then send it out.

15             MR. SHEU:  Yeah, there can be a big delay.

16             THE COURT:  Right, I think they're working on

17   that.  All right so Mr. Hansmeier, you may proceed with your

18   motions.

19             MR. HANSMEIER:  Thank you, Your Honor.  The first

20   motion I have is the Motion for Sanctions under Minnesota

21   Rule of General Practice 11.  I don't have too much to add

22   beyond what's currently in the papers I think they speak for

23   themselves.  The summary of the argument is simply that we

24   have a circumstance where Alpha Law Firm's financial

25   documents, it's account numbers were put on this Court's

```
 1        record not once but as the response makes clear twice and
 2        frankly Mr. Sheu's reaction to it was underwhelming.  Not
 3        only did he fail to take the proper steps to properly file
 4        it under the Rules, but then I believe he made an in
 5        artfully inaccurate representation to this Court that we had
 6        resolved this matter and so late last Friday Mr. Sheu filed
 7        a copy of the new Rules of General Practice which, if I read
 8        it correctly, eliminates the redaction requirements with
 9        respect to bank accounts that are associated with terminated
10        companies or terminated accounts and what not and so I think
11        the thing to take away from that amendment is that the Rules
12        as they currently stand right now do include a prohibition
13        against filing those sorts of documents and with that I'll
14        stand on the motion for the Rule 11 issue.
15                    THE COURT:  Okay.  Do you wish to respond, Mr.
16        Sheu?
17                    MR. SHEU:  Your Honor, I guess I mostly put my
18        arguments into the papers as well.  I would just highlight
19        the fact that when the judgment debtors did not post the
20        bond as you required by June 6$^{th}$, on June 9$^{th}$ or 10$^{th}$ I filed
21        a motion with the Court of Appeals to dismiss the appeal and
22        failure to post the supplemental cost bond so that's pending
23        there, you know, is there concurrent jurisdiction I truly
24        don't know it's sort of odd though if Your Honor's being
25        asked to rule on an issue that's also with them and as I
```

1    said in my papers that the Court of Appeals will either

2    grant the motion or deny the motion so, but I think I put

3    all my position in the papers on that point.

4            THE COURT:  Okay.

5            MR. HANSMEIER:  Your Honor, just to be clear on

6    this I was first addressing my Rule 11 Motion and then just

7    move on to Motion for Relief from the May 27 Order.

8            THE COURT:  You may proceed with that motion now.

9            MR. HANSMEIER:  Thank you, Your Honor.  I think

10   the arguments set forth in the papers for the relief in May

11   27th Order are fairly clear.  I only want to recount a

12   couple of things today one is to develop a record on what

13   the Appellants or I'm sorry what Respondents costs are

14   actually on appeal because that's been one of those well,

15   $16,500.00 questions to find out what the amount is just so

16   we can get to the bottom of that issue and so Your Honor,

17   I'd like to call Mr. Sheu as a witness to examine him on the

18   limited issue of what his client's costs on appeal are.

19           MR. SHEU:  Your Honor, I would object to that

20   request.  That's nowhere noticed in the motion, Your Honor,

21   much less is it relevant.

22           MR. HANSMEIER:  And Your Honor, if he just wants

23   to tell us what his cost on appeal are that's fine too.  For

24   some reason it's been a trade secret as to what he actually

25   spent on appeal so we can simply have that amount be posted

1    and then move to move to strike this motion before the Court

2    of Appeals as moot.

3         THE COURT:  Okay.  First of all, your motion to

4    have Mr. Sheu be sworn to testify as to what the amount of

5    his costs are on appeal is denied because although I admit

6    it is rather strange to have any lawyers testifying as to

7    the amount, testifying in court, you and Mr. Dugas have been

8    called as witnesses because of the judgment debtors but to

9    have Mr. Sheu sworn in when he hasn't been noticed that he

10   would be asked to be a witness, I'm sure if he had he would

11   have brought another lawyer from his firm or something or

12   would have brought--if you had put that in he could have

13   brought maybe one more appropriate--like I'm just assuming

14   there's someone at his firm Best & Flanagan, right, who

15   keeps track of all those, the documents I mean the costs and

16   I'm further assuming that it's not Mr. Sheu but that there's

17   someone whose sole job it is to record costs and that person

18   would probably be the most appropriate person to testify.

19        MR. HANSMEIER:  Certainly understand, Your Honor.

20        THE COURT:  If there was going to be testimony

21   which there's not usually testimony in a motion.

22        MR. HANSMEIER:  But maybe we could at least get

23   some clarification from Mr. Sheu what his costs are.  For

24   some reason this has been just the toughest puzzle to crack.

25   We have Mr. Sheu saying I need to be bonded for all of these

1   costs on appeal and you know certainly a Respondent on

2   appeal has a legitimate interest in being bonded for the

3   costs they've actually expended and here we're faced with a

4   circumstance where those costs are finagling up and maybe

5   Mr. Sheu doesn't know it down to the penny because as you

6   point out he may not be the person who's taking the

7   actuarial record of all those costs, but certainly there's

8   the flipside of the concern which is the concern that Alpha

9   Law Firm and Mr. Dugas are facing which is that you know

10  we're facing this Order to pay $16,500.00 from Trial Court

11  Administrator under the opuses of well Mr. Sheu needs or Mr.

12  Sheu's clients need to be bonded for their costs on appeal

13  then I think that in particularly in light of the amendments

14  to the Rules of Appellate Procedure, would say well which

15  would eliminate a cost bond requirement and say in very

16  extreme circumstances you have a cost bond probably lower

17  than $500.00, but under no circumstance higher than

18  $1,000.00 and we're sitting here with $16,500.00 which is

19  fine, but at the same time Alpha Law Firm doesn't have the

20  money to put up for that and Mr. Dugas will speak for

21  himself, but I think that his testimony was pretty clear at

22  the June 16th, 2014 judgment debtors exam as he points out

23  in his moving papers he's not even employed and he can't get

24  a job.

25              You know I think the best way to balance the

```
 1      interest is to have the amount of actual costs just be

 2      stated and then let's just put those costs up at with the

 3      Trial Court Administrator and then allow the Appellate Court

 4      to rule however it's going to rule and then move on.

 5              THE COURT:  Okay.  So I won't ask a question I'll

 6      let Mr. Sheu respond.

 7              MR. SHEU:  Thank you, Your Honor, a couple of

 8      points.  Your Honor, after the last hearing two weeks ago

 9      issued an Order I think it was actually a letter maybe it

10      was an Order as well denying Mr. Hansmeier's request to

11      subpoena my clients for the same kind of testimony proof of

12      costs.  So I guess Your Honor ruled on that point, but

13      second, this whole supplemental cost issue we argued this to

14      you in a motion three months ago, four months ago back in

15      January so that motion's kind of been argued I feel like

16      we're rehashing the same issue here as to what the

17      appropriate supplemental cost bond is.  Your Honor already

18      ruled that it is appropriate to have a supplemental cost

19      bond, the passage of time is frankly made it worse because

20      my firm's already incurred the fees and cost but we're

21      rehashing the same arguments here and it's kind of perverse

22      that they get a free pass now that the Appellant's arguments

23      over and we're sort of waiting the next 25 days for the

24      opinion.

25              Your Honor, I guess I just raise one more point.
```

1    Your Order from the last couple of weeks ago required the

2    judgment debtors to produce their tax returns.  Mr. Dugas

3    has provided me with his.  I haven't received any from Alpha

4    Law Firm for any year much less from Guava as was also

5    stated in your Order.

6            MR. HANSMEIER:  I'll be glad to address that

7    issue once this motion has been heard, Your Honor.

8            THE COURT:  Okay.  Do you have anything else to

9    say in addition to and to support your Motion for Relief

10   from the 5-27 Order?

11           MR. HANSMEIER:  I do very briefly and I believe

12   Mr. Dugas would like to say a few words as well.  I just

13   want to very briefly address Attorney Sheu's argument that

14   somehow this Court lacks jurisdiction to amend an Order that

15   currently exists before this Court and I would say there's

16   no basis in any case law, in any Rule, in any statute period

17   that this Court lacks jurisdiction to alter or amend an

18   Order that is currently before it that is not the subject of

19   a current appeal and as the Order stands right now it is not

20   in fact the subject of an appeal and so the Court certainly

21   has jurisdiction to amend it.

22           MR. DUGAS:  And Your Honor, may I add my point as

23   well?

24           (WHEREUPON, there was a brief pause in the

25   proceedings while the Judge confers with the clerk.)

 1            THE COURT:  I was just addressing the location of

 2     some of the documents on the electronic file here I'm

 3     looking at.  I'm sorry who asked for what?

 4            MR. DUGAS:  I asked for permission to also voice

 5     my argument.

 6            THE COURT:  Mr. Dugas, you may proceed.

 7            MR. DUGAS:  Well I'll be brief, Your Honor, the

 8     only thing I would add is it is impossible for me to post

 9     anywhere near the $16,500.00.  Attorney Sheu has taken the

10     last of my assets as we learned through either previous

11     pleadings or testifying at the last debtors exam.  I don't

12     have a job, I do not have assets.  I ask also that the Court

13     parse the judgment debtors that even if it were to somehow

14     determine a different judgment debtor could post the amount

15     and that I still could not.  I simply lack any assets and

16     have for several months now as Attorney Sheu has taken the

17     last of it.

18            THE COURT:  Okay, thank you.  With regards to

19     Alpha Law Firm and Mr. Dugas' Motion for Relief from the May

20     27, 2014 Order, that motion is denied.  The Court I think

21     has authority to amend a previous Order that I've issued,

22     but I don't--typically that happens under the Rule 60.02

23     where I modify final judgments or another Rule where there's

24     been a mistake or some inaccuracy or something but the Court

25     stands by the Order that I had previously issued and would

1    not, is denying for the reasons that were set forth in the

2    Order and the Memorandum in support of the Order and, in

3    addition, although I do believe I have authority to reverse

4    or amend a previous Order, if I would take that action while

5    it was on appeal, it could result in a perverse or different

6    kind of Order in case I did something and the Court of

7    Appeals did something else.  So the Motion for Relief from

8    the May 27, 2014 Order is denied.

9          Okay now the Motions for Sanctions, my questions

10   for Mr. Hansmeier is what was the damage done to Alpha Law

11   Firm as a result of the filing, the opposing sides filing of

12   you're a copy of the check, two bank statements and checks

13   when the law firm is closed and presumably the bank

14   statements and the checks, the bank accounts are closed.  So

15   what was the, what was the damage?

16         MR. HANSMEIER:  Yes, Your Honor.  In a normal

17   circumstance where it was associated with an active account,

18   the damage would be the increased risk of credit I guess

19   identity theft, violations of bank account, violations of

20   privacy, et cetera.  To the Court's point, Alpha Law Firm is

21   terminated.  Alpha Law Firm does not face the risk of credit

22   monitoring issues and the many of the things that would be

23   associated with an active account.

24         THE COURT:  Right because I'm very concerned and

25   I in fact make sure--well, in fact we know the Rules are in

1    process of being changed to have more the vigilance because

2    of the concern with identity theft, which I know all too

3    well because I handled those cases as well and with

4    electronic filing not allowing people to have access, but as

5    you were going to, but my question is what is the damage to

6    a terminated law firm?

7              MR. HANSMEIER:  Sure.  So the damage to the

8    extent that any exists, is simply the privacy violation of

9    having your bank account statements being thrown out there

10   on public record for anyone to see.  You know it's

11   embarrassing you want privacy I think that's one of the

12   concerns that's reflected in Rule.  But to the Court's point

13   directly, the sanctions received aren't necessarily

14   sanctions for Alpha Law Firm to recover damages from itself

15   other than perhaps the, you know, fee mortgage practice I

16   don't think we're even assigned a concerted right to that.

17   The sanctions we're received one, the sanctions that Chief

18   Judge Davis of the U.S. District Court the District of

19   Minnesota imposed on Robbins/ Kaplan attorney.  Nothing

20   that's earth shattering or hundreds of thousands of dollars,

21   but he said look, you know, this is a really, really

22   important thing.  These are issues that are affecting our

23   Courts and if we're going to have the benefits of electronic

24   filing we need to make sure people are following the rules.

25   And this is not a case--I mean Best & Flanagan is obviously

1    a very highly regarded firm.  They have very experienced

2    attorneys they should know better.  So that's why we're

3    seeking the deterrence factor.  Certainly from a firm that

4    has more than enough money to money to pay this, this will

5    not be a very significant hurt for them and we're also just

6    seeking the costs and fees associated with bringing the

7    motion which is frankly very de minimums.  There are not

8    many issues of briefing associated with doing so and we're

9    not seeking credit monitoring services which we would be if

10   we thought if we were an active company and there was the

11   risk of identity theft of the company's tax I.D. and what

12   not.  Thank you, Your Honor.

13              THE COURT:  Thank you.

14              MR. SHEU:  Your Honor, may I briefly respond?

15              THE COURT:  You may.

16              MR. SHEU:  Thank you, Your Honor.  So I think--

17              THE COURT:  I will say though I do like Second

18   Harvest Hartland Food Bank.  I've done volunteer work for

19   them so I thought that was a good place.  I thought you

20   should know.

21              MR. SHEU:  Very, very creative I guess.  Well I

22   guess your short answer to your question is that there is no

23   harm to Alpha Law Firm and I would venture to say that this

24   was kind of a punitive type request in light of the posture

25   of the proceedings.  They've been a little bit nastier than

1    your normal case and I think an inadvertent error on my

2    part.  Certainly I'm a big proponent of the privacy.  The

3    same documents I sent to you in a letter in March were

4    blackened out this one wasn't.  I took the whole thing off

5    the Court system completely so it's not there and, as you

6    know, it's all kind of academic because it's a closed

7    account anyway and the Rules going to be changing shortly

8    too, which I actually think applies to banking cases as the

9    amendments said as of tomorrow evenings discussion could

10   even this discussion would probably be moot, but, Your

11   Honor, I think this motion was for sanctions in light of the

12   reason we're here is somewhat poorly taken and kind of a pot

13   shot.

14           THE COURT:  Okay.  Well I'm going to take, I

15   haven't read it over in great detail but it looks like the

16   case that you referred to that was Judge Davis' case I think

17   is being--well I would view it as being a little bit more

18   egregious because it looks like it was full of Social

19   Security numbers and dates of birth for 179 people as

20   opposed to a bank account for a closed law firm.  So I think

21   those are very different, but I'll just take it under

22   advisement and I'll issue a written Order to confirm but I

23   don't think the level of--well, let me back up.  I'm

24   presupposing that Robins & Kaplan didn't intentionally do

25   that either and that Judge Davis was definitely authorized

1   in sending that message to their law firm to say this is the

2   Rules and you can't do that, but what they did was

3   needlessly expose 179 people to potential identity theft.

4   In this case I don't think any personal person was exposed

5   and I think it was a now terminated law firm that was

6   exposed and it was temporary and we really don't know, I

7   don't believe, if anybody ever saw it while it was up do you

8   know what I mean?

9       MR. HANSMEIER:  My assistant saw it.

10      THE COURT:  Okay.  Well--

11      MR. HANSMEIER:  But anyway, the point is that it

12  was on the public record and I would just make one point

13  about the Judge Davis case where his reasoning in the case

14  really doesn't depend on the number of people associated

15  with the harm or anything else, he was making a very clear

16  message about and I think based on the tenor of his Order

17  and the reasoning in it, it would have been the same result

18  with one person versus 179 persons.

19      THE COURT:  Okay.  Well like I said, I'm looking

20  at part of his decision where he says "although electronic

21  filing significantly improves the efficiency and

22  accessibility of our court system it also elevates the

23  likelihood of identity theft and damage to personal privacy

24  when lawyers fail to follow federal and local rules."  So I

25  think that following that logic it doesn't appear that it's

1    likely that a criminal could assume the identity of the

2    Alpha Law Firm as a different law firm or could do damage to

3    Alpha Law Firm as far as personal privacy by taking their

4    Social Security number and things of that nature.  But

5    anyway, I will still issue a written Order in that regard on

6    the Motion for Sanctions.

7            But I think now we can proceed with the remaining

8    testimony of the examination of debtors.  I believe there

9    might have been further questions that you wanted to ask of

10   Mr. Dugas in light of his or I don't know if you had any

11   further questions, Mr. Sheu.

12           MR. SHEU:  Thank you, Your Honor, just a few

13   questions for Mr. Dugas in light of him producing his 2013

14   tax return so if we could please call Mr. Dugas to the

15   stand.

16           THE COURT:  All right so Mr. Dugas, please stand

17   and raise your right hand so you can be sworn in.

18                        **MICHAEL DUGAS**,

19        after having been first duly sworn, was

20              examined and testified as follows:

21           THE COURT:  Sir, please return to the witness

22   stand.

23                        **EXAMINATION**

24   **BY MR. SHEU**:

25   Q.  Mr. Dugas, you provided me with a copy of your 2013 Federal

```
 1        and State income tax return is that correct?
 2   A.   Yes.
 3   Q.   Was this the same copy that was filed?
 4   A.   Yes.
 5   Q.   And you recorded receiving $42,200.00 in income from
 6        Livewire Holdings, LLC, is that correct??
 7   A.   I don't recall the number.
 8               MR. SHEU:  Okay.  Your Honor, may I approach?
 9               THE COURT:  You may.
10   Q.   Mr. Dugas, I'm handing you what appears to be your 2013 tax
11        return, can you look it over and tell me if that's correct?
12   A.   Yes, it looks like my tax return to me.
13   Q.   Okay and with respect to the income that you received in
14        2013 where did it come from and by you I mean you as opposed
15        to you and your wife?
16               THE WITNESS:  Do you happen to know where I can
17        find that?
18               MR. SHEU:  Maybe if you flip to the W-2 at the
19        end.
20               THE WITNESS:  Okay.
21   A.   Yes, there is a W-2 from Livewire Holdings.
22   Q.   And how much is it for?
23   A.   The wages, tips and other compensation is $42,200.00.
24   Q.   Is that the only W-2 that you received for employment in
25        2013?
```

```
 1  A.   Yes.
 2  Q.   Did you receive any other income in 2013?  By you I mean you
 3       not your wife just you?
 4  A.   Just me, yes, I also received unemployment.
 5  Q.   Okay any K-1's, 1099's things like that?
 6  A.   No.
 7            MR. SHEU:  Can I take that back?
 8            (WHEREUPON, Mr. Sheu retrieves the document.)
 9  Q.   Now of the $42,200.00 was that the bulk of your family
10       income?
11  A.   I don't know.
12  Q.   Okay, hand you back your 2013 income tax return.  What was
13       your family's total income?
14            THE WITNESS:  Would that be this number?
15  Q.   Well looking at line 7, wages, tips and salaries?
16  A.   Line 7 says $53,464.00.
17  Q.   Okay of which $42 was yours?
18  A.   Yes, that's correct.
19  Q.   Okay and what does your wife do?
20  A.   She is a Reference Attorney at Thompson Reiders.
21  Q.   Do you know what her income is?
22  A.   I do not, no.
23  Q.   And you testified that your only employment, your only
24       source of funds right now is your wife?
25  A.   Well she doesn't give me money so she doesn't actually give
```

```
 1        me any funds.
 2   Q.   But the way in which you live right now is from your wife,
 3        is that correct?
 4   A.   Yes.
 5   Q.   Any other help from family members, gifts?
 6   A.   No.
 7   Q.   And so Livewire Holdings your employer last year what was
 8        that employment for?  What is that those payments for?
 9   A.   Like what was my position?
10   Q.   Yeah.
11   A.   I was an Associate Attorney.
12   Q.   With Livewire Holdings, LLC?
13   A.   Yes.
14   Q.   And so when you brought the, for example, the lawsuit in
15        this action that was on behalf of Livewire Holdings?
16                  MR. HANSMEIER:  Objection relevance.
17                  MR. DUGAS:  So I would object--
18                  THE COURT:  Could you read the question.
19                  (WHEREUPON, the Court Reporter reads back the
20        last question.)
21                  THE COURT:  Sustained.
22   Q.   Mr. Dugas, what did you do for Livewire Holdings?
23                  MR. DUGAS:  Also objection--
24                  MR. HANSMEIER:  Objection asked and answered.
25                  MR. DUGAS:  I'll say relevance and outside the
```

1    scope.  My understanding is you were going to ask me

2    questions regarding my tax return.  We already had a hearing

3    where you asked me questions and we completed it regarding

4    everything else.

5         MR. SHEU:  Your Honor, I'm looking at the 2013

6    tax return that was produced in the past week per your Order

7    and I'm just looking at a W-2 for Livewire Holdings.

8         MR. HANSMEIER:  And Your Honor, the Court's Order

9    granting Mr. Sheu's oral request at the prior hearing plus

10   denying my request to bring Mr. Sheu's client and have him

11   answer questions made very clear that the scope of this

12   hearing on both for purposes of making sure I assume that

13   this gets done in a somewhat timely manner and also for the

14   sake of keeping this to a judgment debtors exam was going to

15   be very narrowly tailored to finding out sources and uses of

16   income and any assets that are out there that may be applied

17   to the judgment that have not yet been.

18        MR. DUGAS:  And certainly I would add that Mr.

19   Sheu was aware that I worked for Livewire holdings last

20   hearing. He didn't just learn of my employment at Livewire.

21        MR. SHEU:  Your Honor, I'm just seeing this tax

22   return for the first time and Your Honor Chapter 575 the

23   reason why we're here is pretty broad.  It's about looking

24   for property that's either in the debtor's hands or somebody

25   else's hands and understanding the relationship.  I mean

```
 1          these are known what is the relationship I'm not fishing for
 2          anything other than the source of money and I see a lot of
 3          transfers, Your Honor, hundreds of thousands of dollars of
 4          transfers between Alpha and all these other people and I'm
 5          entitled to know are these loans?  Did somebody owe Alpha
 6          money?  Did somebody owe Mr. Dugas money because I see lots
 7          of money going to lots of people and entities?
 8                    MR. HANSMEIER:  He's free to ask Mr. Dugas if
 9          someone loaned him money, but what Mr. Dugas did at a
10          company is not relevant to where Mr. Dugas' assets are, Your
11          Honor.
12                    THE COURT:  I'm going to sustain the objection to
13          the question because I think it went to, I guess the nature
14          of what he was doing.  You said, did you work for Livewire
15          when you brought this anyway, but you're free to ask
16          questions about any interrelationships between like Alpha
17          and things like that and Mr. Dugas--
18                    MR. SHEU:  Thank you, Your Honor.
19                    THE COURT:  To the extent that it goes to the
20          source of money.
21                    MR. SHEU:  Thank you, Your Honor.
22  Q.   Mr. Dugas, are you aware of some agreement between Livewire
23        and Alpha?
24                    MR. DUGAS:  Again, objection relevance.
25                    THE COURT:  I'm going to overrule that objection
```

1  just because of my history of the case and that Mr. Sheu's

2  offer of proof was that it appeared that--anyway I'm

3  overruling the objection because of the interrelationship

4  between you and you said you testified that you worked for

5  Livewire, that you worked for Alpha, that you worked for

6  someplace else and when did you work for all these places?

7          MR. HANSMEIER:  A quick objection Your Honor,

8  vagueness just because he asked if there were any agreement

9  versus being more specific.

10          THE WITNESS:  So could you repeat the question?

11  Q.  Do you know if there was a agreement or an agreement between

12  Alpha Law Firm and Livewire Holdings, LLC?

13  A.  No.

14  Q.  Did you ever wonder why you were getting paychecks from

15  Livewire Holdings when you were appearing in cases on behalf

16  of Alpha Law Firm?

17          MR. DUGAS:  Objection relevance.

18          THE COURT:  Overruled.

19  A.  No.

20  Q.  Who did you answer to at Livewire Holdings?

21  A.  I believe Mark Lutz was in charge of Livewire.

22  Q.  And who's Mark Lutz?

23          MR. HANSMEIER:  Objection relevance.

24          MR. SHEU:  Your Honor, these are--

25          THE COURT:  Overruled.

1   A.   Well when I was at Livewire he was, he ran Livewire I don't

2        know exactly his title.

3   Q.   And between two weeks ago and today do you recall the last

4        time we were here I showed you some checks from Alpha Law

5        Firm, LLC, written out to you, do you recall that?

6   A.   I do remember that, yes.

7   Q.   And have you had any chance to review your records or

8        refresh your recollection as to why you were getting

9        paychecks from Alpha Law Firm?

10  A.   No, I did not.

11  Q.   Did you report, did you receive any W-2's from Alpha Law

12       Firm?

13  A.   I do not recall.

14  Q.   They'd be in the tax returns that you would have provided

15       previously?

16  A.   Correct.

17  Q.   And between two weeks ago and today, have you had any more

18       job prospects?

19  A.   No, I have not.  I've only heard from Northwestern Mutual

20       that's actually as a result of this action they cannot offer

21       me employment.

22  Q.   I'm sorry.

23  A.   I've--Northwestern Mutual talked to me and said that they

24       could not offer me employment as a result of this action?

25  Q.   What do you mean this action the debtor's exam?

1  A.   No, Guava vs. Merkel in general that there's a Sanctions

2      Order to be specific I would assume.

3  Q.   Did you provide any payment for the appellate proceeding in

4      this case this case the appellate briefs or appellate costs?

5              MR. DUGAS:  Objection relevance.

6              THE COURT:  Overruled.

7  A.   No, I did not.

8  Q.   Do you know who did?

9  A.   No, I don't actually.

10             MR. SHEU:  No more questions, Your Honor, for Mr.

11    Dugas at this time.

12             THE COURT:  Mr. Dugas, do you have anything else

13    to share?

14             MR. DUGAS:  No.

15             THE COURT:  All right, you may step down.  Mr.

16    Sheu, did you have any other questions for Mr. Hansmeier?

17             MR. SHEU:  Yes, Your Honor.

18             THE COURT:  Mr. Hansmeier, please stand and raise

19    your right hand so you can be sworn in.

20                    **PAUL HANSMEIER**,

21      after having been first duly sworn, was

22       examined and testified as follows:

23             THE COURT:  Could you once again for the record

24    spell your name first and last?

25             THE WITNESS:  Paul Hansmeier, P-a-u-l, last name

 1      Hansmeier, H-a-n-s-m-e-i-e-r.

 2              THE COURT:  Thank you, Mr. Hansmeier.  You may

 3      inquire, Mr. Sheu.

 4              MR. SHEU:  Thank you, Your Honor.

 5                        **EXAMINATION**

 6  **BY MR. SHEU**:

 7  Q.  Mr. Hansmeier, did you bring with you today copies of any

 8      income tax returns for Alpha Law Firm, LLC?

 9  A.  No, Mr. Sheu, I did not.  I tried to make the point at the

10      prior hearing that Alpha Law Firm did not have a tax return

11      for 2013 the same is true for 2012, 2011, 2010.  I didn't

12      fully understand, as not being a tax lawyer myself, why that

13      was.  I spoke to a tax accountant and what he informed me

14      was that because Alpha Law Firm is a single member limited

15      liability company and I apologize if I get this a little bit

16      wrong, tax laws are not my forte, the idea is that a single

17      member limited liability company under the Internal Revenue

18      Code that does not make the corporations or S-Corporation

19      election does not in fact file a tax return instead for

20      purposes of the tax code it is a disregarded entity so

21      therefore that's rather in depth explanation of why Alpha

22      Law Firm does not file a tax return and that's why when in

23      response to the original interrogatories and document

24      requests from I believe back in November 2013 you did not

25      receive tax returns in response to those, that's why when

1    we've talked about the issue I said Alpha Law Firm did not

2    have the tax returns.  Had you identified tax returns on

3    your Motion to Compel documents, I certainly would have been

4    able to have someone who has more tax knowledge than myself

5    explain why there is no tax return for a single member

6    limited liability company that is not elected made the

7    corporation election and beyond that I ask my tax accountant

8    you know if I could bring some documents to the court or

9    what section of the code that related to but he said it was

10   pretty easy to Goggle search just search for limited

11   liability company, disregarded entity, single member.

12 Q.  So that's a very long yes or no.  I guess the answer is no,

13   Alpha did not have any tax returns, true or false?

14 A.  Could you repeat the question?

15 Q.  Alpha doesn't have any tax returns true or false?

16 A.  Alpha Law Firm does not have the Federal/State income taxes

17   like a corporation would, that's correct.

18 Q.  And when you said disregarded law firm that disregarded

19   entity for tax purposes that actually means that the single

20   member reports on their own personal tax return any loss or

21   gain?

22 A.  Yeah, it's incorporated into the overall personal tax return

23   that's correct.  At least that's my understanding.  Again

24   I'm not a tax accountant and I'm not a tax attorney.

25 Q.  So we would need to see your tax returns, your personal tax

1       returns to see or at least a schedule where you listed

2       Alpha's gain or loss on your tax returns?

3   A.  No, absolutely not.  That's my understanding of tax returns

4       is that there's no separate Alpha Law Firm schedule for

5       example there's nothing in the tax code that says if you own

6       a law firm here's where you report stuff it just comes into

7       the top line.  So the way you would determine what Alpha Law

8       Firm's revenues and expenses are would not be to look at for

9       example my personal tax return.  In fact, you wouldn't get

10      any information about Alpha Law Firm's expenses and revenues

11      from that.  The way to find out Alpha Law Firm's expenses

12      and revenues would be or they're effective taxable income

13      would be, even if they reported taxable income, would be the

14      same way my accountant does which is simply to look at the

15      bank statements for Alpha Law Firm for any given year, look

16      at 12 months from January to December which is the calendar

17      recording year and simply look at what the revenues are and

18      what the expenses are and that's the income, if you will,

19      from that particular year.  But looking at my overall tax

20      returns all you're going to find is numbers that are all run

21      together that don't break out Alpha Law Firm.  You know I

22      own Steele Hansmeier or any other company it would all be

23      lumped together.

24  Q.  Did you report any income from Alpha Law Firm on your tax

25      returns?

A.    I reported every single penny that was attributed to me

      through any company that I had an ownership interest so yes

      for Alpha Law Firm to the extent that Alpha Law Firm

      reported income where I guess Alpha Law Firm does not report

      income, to the extent that there was net positive cash flows

      from Alpha Law Firm to me, yeah, there would be income on my

      tax returns statement but it wouldn't be broken out by Alpha

      Law Firm it would be lumped in with everything else.

Q.    Whether it be some worksheet somewhere--

A.    No, I've said this now three times.  Alpha Law Firm is not

      broken out in a separate worksheet or schedule at least to

      my knowledge and my understanding is that all the tax

      accountant would do is take the bank statements, which you

      have, and then go from there to arrive at whether that's

      adding or taking away from income any given year.  So the

      tax returns no, my personal tax returns would not be helpful

      to you in determining what positive cash flow Alpha Law Firm

      had during a given year.  Instead the bank account

      statements which you already have are what you would want to

      look for.

Q.    When you refer to bank statements that I already have, what

      are you meaning?

A.    I produced bank statements to you and I assumed you

      subpoenaed bank statements from TCF which is where Alpha Law

      Firm banks as we can find out by looking at a couple of

1        exhibits in this matter.

2   Q.   Okay, let me switch gears a little bit, Mr. Hansmeier,

3        discovery responses in this case, you mentioned them just a

4        moment ago.  Were there any other owners or members of Alpha

5        Law Firm other than yourself?

6                  MR. HANSMEIER:  I would just object this is asked

7        and answered about three time's last hearing.  Actually I'll

8        waive the objection.

9   A.   No.

10                 MR. SHEU:  Your Honor, Mr. Hansmeier said he

11        answered all my discovery.  Obviously he didn't.  Your Order

12        from May 27th issued a sanction for not answering these.  If

13        there's any relevant subject of a debtor's exam it's most

14        certainly discovery requests.

15                 MR. HANSMEIER:  I believe I answered the

16        question, Your Honor.

17  A.   The answer is no, there are no other members or owners of

18        Alpha Law Firm.

19  Q.   Thank you.  How about Guava, do you know any owners of

20        Guava?

21  A.   No.

22  Q.   Have you ever spoken to anybody at Guava?

23  A.   Sure.

24  Q.   Who would that be?

25                 MR. HANSMEIER:  Objection Your Honor, this does

1    not go to whether or not Alpha Law Firm has assets that Mr.

2    Sheu can seize in a final judgment.

3                    MR. SHEU:  Your Honor--

4                    THE COURT:  Overruled.

5   A.  My primary point of contact at Guava was an attorney named

6       Brett Gibbs, that's B-r-e-t-t- last name Gibbs, G-i-b-b-s.

7   Q.  And who was Mr. Gibbs?

8   A.  Mr. Gibbs was Guava's General Counsel.

9   Q.  Anybody else from Guava?

10  A.  I'm trying to recall Mr. Gibbs was certainly my primary

11      point of contact at Guava and in fact his instructions were

12      pretty clear that I speak with him directly about this case

13      and that's pretty much this case was the only real dealing I

14      had with Guava so Mr. Gibbs would be the person.

15  Q.  Mr. Dugas testified a couple of weeks ago about an Allan

16      Mooney being--

17  A.  Oh that's correct also Mr. Mooney.

18  Q.  And what was Mr. Mooney's role with Guava?

19  A.  You'd have to ask him.

20  Q.  Okay where would I find him?

21  A.  I don't know where he lives.

22  Q.  Is he in Minnesota?

23  A.  You would have to ask Mr. Mooney.

24  Q.  Okay but you're representing Guava in the appeal, how do you

25      communicate with Guava about the goings on?

1      MR. HANSMEIER:  Objection Your Honor, this is

2  getting really close to attorney/client privilege grounds.

3      MR. SHEU:  Your Honor, I'd like to be able to

4  serve Guava with discovery, make him come here.  Actually

5  your Order from a week ago required them to produce tax

6  returns.  How else are we supposed to find them or serve

7  them?  Chapter 575.05 and 575.07 says that any person who's

8  indebted to the judgment debtor may be questioned.

9      MR. HANSMEIER:  Your Honor, this is a judgment

10  debtor exam not help Mr. Sheu serve Guava exam.

11      THE COURT:  I'll overrule the objection you can

12  answer.

13      MR. HANSMEIER:  Can you repeat the question,

14  please?

15  Q.  If I were to want to get ahold of Guava to serve post

16  judgment discovery, get their tax returns, anything like

17  that, how would I get a hold of them?

18  A.  Oh, we provided mailing address in Nieves.  I would assume

19  that's their registered office still.

20  Q.  The address in St. Kates, Nieves that you provided me?

21  A.  I would have to look at the specific address but yes

22  generally speaking at the--there was a notice of withdrawal

23  filed at some point where it listed an address in Nieves and

24  that's the address that one may reach Guava at for service

25  purposes.

```
 1   Q.   Okay.
 2   A.   As far as I understand.  Again, I don't represent Guava
 3        during this proceeding anymore just on appeal.
 4   Q.   Okay how did you--how do you communicate with Guava about
 5        the appeal, is it also at that same address?
 6   A.   I speak with Guava about the appeal through Paul Duffy right
 7        now.  He's a attorney in Chicago and he is the primary point
 8        and contact with Guava now after Mr. Gibbs moved on from
 9        Guava.
10   Q.   Do you know if Guava has any money or assets?
11   A.   I have no personal knowledge about Guava's financial
12        situation whether its money or assets.
13   Q.   Didn't Guava pay Alpha to bring this action?
14   A.   No.
15   Q.   Some legal fees of some sort some costs?
16   A.   No.  Again, Mr. Sheu, I think Mr. Dugas' testimony at the
17        prior hearing was crystal clear Alpha Law Firm's role in
18        this case was to have a convenient mailing address for
19        people locally so that people weren't having to mail a bunch
20        of materials to Chicago versus being able to mail stuff to
21        Minneapolis or if they wanted to personally serve subpoenas
22        or whatever might be.
23   Q.   Did Alpha Law Firm have a bank account of some sort?
24   A.   Yeah, your filings in this case have made that point crystal
25        clear they had a bank account at TCF.
```

```
 1  Q.   Any other bank accounts?

 2  A.   No.

 3  Q.   Was that a deposit account or a credit account?

 4  A.   I don't know the difference between the two.

 5  Q.   Did Alpha Law Firm ever have a credit card?

 6  A.   No.

 7  Q.   Was the TCF bank account was that in Iolta, I believe I-o-l-

 8       t-a account?

 9  A.   No.

10  Q.   It was an operating account?

11  A.   If I understand the term correctly operating account is

12       basically like a checking account that an individual would

13       have except it's used for business.  I'm just asking for

14       clarification by what you mean by operating account?

15  Q.   Yeah.

16  A.   Yep, that's what had.

17  Q.   Did Alpha Law Firm have any title to an account anywhere?

18  A.   No, Alpha Law Firm did not handle client funds

19  Q.   How did Alpha Law Firm get any of its money to its bank

20       account?

21  A.   I don't understand the question.  Well people would write a

22       check to Alpha Law Firm or--I mean you have all the bank

23       transactions each transaction speaks for itself.

24  Q.   Okay.  Let's talk about some transactions.  On July 26,

25       2010, Alpha Law Firm wrote a $2,000 check to Media Copyright
```

1        Group, LLC for 50 percent interest capital contribution, do

2        you recall that?

3   A.   No.

4   Q.   Do you know what Media Copyright Group, LLC is?

5             MR. HANSMEIER:  Objection Your Honor, relevance.

6             MR. SHEU:  Your Honor, if Alpha Law Firm owns

7        some interest in another entity that's an asset that can be

8        collected on.

9             MR. HANSMEIER:  I will represent to the Court

10       that Alpha Law Firm does not have a 50 percent interest in

11       any entity.

12            THE COURT:  The objections Overruled you may

13       answer the question.

14  A.   I did answer the question by saying it did not have 50

15       percent interest in any Copyright Group.

16  Q.   No, the question is what's Media Copyright Group, LLC?

17  A.   It's a limited liability company called Media Copyright,

18       LLC.

19  Q.   Well why did Alpha Law Firm invest $2,000 for 50 percent

20       interest capital contribution in July of 2010?

21  A.   You're talking about a transaction now that's over four

22       years old so I don't remember the specifics of it.

23  Q.   How about a transaction three years ago May 3rd, 2011, Alpha

24       Law Firm made a $75,000 check to Monyet, M-o-n-y-e-t, LLC,

25       does that ring a bell?

```
1   A.   No.

2   Q.   Do you know what Monyet, LLC is?

3   A.   It's presumably a limited liability company.

4   Q.   I see you're the signatory to the check and you're also the

5        signatory on the back of the check.  You don't know what

6        Monyet, LLC is?

7   A.   To the best of my recollection the Monyet, LLC entity is

8        simply an account associated with estate planning but I

9        don't know--the reason, I can't tell you how it operates

10       within the whole estate planning scheme is because I did not

11       set up the estate planning myself that's something that's

12       well beyond my expertize.

13  Q.   Well why would Alpha Law Firm be setting up an estate plan?

14  A.   I don't think Alpha Law Firm was setting up an estate plan.

15  Q.   You don't know why Alpha Law Firm was sending a $75,000

16       check to Monyet, LLC in the memo line it says trust one of

17       the bigger transactions in Alpha's--

18  A.   Well you're talking about a transaction that's like three

19       years now.  I mean if you're going to go through every

20       transaction in the bank account and hope that I can give you

21       the particulars of each transaction because there are

22       several large transactions in Alpha Law Firm's history I

23       think that probably in excess of $75,000 inflows and

24       outflows and to go through each transaction asking

25       particulars of those is a bit well, I guess I don't have the
```

```
 1        recollection that you may attribute to me.
 2   Q.   Well in May of 2011 you wrote another $10,000 check to
 3        Monyet, LLC this time in the memo line it said estate.
 4   A.   Yeah, I think that's correct.
 5             THE COURT:  So you said the memo line is what?
 6             MR. SHEU:  It said estate.
 7   A.   I mean yeah and that's my testimony that the Monyet
 8        distributions were made for estate planning purposes not for
 9        Alpha Law Firm.
10   Q.   Whose estate planning then?
11   A.   It's just setting up a trust for well now my son I guess he
12        would be the beneficiary of it.
13   Q.   And then in June, June 4$^{th}$, 2012, Alpha Law Firm writes a
14        $180,000 check to Monyet, LLC and the memo line says TR
15        dash?
16   A.   Yeah, trust.
17   Q.   Same trust for your family?
18   A.   Yes.  Well no, not for my family got my son.  For example,
19        I'm not a beneficiary of the trust.
20   Q.   Are you trustee of the trust?
21   A.   No.
22   Q.   Who is?
23             MR. HANSMEIER:  Your Honor, I'm going to object
24        here this--who the trustee of my personal trust is is not
25        relevant to where Alpha Law Firm's assets are.
```

```
 1                    THE COURT:  Ummm--
 2                    MR. SHEU:  That's where an awful lot of Alpha Law
 3         Firm's money went.
 4                    THE COURT:  I'm going to overrule the objection
 5         because you said that you're the sole member of Alpha Law
 6         Firm and that all of Alpha Law Firm's anything that you got
 7         income from Alpha Law Firm went into your personal account
 8         so if there's---
 9                    MR. HANSMEIER:  Your Honor, that was not my
10         testimony.  I don't believe my testimony was that.
11                    THE COURT:  Oh not personal account it would be
12         reflected in your tax returns in a global manner not in any
13         schedule or separate schedule and so now it looks like
14         there's a trust where money from Alpha Law Firm is flowing
15         to a Monyet, LLC so I think it's a relevant question.
16    A.   Okay, my wife is the trustee of the trust.
17    Q.   Your wife is the trustee and your son is the beneficiary of
18         the trust?
19    A.   To the best of my recollection.  Again, this trust and
20         estates planning is not, yeah, I think that's correct, but--
21    Q.   Any other trustee or beneficiaries?
22    A.   None that I'm aware of.
23    Q.   Who else would be aware of it your wife?
24    A.   I don't know you'd have to ask her.
25    Q.   Who's Nathan, N-a-t-h-a-n, Wersal, W-e-r-s-a-l, he gets a
```

```
 1        lot of checks from Alpha Law Firm?
 2   A.   He's an attorney.
 3   Q.   An attorney did you say?
 4   A.   Is that a question?
 5   Q.   Did you say--
 6             THE COURT:  He didn't understand what you--
 7             MR. HANSMEIER:  Oh I'm sorry an attorney.
 8             THE COURT:  He didn't hear your answer.
 9   Q.   Did the law office of Lee McCullah, III PC assist in setting
10        up the Monyet Trust?
11   A.   I don't believe so, no.
12   Q.   Do you know why Alpha Law Firm would be writing a check to
13        the law office of Lee MaCullah, III, PC for $4,210.00?
14   A.   Well is there something in the memo line of the check that
15        might shed some light?
16   Q.   It says AJS trust work.
17   A.   I'm sorry could you please say that more clear?
18   Q.   AJS trust work.
19   A.   AJS?
20             MR. SHEU:  Your Honor, may I approach briefly?
21             THE COURT:  You may.
22             MR. SHEU:  Maybe Mr. Hansmeier knows his
23        handwriting better than me.
24   A.   No, I don't.  I don't know what the acronym AJS trust work
25        stands for.
```

```
1   Q.   I asked Mr. Dugas about checks written out to him from Alpha
2        Law Firm.  Do you know why Alpha Law Firm would be writing
3        Mr. Dugas payroll checks?
4   A.   Can you show me the checks?
5                (WHEREUPON, Mr. Sheu approaches to show him the
6        checks.)
7   Q.   I'll show you the one dated December 2nd, 2011, to Michael
8        Dugas.
9   A.   Do you have the other ones too?  Oh, so these are not
10       payroll checks these are marked okay November payroll.  Oh,
11       okay so here's I think the confusion on that one.   If you
12       recall testimony from the last hearing we sold Steele
13       Hansmeier to Prenda Law at the end of 2011, I think November
14       of 2011.  So you're seeing here is a reflection of the
15       transition between Steele Hansmeier and Alpha Law.  These
16       checks are clearly associated with Prenda Law and it was
17       just a matter of Prenda Law wasn't getting their act
18       together in ADP and so we had--
19                THE COURT:  I'm sorry ADP?
20                MR. HANSMEIER:  They're the payout processor of
21       choice for basically every company out there.
22                THE COURT:  Okay.
23  A.   Anyway, so Prenda Law's account was not getting set up in a
24       timely manner with ADP, but you can't run it through Steele
25       Hansmeier anymore otherwise you'll have to pay payroll taxes
```

```
 1        at Steele Hansmeier at the time was a, Paul Duffy asked me
 2        just cut checks for people in Minnesota and I think these
 3        are the people in Minnesota look right based upon who I'm
 4        seeing and that went on for a couple of months.  It looks
 5        like sounds about right or maybe just one month and then
 6        after that they got there ADP account set up and they just
 7        started doing it for themselves.
 8   Q.   Who did Alpha Law Firm--
 9   A.   What's your question?
10   Q.   Who started doing it themselves?
11   A.   Prenda Law started paying Prenda Law employees directly.  I
12        mean it's a sort of thing where you get a transition of a
13        business.  I don't know if you've ever been involved with
14        one before or not, but it's never as neat and clean as one
15        might like and there's certainly a transition from okay you
16        know we sell the business.  We've been working on a deal for
17        a while but can we get it quickly and just some of those
18        transitions used one or two months I think I don't recall if
19        it went longer than that but after that Prenda Law was just
20        doing the payroll itself it got its account set up and that
21        was it.
22   Q.   Okay.  I'm showing you April 16, 2012, checks Alpha Law Firm
23        looks like you're making estimated tax payments but Alpha
24        Law Firm didn't file any taxes.  Whose estimated taxes are
25        these for?
```

```
 1  A.   I think they idea would be that paying the estimated taxes
 2       on that date because it's right at the deadline rather than
 3       go from Alpha Law Firm to my account and then to my account
 4       to the tax it just went straight from Alpha Law Firm's
 5       account because this is dated April 16, 2012.  So I assume
 6       that day I was scrambling to get these in.
 7  Q.   So yeah on April 16, 2012, you were making $196,865.00 check
 8       to the United States Treasury for estimated taxes in the
 9       memo line it's 33-72-1659.  Do you know what that number
10       refers to?
11  A.   No.
12  Q.   Maybe it's 133-72-689, do you know what that number refers
13       to?
14  A.   No.
15  Q.   That's not a tax ID number that you're aware of or a social
16       security number that you're aware of?
17            MR. HANSMEIER:  I would object on the grounds of
18       asked and answered.  I don't know what it is.
19            THE COURT:  Sustained.
20  Q.   So whose estimated taxes are these for yourself personally?
21  A.   I mean the check speaks for itself.  I don't know the in's
22       and out's or even how to answer that question.
23  Q.   Well it's not for Alpha Law Firm maybe I misheard you before
24       Alpha Law Firm didn't pay any taxes?
25  A.   Alpha Law Firm is a disregarded entity for the purposes of
```

|  |  |  |
|--|--|--|
| 1 |  | Federal and State income taxes but I mean to go directly to |
| 2 |  | your question, I mean the question is if my wife's and my |
| 3 |  | joint taxes, is it my personal taxes?  I just don't know |
| 4 |  | form a tax prospective because I'm not a tax accountant and |
| 5 |  | I'm not a tax lawyer how that system works and so I don't |
| 6 |  | want to say well it's my personal income taxes if in fact it |
| 7 |  | goes to where it's a joint filing.  That's the only |
| 8 |  | ambiguity I have in my mind. |
| 9 | Q. | So on February 5th, 2013, you, Alpha Law Firm accounts a |
| 10 |  | check for $69,057.10 something Justice Institute, do you |
| 11 |  | recall that Class Action Justice Institute? |
| 12 |  | MR. HANSMEIER:  Can I see the check please? So |
| 13 |  | I'm looking at this one right here? |
| 14 |  | MR. SHEU:  That's correct. |
| 15 | A. | So yeah.  So what I'm seeing here is a check for looks like |
| 16 |  | 65,000 in change on February 5th, 2013, that's correct. |
| 17 | Q. | And what was this check for? |
| 18 | A. | I think it was money that was owed to Class Action Justice |
| 19 |  | Institute. |
| 20 | Q. | Owed from Alpha Law Firm? |
| 21 | A. | Uh huh. |
| 22 | Q. | Was there a loan or some sort of written agreement? |
| 23 | A. | No. |
| 24 | Q. | Why would there be any debt? |
| 25 | A. | I think the idea is that there was a fee in a case that |

```
 1        Class Action Justice Institute, LLC performed the lion share
 2        of the work so they got that amount of money from it.
 3   Q.   What case would that be?
 4              MR. HANSMEIER:   Your Honor, I object this is
 5        coming to a very, very confidential settlement and I will
 6        move for Protective Order if I have to answer.
 7              THE COURT:   Sustained.
 8   Q.   What about the $80,000.00 check on March 13, 2013, from
 9        Alpha Law Firm to yourself with the mortgage in the memo
10        line?
11   A.   What about it?
12   Q.   Is that pursuant to some distribution or loan that was
13        $80,000.00?
14   A.   I believe it was simply a distribution from Alpha Law Firm
15        to myself in connection with a mortgage payment if my
16        reading of the memo line is correct and that was a mortgage
17        payment that went under contract two months prior to that
18        and I would just state for the record since that is
19        certainly a distribution that you seemed to be focused on
20        most intently, that this distribution was made six months
21        prior to entry in this case and at a time when Alpha Law
22        Firm was neither a judgment debtor in any proceeding nor
23        subject to an Order to Show Cause in any proceeding.
24   Q.   Which what house is this mortgage for?
25   A.   That's my current residence.
```

```
 1   Q.   At the Carlyle, is that correct?
 2   A.   That's correct.  I would just add to my prior testimony that
 3        we've been looking for the house for about--so if the check
 4        was written on March 13th, I think we closed on the 15th.  We
 5        weren't under contract two months prior so that the January
 6        15th and we had been looking for a house since approximately
 7        well my son was born in July of 2011 so since about then.
 8   Q.   Was the mortgage you're talking about is dated March 13,
 9        2013, isn't that right?
10   A.   Yeah, I think that sounds right two days after the check was
11        written.
12   Q.   Do you know why Alpha Law Firm would have received a
13        $59,400.00 payment on January 29, 2013, from the Simpson
14        Thatcher Bartlett Law Firm in New York?
15   A.   Yes, I do.
16             MR. HANSMEIER:  And Your Honor, this goes to the
17        same highly confidential settlement that I'm obligated to
18        seek a Protective Order otherwise I'd be in very significant
19        violation of terms of settlement other than to say it was
20        received in connection with a settlement of a lawsuit.
21             MR. SHEU:  Your Honor, I guess that Mr. Hansmeier
22        submit that to you for in camera review and if you deem it
23        not subject to my review that's perfectly fine.
24             THE COURT:  Okay.  Yeah, I think that would be
25        appropriate for instance if Alpha Law Firm received payment,
```

1    settlement payment for a law suit typically it would be one,

2    but it could be over a course of years depending on how big

3    it is and so if that was the case there could be money still

4    be coming in that's the only time I would think that would

5    be relevant.

6           MR. HANSMEIER:  I can represent that it was a

7    lump sum payment and there's no future obligations owed to

8    Alpha Law Firm or anyone else through the settlement.  I

9    mean I understand the point it's money coming in but at the

10   same time obviously this kind of gets into very, very shaky

11   grounds in terms of attorney/client privilege and

12   obligations under settlement agreements with some pretty

13   powerful firms so I want to be careful about that.

14          MR. SHEU:  I think Your Honor, I think with the

15   $65,000.00 with Class Justice Institute a year ago and this

16   big firm from Alpha Law Firm in New York, you know if it's--

17   we don't even know that there's an agreement we're taking

18   Mr. Hansmeier's words.  I'd be happy with Your Honor taking

19   a look at it in camera.  I don't need to see it if you deem

20   it confidential, but no settlement is insulated from in

21   camera Court review.

22          MR. HANSMEIER:  Well that's certainly not true,

23   but I would--I mean I would have to go back and look at the

24   agreement.  If it's something I can submit in camera without

25   problems I'll just submit it I'm fine with that if I can't

1   then I'm going to move for Protective Order and--

2              THE COURT:   Okay.   I would just say then that any

3   information with regards to this I guess it's a settlement,

4   I'm not taking word-for-word notes, but it was a settlement

5   that Alpha received a payment.   My notes say $59,400.00 from

6   settlement of a lawsuit.   There was some other information

7   about Alpha received so much for settlement from a lawsuit

8   that and it sounds like your testimony was that it was the

9   same lawsuit where it was one or two that information should

10  come before me in camera review within I'll say 10 business

11  days, within two weeks of today and if not you can do a

12  Protective Order.

13             MR. HANSMEIER:   I would just ask for a little bit

14  of additional time because if it's a typical settlement

15  agreement what you'll have is if there's any disclosure of

16  the information whatsoever then other people want to be

17  notified first so they can come and move for Protective

18  Order too and I would expect quite a few lawyers to be

19  flying to this courtroom to do so.   So you may want to do 28

20  day or so just to give those people an opportunity to weigh

21  in.

22             (WHEREUPON, a recess was duly had.)

23             THE COURT:   All right, you may continue Mr. Sheu.

24             MR. SHEU:   Thank you, Your Honor.

25  Q.   Mr. Hansmeier, you familiar with an entity known as Under

```
 1        the Bridge Consulting?
 2   A.   Yes.
 3   Q.   And what's that entity?
 4              MR. HANSMEIER:  Objection relevance.
 5              THE COURT:  Overruled.
 6              MR. HANSMEIER:  Can you repeat the question, Mr.
 7        Sheu?
 8   Q.   What is the Under the Bridge Consulting, LLC?
 9   A.   It's a limited liability company called Under the Bridge
10        Consulting, LLC.
11   Q.   And do you have, did you have or do you still have an
12        ownership interest in that entity?
13   A.   I don't know what the entity status is so I can't answer the
14        question.
15   Q.   Did you at one point?
16   A.   Yes.
17   Q.   Okay what was your interest?
18   A.   Fifty percent interest.
19   Q.   Who was the other 50 percent?
20              MR. HANSMEIER:  Objection relevance of the
21        ownership structure of a non-judgment debtor entity.
22              MR. SHEU:  I'm aware that's recognized objection
23        but--
24              MR. HANSMEIER:  Objection relevance.
25              THE COURT:  Overruled.
```

1    A.    I believe it's relevant because there's all these companies

2          that keep peaking up that you have 50 percent interest in

3          because it's relevant because we want to see where the money

4          went.  Well Alpha Law Firm's money isn't, I don't know that

5          he didn't have a chance to ask the question

6                   MR. HANSMEIER:  Objection on the grounds that I

7          don't know if you're inviting an objection there or--

8                   THE COURT:  I gave the reason for why I overruled

9          the objection.

10   A.    Oh well I'll testify under the--to my knowledge Alpha Law

11         Firm never wrote a check to Under the Bridge Consulting,

12         LLC.

13                  MR. SHEU:  Okay.  Well, Your Honor, I guess I

14         just have four or five questions about this very specific

15         thing.

16   Q.    On March 30th, 2012, there's a $50,000.00 transfer Under the

17         Bridge Consulting to Alpha Law Firm.  On May 21st, 2012,

18         there's a $20,000.00 transfer from Under the Bridge

19         Consulting to Alpha Law Firm.  On June 20th, 2012, there's a

20         $25,000.00 sorry on June 8th, 2012, there's a $100,000.00

21         transfer from Under the Bridge Consulting to Alpha Law Firm

22         and on September 27th, 2012, there's a $50,000.00 transfer

23         from Under the Bridge Consulting to Alpha Law Firm.  Do you

24         know why these transfers would have taken place between

25         Under the Bridge Consulting and Alpha Law Firm?

```
1   A.   When the transfers were made at the behest of an accountant
2        who had said when it was proper for it to come directly to
3        Alpha Law Firm or when it was proper to on to myself
4        personally.
5   Q.   You'll have to explain that better, an accountant said that?
6   A.   Yes.
7   Q.   What's an account?
8   A.   An accountant?
9   Q.   An accountant I'm sorry?
10  A.   Who's responsible for preparing tax returns and I think you
11       know what an accountant--
12            THE COURT:  He thought you said an account.
13            MR. HANSMEIER:  Oh I'm sorry accountant.
14  Q.   Which accountant was that, do you know which accountant it
15       was?
16  A.   Which accountant what was?
17  Q.   Told you how to make the transfers to Under the Bridge
18       Consulting to Alpha Law Firm?
19  A.   Well an accountant didn't tell me how to make transfers in
20       anything.  The accountant was an accountant in South Beach.
21       His name is Berry Wasserstein.
22  Q.   Berry Wasserstein?
23  A.   Berry Wasserstein.
24  Q.   Why is this person telling you what to do with a company
25       that you're half owner of?
```

1   A.   I will restate my prior answer to your question which is

2        what he--I don't know why you continue to say he was telling

3        me to do anything.

4   Q.   I guess the basic question is why is there hundreds of

5        thousands of dollars coming from Under the Bridge

6        Consulting, LLC, to Alpha Law Firm?

7   A.   Because the person who's responsible for taxes and who knows

8        this information is he said this was the proper way to do

9        it.

10  Q.   Proper way to do what?

11  A.   To distribute the money the way that you're pointing out.

12       You said why are these why are these distributions being

13       made to Alpha Law Firm and we said my answer is that we did

14       not on the basis of the accountant was suggesting or

15       advising us to do it.

16  Q.   But I'm misunderstanding it.  Alpha Law Firm earned this

17       money from Under the Bridge Consulting, why is your law firm

18       getting money from some LLC?

19  A.   I guess I can't tell you anything more than the fact that we

20       relying on advice of accountant that's why you hire

21       advisors.  You say who's the proper recipient of a

22       particular distribution and the accountant says in this case

23       you should do it this way in this case you should do it the

24       other way.

25  Q.   Did you have any ownership interest in Livewire Holdings,

```
 1        LLC?
 2   A.   No.
 3   Q.   Do you know who did?
 4   A.   No.
 5   Q.   Who did you ever speak to at Livewire Holdings, LLC?
 6   A.   Mark Lutz and Greg Gibbs.  I suppose Mr. Dugas the extent to
 7        which he was employed by Livewire.
 8   Q.   And who is Mark Lutz?
 9   A.   Mark Lutz is--
10             MR. HANSMEIER:  I'm going to object on the
11        grounds of relevance.  I believe the same objection was
12        sustained earlier.
13             THE COURT:  Sustained.
14   Q.   Well, we talked earlier about Media Copyright Group, LLC.
15        There's a December 20, 2010 transfer of $39,000.00 from that
16        entity to Alpha Law Firm, do you know why that would occur?
17   A.   From 2010?
18   Q.   Yeah.
19   A.   No.
20   Q.   Did Alpha Law Firm own any interest in Media Copyright
21        Group, LLC?
22   A.   No.
23   Q.   Did you?
24   A.   Yes.
25   Q.   What was your ownership interest?
```

```
 1   A.   Fifty percent ownership.

 2   Q.   Was Mr. Steele the other 50 percent owner?

 3   A.   Yes.

 4   Q.   Was Media Copyright Group a client of any of your law firms?

 5   A.   I can't specifically recall what the contractual

 6        arrangements were.  You're talking about something that's

 7        almost half a decade ago.

 8   Q.   Does say Alpha Law Firm have any computer records?

 9   A.   Sure.

10   Q.   What kind of computer records?

11   A.   It has its articles of organization.  It has its bank

12        account statements.

13   Q.   Does it have a record book like a meeting record?

14   A.   Well in a traditional multi-media liability company you have

15        minutes of board and everything and those sorts of minutes,

16        but with respect to Alpha Law Firm it's a single-member

17        limited liability company it has it's article of

18        organization.  It has its separate bank accounts.

19   Q.   Any other computer records?

20   A.   As I set here right now I can't think of anything that would

21        fall into the traditional gambit of a computer record as you

22        would expect to see if a Fortune 500 company.  I guess it

23        has I think that's all I can think of.

24   Q    Was there any connection between Alpha Law Firm and Class

25        Action Justice Institute?
```

1   A.   Could you tell me what you mean by connection?

2   Q.   Any--are you the sole-member of Class Action Justice

3        Institute?

4   A.   Uh huh.

5   Q.   Is that a yes?

6   A.   Yes, that's a yes.

7   Q.   was Allan Mooney we talked about earlier, was he a client of

8        yours?

9            MR. HANSMEIER:  Objection, Your Honor, now we're

10       getting into client--

11           THE COURT:  Sustained.

12  Q.   Okay.  Well I see a $990.00 check on August 22nd of last

13       year to Allan Mooney for business development consulting so

14       it doesn't look like he's a client.  Do you know why you

15       would have been writing a check to him for $990.00?

16  A.   Well I trust what I put on the memo line.  It sounds like

17       he's performing business development services for me.

18  Q.   So obviously you were in contact with him as recently as

19       last August, have you had any contact with him since?

20           MR. HANSMEIER:  Objection I don't know why the

21       last time I spoke to Allan Mooney is relevant.

22           THE COURT:  Sustained.

23           MR. SHEU:  Well Your Honor, I think the testimony

24       that Mr. Mooney's a Guava representative and I sure like to

25       get a hold of a Guava representative.

```
 1              THE COURT:  Okay.  I'll reverse that and overrule
 2      the objection.  I did see that he was an officer of Guava.
 3              MR. HANSMEIER:  Who testified that he's an
 4      officer of Guava?
 5              THE COURT:  You did.
 6              MR. SHEU:  Mr. Dugas mentioned his name the other
 7      couple of weeks ago.
 8              MR. HANSMEIER:  Oh, I mean he may be an officer
 9      of Guava.  I think my testimony was I don't know what his
10      position at Guava was.  I'm sorry Mr. Sheu, can you repeat
11      the question?
12  Q.  Other than last August when you wrote a check to him for
13      $990.00 for business consulting or business development have
14      you had any contact with Mr. Mooney?
15  A.  Sure.  I guess I haven't spoken to Mr. Mooney in several
16      months now.  I want to say almost I would just be
17      estimating, but certainly several months.
18  Q.  And how did you meet Mr. Mooney?
19              MR. HANSMEIER:  I'm just going to object again on
20      the basis that we're getting into matters that are far--
21              THE COURT:  Did you say how did you meet him?
22              MR. SHEU:  Yes.
23              THE COURT:  I'll sustain the objection.  Counsel,
24      if you have more than one more question I think we'll have
25      to continue until tomorrow.
```

```
 1              MR. SHEU:  Okay.  Does tomorrow morning work for
 2     Your Honor?
 3              MR. HANSMEIER:  It does not work for me tomorrow
 4     I have a client meeting tomorrow morning.  I could do it I
 5     think Thursday's very wide open for m.
 6              THE COURT:  How about the second Wednesday I have
 7     nothing scheduled.
 8              MR. SHEU:  That works for me, Your Honor.
 9              THE COURT:  Can you check your--do you have an
10     electronic calendar on you?
11              MR. HANSMEIER:  I didn't bring my phone with me.
12     If we can do it I don't know how early we can start I'm
13     concerned about later in the day on Wednesday.
14              THE COURT:  I'm assuming this isn't going late.
15              MR. HANSMEIER:  Well I want to start first thing
16     in the morning so we're not coming back.
17              THE COURT:  I have nothing else scheduled so we
18     can start at 9:00 or 8:45.
19              MR. HANSMEIER:  Yeah, if we can do 8:45 I'm sure
20     I can make that.
21              MR. SHEU:  On Wednesday?
22              MR. DUGAS:  Your Honor, would I be required to
23     attend that?
24              THE COURT:  I don't believe that there should be
25     any more questions for you so you would be excused, Mr.
```

 1      Dugas.

 2                  MR. DUGAS:  Thank you.

 3                  THE COURT:  Of course you're free to come if you

 4      want because it's a public hearing.

 5                  MR. DUGAS:  It's good point, yes.

 6                  THE COURT:  But I don't believe you'd be required

 7      to attend.  So 8:45 on Wednesday July 2.

 8                  MR. HANSMEIER:  Can I get an Order from the Court

 9      this will be the last hearing, I expect it will be?

10                  THE COURT:  Yeah.

11                  MR. HANSMEIER:  But you never know.

12                  MR. SHEU:  Well Your Honor, I mean the statute

13      reads that I can go get a writ, have it served, come back

14      unsatisfied and we can come back to you.  This process can

15      go on the next ten years and hereafter so it's never the end

16      until the judgment is satisfied.

17                  THE COURT:  Well, but for these purposes of

18      gathering the information that you need, I'm going to give

19      you until noon and hope that you won't need that much time.

20                  MR. SHEU:  Okay, thank you.

21                  THE COURT:  And that will be it.  Thank you.

22                  MR. HANSMEIER:  Thank you, Your Honor.

23                  (WHEREUPON, the proceedings concluded.)

24

25

```
1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16   STATE OF MINNESOTA)

17                   )

18   COUNTY OF HENNEPIN)

19

20           I, Lynn R. Burkett, do hereby certify that the above

21   and foregoing transcript is a true and correct transcript of my

22   stenograph notes and is a full, true and complete transcript of

23   the proceedings to the best of my ability.

24

25   Dated:   September 7, 2014        _____
```

Lynn R. Burkett
Official Court Reporter