# EXHIBIT E

```
 1  STATE OF MINNESOTA                          DISTRICT COURT

 2  COUNTY OF HENNEPIN               FOURTH JUDICIAL DISTRICT

 3                                     DIVISION I, MINNEAPOLIS

 4  ---------------------------------------------------------------

 5  Guava LLC,

 6              Plaintiff(s),        FILE NO:  27-CV-12-20976

 7       vs.

 8  Spencer Merkel et al.,

 9              Defendant(s).

10  ---------------------------------------------------------------

11      The  above-entitled  proceeding  came  duly  on  for  hearing

12  before the Honorable Tanya M. Bransford, one of the Judges of the

13  above-named  Court  on  July,  2,  2014,  at  Hennepin  County

14  Government  Center,  City  of  Minneapolis,  County  of  Hennepin,

15  State of Minnesota.

16                          APPEARANCES:

17          EDWARD  SHEU,  Attorney  at  Law,  appeared  for  and  on

18  behalf of the Judgment Creditor.

19          PAUL HANSMEIER,  Attorney at Law, appeared for and on

20  behalf of Alpha Law Firm, LLC.

21          Lynn R. Burkett, Official Court Reporter

22              Kimberlee Shelton, Law Clerk

23

24

25
```

```
 1          (WHEREUPON, the following proceedings were duly

 2      had.)

 3          THE COURT:  Counsel, I want to apologize for my

 4      delay I had some elder care issues this morning.  We are

 5      back on the record in the matter of Guava vs. Merkel, but

 6      we're at the stage of the continuation of the examination of

 7      judgment debtors.  Mr. Hansmeier, do you want to take the

 8      witness stand again?

 9          MR. HANSMEIER:  Yes, Your Honor.  One quick

10      housekeeping matter, I believe that the Court was going to

11      read or state the basis for its ruling yesterday declining

12      our, Alpha Law Firm's request to call Best & Flanagan or a

13      Best & Flanagan representative as a witness.

14          THE COURT:  Okay.  Yes, I did issue an Order that

15      was in writing that affirmed my oral Order which was

16      continuing the further examination of debtor until today's

17      date, July 2, but also requiring Alpha Law Firm to provide

18      for the Court for an in camera review settlement agreements

19      authorizing, permitting or requiring the issuance of some

20      transfers to and from Alpha Law Firm that were set the

21      specifics were set forth in the Order.  Then Mr. Hansmeier

22      sent an e-mail also indicating that he wanted to subpoena

23      Best & Flanagan to appear at today's hearing to gather

24      information about the amount of the outstanding judgment and

25      that that was tied into the right to question under Minn.
```

1      Stat. § 575.04 which reads in part, "Upon appearing or being

2      brought before the Judge or a Referee, the judgment debtor

3      or officer required to answer for any corporation may be

4      examined under oath and witnesses may be required to appear

5      and testify on behalf of either party and the debtor may be

6      represented by counsel."  I believe Mr. Hansmeier was

7      claiming that when it says either party that therefore he

8      has the right to inquire also but this Court's

9      interpretation of witnesses may be required to appear and

10      testify on behalf of either party would mean that the

11      subject matter in which they would be testifying about would

12      be that of the judgment.  Otherwise it doesn't, § 157 excuse

13      me, 575.04 otherwise wouldn't make sense that if a party

14      sued another party, obtained a judgment against that party,

15      and therefore the party is entitled to ask the judgment

16      debtor questions about their ability to collect on the

17      judgment.  It doesn't make sense for the judgment debtor to

18      be able to ask the judgment creditor questions about their

19      ability to pay because that's not the point.  It really

20      doesn't matter if the judgment creditor is a multi-

21      billionaire if the money's owed it's still owed.  So the

22      financial position of the judgment creditor is not the

23      purpose of the statute and furthermore, I believe in light

24      of the entire communication and other motions that what Mr.

25      Hansmeier really wants is to find out the actual amount of

1      costs that Best & Flanagan has incurred on the appeal, which

2      is an Order that I've already done and is on appeal.  So I

3      think that would be more properly brought before the

4      Appellate Court, which I think it already is there.  So

5      that's my reason that I placed on the record.

6            MR. HANSMEIER:  Thank you, Your Honor.  May I

7      just state I acknowledge your Order, the Court's Order I

8      would just like to state Alpha Law Firm's position on the

9      record.

10           THE COURT:  Okay.

11           MR. HANSMEIER:  Just so it's there.  Very briefly

12     Your Honor, it's Alpha Law Firm's position that the amount

13     of outstanding judgment and the amount of the costs on

14     appeal are relevant in a debtor examination.  It was not

15     Alpha Law Firm's motive to seek Best & Flanagan's financial

16     position but to ascertain what the outstanding amount of the

17     judgment is.  Also, it's Alpha Law Firm's position that any

18     judgment debtor, since one of the purposes of the judgment

19     exam is to ascertain whether assets are in possession of a

20     third-party that actually belong to the judgment debtor,

21     that both sides should be allowed the chance in adversarial

22     proceedings to examine each other about what their evidence

23     is and test the sufficiency of their evidence to determine

24     on what basis they're making a claim that assets that are a

25     possession of the third-party are actually assets of the

1    judgment debtor.  Thank you, Your Honor.

2         MR. SHEU:  Your Honor, may I briefly say a couple

3    of words?

4         THE COURT:  You may.

5         MR. SHEU:  Thank you, Your Honor.  A couple of

6    points you read the statute.  I think you read it correctly

7    before § 575 anticipates the debtor calling other witnesses

8    to vouch for their own poverty not to attack the validity of

9    the judgment or the amount of the judgment or anything like

10   that.  As a practical matter, Your Honor, Best & Flanagan

11   shortly will be filing an affidavit with the Court

12   Administrator attesting to the amount of the judgment that's

13   been collected I believe it's about $1,900.00 as well as to

14   reduce the amount of debt and partially satisfy that amount

15   and then an affidavit attesting to the cost of alleged

16   attorney's fees and garnishment fees and things like that.

17   So that will be on the record on the court docket shortly.

18        MR. HANSMEIER:  Could the Court also order Best &

19   Flanagan to submit in that same affidavit its costs on

20   appeal because I believe that is part of what they claimed

21   the judgment is?

22        MR. SHEU:  No, that's not what we claim that the

23   judgment is.  The bill of costs will be submitted to the

24   Court of Appeals if we prevail but the costs affidavit here

25   in the District Court will be cost of collection, interest

1    on the judgment less payments received.

2         THE COURT:  Okay.  So you're acknowledging that

3    or you will be filing a document to specify the exact amount

4    but your acknowledging that you've already received some

5    payment on the judgment and therefore would be filing

6    showing that it's a partial satisfaction?

7         MR. SHEU:  Absolutely, Your Honor.  The Court

8    Administrator now thinks we have a full judgment and it's

9    not true we received a few months ago $1,900.00 from Wells

10   Faro $300.00 from the Hennepin County Sheriff and I'm going

11   to specify the amounts and dates so that the Court

12   Administrator can recalculate the amount of the judgment.

13   Otherwise it's askew right now.

14        THE COURT:  Okay.  So Mr. Hansmeier, your request

15   that Best & Flanagan be required to come in and bring in the

16   amount of costs incurred on the appeal is denied.  Again, I

17   feel that the appeal is different from what they're

18   requesting then they're just collecting on the judgment

19   right now and I understand your position that you're saying

20   it's part of the underlying basis for the Order.  If you

21   recall in the Order I reduced, could be argued

22   substantially, the amount that Best & Flanagan was claiming

23   for the--that they would potentially be using for the

24   appellate costs.  I reduced that amount from the amount that

25   they have been claiming, but at this point even if, if

1      they've only collected $1,900.00 approximately, there can

2      be, I'm quite sure that they've expended more than that in

3      their appellate costs and we'll leave the rest of the

4      appellate issues to the Appellate.  Okay thank you, Mr.

5      Hansmeier, please come forward raise your right hand so you

6      can be sworn in.

7                           **PAUL ROBERT HANSMEIER**,

8             after having been first duly sworn, was

9               examined and testified as follows:

10                       **EXAMINATION**

11  **BY MR. SHEU**:

12  Q.   Mr. Hansmeier, I just have one point of clarification about

13      the $65,000.00 payment from Alpha Law Firm to Class Action

14      Justice Institute and $59,000.00 payment from the Simpson

15      Thatcher Law Firm to the Alpha Law Firm that's the subject

16      of the Court's Order from yesterday.  I believe your

17      testimony was that these monies were settlement monies?

18  A.   I can't testify about that without first seeking a

19      Protective Order.

20  Q.   Okay well that's what I'm getting to.  So you're going to be

21      seeking a Protective Order before July 21st as to those

22      issues?

23  A.   I'm--well I have to get clarification from counsel as to how

24      they'd like me to proceed so as to protect their rights

25      under the document, but also then to further this Court's

```
 1        consideration of the issues as well and I haven't reached
 2        out to counsel yet.
 3   Q.   Okay.  Well, I guess my question is actually there are
 4        documents settlement documents of some sort that would
 5        authorize you to take a Protective Order and seek a
 6        Protective Order?
 7   A.   I don't understand.  There are documents certainly there are
 8        documents that were negotiated between myself and opposing
 9        counsel.  I don't know what you mean by a document
10        authorizing me to seek a Protective Order.
11   Q.   I should be more clear there is a settlement agreement that
12        you're worried about violating?
13   A.   I can't testify as to the nature, whether it's a settlement
14        agreement or a document or what have you.  I will testify
15        that generally speaking in the context of litigation if
16        there is a settlement, a common term is a confidentiality
17        clause that requires before the terms of settlement are
18        disclosed particularly in a court proceeding or in a public
19        record that would require disclosure of that circumstance to
20        the opposing party and then an opportunity for the counter
21        party to the settlement agreement to appear before the Court
22        and seek a Protective Order or waive it provisionally to
23        simplify matters.
24   Q.   Okay and is your testimony there is some document or you
25        don't know if there's a document?
```

```
1   A.   I'm not trying to be circumspect here I'm trying to honor my
2        obligations.
3   Q.   And I'm not asking you to violate what you're going to--
4   A.   The point Mr. Sheu, I think, is that I fully intend to
5        comply with the Court's Order and I think the Court's Order
6        contains pretty specific instructions if that satisfies your
7        questions.
8   Q.   Sure.  Well it's the Court's Orders either produce the
9        documents in camera or seek a Protective Order and I just
10       want to clarify that there actually are documents that will
11       either be produced in camera or that you're going to seek a
12       Protective Order not to have to disclose?
13  A.   That's correct.
14  Q.   Okay, thank you.  Is the Media Copyright Group, LLC, still
15       in business?
16  A.   I don't believe so.
17  Q.   Is the Under the Bridge Consulting, LLC still in business?
18  A.   I don't know.
19  Q.   What about Livewire Holdings, LLC?
20  A.   I don't know.
21  Q.   All of Alpha's clients during its existence include Guava,
22       LLC obviously; did they also include AF Holdings, LLC?
23  A.   I would clarify the premise of your question I don't believe
24       that Alpha Law Firm represented Guava.  Again Mr. Dugas'
25       testimony was that Alpha Law Firm's roll in this case was to
```

1       basically provide a courtesy local mailing address to either

2       Mr. Merkel whose counsel I know works downtown or to be the

3       non-party John Does.

4   Q.  So is it your testimony that AF Holdings was not or excuse

5       me Guava, LLC was not a client of Alpha Law Firm, LLC?

6   A.  I'm trying to recall whether Alpha Law Firm formerly

7       represented Guava in any proceedings.  I can't think of any

8       but in this case again Alpha Law Firm's primary roll was

9       simply to serve as the mailing address and other than the

10      mailing address and Mr. Dugas' signature block on the papers

11      he filed with this Court, his e-mail address and his phone

12      number and I'm not sure if there's a fax number on there,

13      those were all associated with his contact information for

14      the Prenda Law Firm.

15  Q.  So who were--did--let me back up then.  Did Alpha Law Firm

16      represent AF Holdings, LLC?

17             MR. HANSMEIER:  I'm going to object on the ground

18      of relevance, Your Honor.

19             MR. SHEU:  Well, Your Honor--

20             THE COURT:  Overruled.

21  Q.  You can go ahead.

22  A.  I believe that Alpha Law Firm represented AF Holdings in I

23      want to estimate five to ten cases in Minnesota in Federal

24      Court.

25  Q.  Any other states or jurisdictions?

1    A.    To the best of my recollection it would have been

2          exclusively in Minnesota.

3    Q.    Does AF Holdings still owe Alpha Law Firm any money or fees

4          or anything like that?

5    A.    It does not.

6    Q.    Do you know how much Alpha Law Firm received from AF

7          Holdings?

8    A.    I don't believe that Alpha Law Firm received money from AF

9          Holdings.

10   Q.    How about Quad International?

11   A.    Alpha Law Firm did not receive money from Quad

12         International.

13   Q.    How about Light Speed?

14   A.    Alpha Law Firm did not receive money from Light Speed.

15   Q.    How about Ingenuity 13, LLC?

16   A.    Alpha Law Firm did not receive money from Ingenuity 13, LLC.

17   Q.    Now Alpha Law Firm did receive money from Media Copyright

18         Group, LLC?

19   A.    If it did it would have been a long time ago and if there is

20         a check from Media Copyright Group, LLC to Alpha Law Firm,

21         I'll take your word for it.

22   Q.    Do you know what it would have been for?

23   A.    I don't recall.  I believe the transfer would have occurred

24         almost four years ago now maybe more recently but not by

25         much.

```
 1   Q.   Did Alpha Law Firm ever receive any money or payments from
 2        6881 Forensics, LLC?
 3   A.   I don't believe so.
 4   Q.   And you know what 6881 Forensics, LLC is?
 5   A.   I do.
 6   Q.   What is that entity?
 7   A.   It's a limited liability company called 6881 Forensics.
 8   Q.   Do you know anything about that company?
 9   A.   Yes.
10   Q.   What do you know about it?
11   A.   My knowledge about 6881 Forensics is that it performed
12        bitttorrent, B-i-t-t-o-r-r-e-n-t, related copyright
13        infringement monitoring service.
14   Q.   Did you ever own any interest in that entity?
15   A.   No.
16   Q.   Do you know who did?
17             MR. HANSMEIER:  I'm going to object on the
18        grounds of relevance.
19             MR. SHEU:  I'll move on, Your Honor.
20             THE COURT:  Sustained.
21   Q.   Did Alpha Law Firm ever receive any money from the Fifth
22        Third Bank?
23   A.   I don't recall.
24   Q.   Did Alpha Law Firm ever bank at the Fifth Third Bank?
25   A.   Alpha Law Firm's sole bank account was with TCF.
```

```
 1   Q.   Do you recall providing a financial disclosure form on Alpha
 2        Law Firm's behalf in connection with this action?
 3   A.   Yes.
 4   Q.   At the end right before your signature and the date of
 5        November 26, 2013, you say in answer to you answered yes to
 6        Question 25, which is do you own any of the following
 7        property?  You chose to fill out the blank and in the blank
 8        you wrote $146.05 held in trust and available for turnover,
 9        do you remember writing that?
10   A.   I do.
11   Q.   What was was there a trust account where this money was?
12   A.   No, that may have been confusing.  There was no trust
13        account it was simply that that's the cash that Alpha Law
14        Firm had left over and so I was disclosing that to you so if
15        you wanted to go seize that cash you could have just gone
16        and done it.
17   Q.   So that $146.05 was in the TCF bank account?
18   A.   Yeah, it was in the account, yeah.  I think that was the
19        balance of the account on that day.
20   Q.   Well earlier in the disclosure Line 20 which was asking you
21        do you have a checking or savings account you wrote N/A, do
22        you remember writing that?
23   A.   Yes.
24   Q.   So was that an incorrect answer?
25   A.   Well that's why I disclosed the cash at the end.  At the
```

```
 1        time that I filled out the disclosure the interpretation
 2        problem was on one hand Alpha Law Firm's terminated so it
 3        does not have a checking account it's essentially an
 4        account, if I understand Minnesota law, that reverts to the
 5        members, but on the other hand, it has cash available for
 6        turnover and so that's why I just said there's this money
 7        sitting there ready for you to take and if you had sent me
 8        an e-mail to ask where it was I would say it's in this
 9        account right here and go take it if you want.
10   Q.   Okay.  So when you saw the line do you have a checking or
11        savings account you thought you didn't have to answer that
12        question?
13   A.   Well I did answer the question.
14   Q.   N/A what does N/A stand for?
15   A.   Not applicable because the company no longer exists.  It's
16        not a matter of law capable of having a checking account.
17   Q.   But it did as a factual matter have a checking account?
18   A.   No, that's incorrect.
19   Q.   Alpha Law Firm's checking account was not still open on
20        November 26, 2013?
21   A.   I guess what we're getting into right now is semantics over
22        the proper interpretation of Minnesota law.  It's my
23        interpretation of that form that I filled it out accurately.
24        I disclosed the balance of the amount to you so that you
25        could just simply go take the money and if you think that a
```

1    terminated limited liability company is in fact capable of

2    having a checking account I don't think you'd find any

3    support for that proposition in the law.

4 Q.  Mr. Hansmeier, have you ever heard of the Antipiracy Law

5    Group, LLC?

6 A.  I, I have heard of a organization called Antipiracy Law

7    Group or something to that effect.  I don't know if it's a

8    limited liability company or a corporation.

9 Q.  Okay.  Do you know who is involved with that entity?

10         MR. HANSMEIER:  I'm going to object on the

11   grounds of relevance, Your Honor.

12         MR. SHEU:  Well Your Honor, this is one of the

13   entities that you're ordered from your Sanctions Order

14   covers?

15         MR. HANSMEIER:  That's--

16         THE COURT:  Yeah, I was going to say I remember

17   the name of that LLC.  I'm going to overrule the objection.

18   I think my--it becomes relevant if in fact because a lot of

19   these LLC's if Mr. Hansmeier or one of his partners was

20   involved in a LLC.

21         MR. HANSMEIER:  Again Your Honor, Alpha Law Firm

22   is the judgment debtor not myself.

23         THE COURT:  But since Alpha Law Firm was, you

24   were the sole owner of Alpha Law Firm it appears and when it

25   was dissolved it appears that all these other LLC's that you

1  either sold or 50 percent owner seems to be relevant.  So

2  I'm going to allow the question to be answered.

3  MR. HANSMEIER:  Could you please repeat the

4  question, Mr. Sheu?

5  Q.  Do you know who was involved with Antipiracy Law Group?

6  A.  I believe it was Paul Duffy.

7  Q.  Anybody else?

8  A.  Not to my knowledge.

9  Q.  Did you ever have any interest in that entity?

10  A.  I did not.

11  Q.  Did Alpha Law Firm ever receive any money or give any money

12  to Antipiracy Law Group?

13  A.  I don't recall.

14  Q.  So it could have but you don't recall?

15  A.  I think Alpha Law Firm's bank statements speak for

16  themselves.  I don't specifically recall receiving money

17  from or providing money to the Antipiracy Law Group.

18  MR. HANSMEIER:  Your Honor, while Mr. Sheu's

19  formulating his next question, I just want to reserve time

20  for a statement at the close of my testimony.

21  THE COURT:  Okay.  I'm assuming that we'll have

22  sufficient time for that.

23  MR. HANSMEIER:  I hope.

24  MR. SHEU:  I'll move it along, Your Honor.

25  Q.  Mr. Hansmeier, the last time we talked about Monyet LLC, M-

```
1        o-n-y-e-t, LLC, do you remember that?
2   A.   Yes, and that's actually the point of clarification I was
3        hoping to make so I'm going to make my clarification if it's
4        okay with you Mr. Sheu and that might help focus your
5        questions.
6   Q.   Sure.
7   A.   At the last hearing on well two days ago on Monday, my
8        testimony was that Monyet, M-o-n-y-e-t, LLC, was a trust.
9        After discussing my testimony with my wife she gave me a
10       look that suggest I should go back to trust and estates and
11       she correctly noted and I found this out myself too, that
12       Monyet, LLC is not actually a trust it's a limited liability
13       company.  A trust is a set of documents and Monyet is a
14       limited liability company so to the extent that I was
15       describing Monyet, LLC as a trust that was inaccurate it's
16       purely a limited liability company.
17  Q.   And it's a limited liability company organized in the State
18       of Delaware, is that correct?
19  A.   I don't know where it's organized.  I don't know if that's
20       correct or incorrect.
21  Q.   Well who set up Monyet, LLC?
22  A.   An attorney.
23  Q.   On whose behalf?
24  A.   It--I'm not aware of the circumstances of on whose behalf it
25       was.
```

```
 1   Q.   Was it at your direction?
 2   A.   I'm trying to be precise here because I've botched this once
 3        before.  The way I would describe it to be most precise and
 4        hopefully most accurate, is that it was set up as part of
 5        the trust and estates planning and that's how I describe it.
 6   Q.   Trust and estates planning for whom?
 7   A.   I guess I would describe it as my family.
 8   Q.   And who makes up your family?
 9             MR. HANSMEIER:  Your Honor, I'd like to object
10        here on the grounds of relevance.  Since I'm not a judgment
11        debtor I think Mr. Sheu's questions about my family are a
12        bit off putting.
13             MR. SHEU:  Well Your Honor, there's $515,000.00
14        transferred to Monyet, LLC and Mr. Hansmeier says he hardly
15        knows anything about this entity where it's located and
16        where it was organized.
17             THE COURT:  I'm going to overrule the objection.
18   A.   Okay.  Well my family consists of me, my wife and my baby
19        son.
20   Q.   So this Monyet, LLC was set up for your family, the three
21        you just mentioned?
22   A.   As I've testified.
23   Q.   Do you know where this money is located?
24   A.   I do not.
25   Q.   Well how would you ever as beneficiary of this money ever
```

| | | |
|---|---|---|
| 1 | | get any of it? |
| 2 | A. | I don't think I could get any of it. |
| 3 | Q. | And how is it set up for your benefit or your family's |
| 4 | | benefit? |
| 5 | A. | Mr. Sheu, I don't know the specifics of the trust documents. |
| 6 | | I don't know the specifics of how the trust and estates |
| 7 | | works that's why we hired an advisor and if you're going to |
| 8 | | ask me to go through the specifics of a trust document, we |
| 9 | | may be here until noon because I just don't have that |
| 10 | | knowledge.  I don't have any specialty or expertise in that |
| 11 | | area just as I do not have any specialty or expertise in tax |
| 12 | | or accounting or several other areas. |
| 13 | Q. | Do you know who would be most knowledgeable about Monyet, |
| 14 | | LLC and its organizational structure? |
| 15 | A. | I would have to say my accountant. |
| 16 | Q. | Who would that be? |
| 17 | A. | Berry Wasserman or Wasserstein. |
| 18 | Q. | Is that the gentleman you mentioned just two days ago? |
| 19 | A. | Yes. |
| 20 | Q. | In Florida? |
| 21 | A. | Yes. |
| 22 | Q. | And he would be the person who would have documents about |
| 23 | | Monyet, LLC's organization? |
| 24 | A. | I do not know what he has or does not have in his |
| 25 | | possession.  I will say that you know equivocally Alpha Law |

```
 1        Firm the entity that is a judgment debtor has zero interest
 2        in this company and the transfers you're referencing I
 3        believe took place years ago perhaps even years before the
 4        suit given rise to the Sanctions Order was filed to the best
 5        of my recollection.  You may be able to correct me on a
 6        transfer or two.
 7   Q.   Okay.
 8   A.   Or perhaps even more.
 9   Q.   Okay.  Other than the checks that we talked about from Alpha
10        Law Firm to yourself or to Class Action Justice Institute,
11        are there any other documents regarding those payments in
12        terms of what they were for?
13   A.   That's an extremely vague question.
14   Q.   Well, I see a c heck for instance for $80,000 from Alpha Law
15        Firm to yourself and a notation that says mortgage, is there
16        any other document other than that check associated with
17        that transfer of money or distribution?
18   A.   Maybe I'm not fully understanding what you're getting at.  I
19        mean, for example, there's certainly a mortgage associated
20        with the mortgage.
21   Q.   Sure and I'll be more clear.  So from Alpha Law Firm's point
22        of view did you just write yourself an $80,000.00 check or
23        is there some loan note?
24   A.   No, a distribution from a limited liability company to its
25        owner is not a loan or a note it's a distribution.
```

```
1    Q.    And who decides the distributions?
2    A.    The Board of Directors of Alpha Law Firm which consists of
3          myself.
4    Q.    Did it hold board meetings?
5    A.    No, I did not hold a board meeting with myself.
6    Q.    Did you prepare any tort minutes, meeting minutes?
7    A.    No, again Alpha Law Firm is organized as a limited liability
8          company, single member.  It was not required to hold member
9          meetings under the Minnesota Limited Liability Company Act.
10   Q.    Any written actions?
11   A.    Again, same answer.
12   Q.    Is Class Acton Justice Institute run the same way, you're
13         the sole member?
14   A.    Yes, I am the sole member of Class Action Justice Institute.
15   Q.    Now I sent some discovery post-judgment discovery requests
16         in this case including to Alpha, Mr. Dugas and Guava.  I
17         didn't get any response from Guava do you know how I would
18         be able to get any responses from Guava?
19   A.    I would suggest you send them to--
20   Q.    Nevis?
21   A.    The Nevis location beyond that, no.
22   Q.    What about Mr. Duffy would he be able to answer any Guava
23         questions?
24   A.    You'd have to ask Mr. Duffy if he's able to answer questions
25         about Guava I wouldn't' want to speak for him.
```

1    Q.   In my post-judgment discovery requests to Alpha I asked

2         about documents showing, I had asked for a document showing

3         the payment of any money by Alpha to any person or entity

4         since July 1, 2012, do you have such documents?

5    A.   The documents I believe are the payments that Alpha made are

6         reflected in its bank statements which I believe was my

7         answer to the document request.

8    Q.   I also asked document showing the receipt of any money by

9         Alpha since July 1, 2012, is that your answer as well?

10   A.   Yes, I believe my answer was to reference you to the bank

11        statements which are probably should fully capture the money

12        Alpha received from I believe your time frame was July 1,

13        2012, to the present.

14   Q.   How about Request No. 37, which asks documents showing

15        Alpha's bookkeeping, financial accounts, corporate records

16        and accounts payable and accounts receivables since Alpha's

17        inception?  Your answer was, after a bunch of objections, to

18        the extent that Alpha has any responsive documents in its

19        possession, custody or control, it will make such documents

20        available for inspection and copying.

21   A.   Sure I think that the bank statements are the responsive

22        documents to that request.

23   Q.   And nothing else?

24   A.   That's correct.

25   Q.   All right.  Request No. 36 asks documents showing Alpha's

```
 1        corporate organizational documents including without
 2        limitation, written actions, records books, corporate books,
 3        minutes of meetings and any documents associated with
 4        Alpha's dissolution as a corporate entity and your response
 5        was the same as the one we just discussed.  Do you have any
 6        such documents?
 7   A.   I don't believe my response was what we just discussed.  If
 8        I recall, my response incorporated by reference the articles
 9        of organization filed on the Minnesota Secretary of State's
10        website and I believe my response was that our
11        organizational documents are just as easily available to you
12        as they are to me since the originals of all that and the
13        annual renewal statements and the other documents required
14        to keep a limited liability company active in any good
15        standing in Minnesota are all available at the Secretary of
16        State's website and I don't keep, for example, a file copy
17        of the annual renewal that you have to file every year just
18        to make sure the Secretary of State knows that the limited
19        liability company is still active in the State of Minnesota.
20   Q.   Well wasn't your answer your written answer was subject to
21        certain objections Alpha will make responsive documents
22        available but your answer now is--
23   A.   I can tell you what my objections was is that they're
24        equally available to you.  I mean I think the objections are
25        in fact important to read rather than just gloss over as if
```

1    they're--

2  Q.   Okay, I'll read it.  Alpha objects to the extent the request

3       of this information about persons that are not an actual

4       judgment debtor on the grounds that it is harassing,

5       irrelevant and not reasonably calculated to lead to a

6       discovery of admissibility of evidence.  Alpha also objects

7       on the grounds that the request referenced terms that are

8       not defined in the definition section of the discovery

9       requests.  Subject to that objection, to the extent that

10      Alpha has any responsive documents in its possession,

11      custody or control, it will make such documents available

12      for inspection, copying.

13           MR. HANSMEIER:  I'll trust you read that

14      accurately.  I would just ask you what's the question again?

15  Q.   The question is Alpha's corporate organizational documents,

16      written actions, record books, corporate books, minutes of

17      meetings, et cetera?

18  A.   Sure.  I mean the responsive documents to that request I

19      thought I had objected on the grounds of that you could just

20      go get it from the Secretary of State's website yourself

21      and--

22  Q.   I'm just trying to get your answer, is that your answer?

23  A.   Yeah, the documents that are on file with the Minnesota

24      Secretary of State constitute the organizational documents

25      associated with Alpha Law Firm plus the annual renewal

|     |     |                                                                        |
| --- | --- | ---------------------------------------------------------------------- |
| 1   |     | statements.  Alpha Law Firm has done everything it's                   |
| 2   |     | required to do well, to remain, at the time, remain a                  |
| 3   |     | limited liability company in good standing with the State of           |
| 4   |     | Minnesota.                                                              |
| 5   | Q.  | I asked for copies of insurance policies that may apply to             |
| 6   |     | the judgment, you don't have any, is that correct?                     |
| 7   | A.  | That's correct.                                                        |
| 8   | Q.  | Did Alpha ever have insurance of any kind?                             |
| 9   | A.  | I believe for a year it was insured under a professional               |
| 10  |     | liability policy with Minnesota Lawyers Mutual but I don't             |
| 11  |     | recall if Alpha was a beneficiary of that.  Certainly I was            |
| 12  |     | personally but I don't recall if Alpha was.                            |
| 13  | Q.  | And then I asked for any attorney fee engagement or other              |
| 14  |     | legal represented retention agreements entered into by Alpha           |
| 15  |     | and any attorney for the past two years.  Do you have any              |
| 16  |     | such documents?                                                        |
| 17  | A.  | I do not.                                                              |
| 18  | Q.  | Now from calculating the numbers that Alpha received from              |
| 19  |     | Prenda Law Firm, Steele Hansmeier, Under the Bridge                    |
| 20  |     | Consulting and the Media Copyright Group, I added them up to           |
| 21  |     | I think $167,996.00, does that sound about right?                      |
| 22  | A.  | I haven't done the math.                                               |
| 23  | Q.  | Would that surprise you?                                               |
| 24  | A.  | I don't know what my emotional reaction would be.  If that's           |
| 25  |     | what you say the math is and I don't know what amount Alpha            |

```
 1        Law Firm would have received from which of the entities you

 2        mentioned.

 3   Q.   We talked last time about Alpha Law Firm not filing any

 4        taxes or not tax returns or not needing to do you remember

 5        that?

 6   A.   Yes.

 7   Q.   And your testimony was that any income or losses that Alpha

 8        would have would be passed through to your tax returns, is

 9        that correct?

10   A.   I believe my testimony based upon my understanding of tax

11        law, which is admittedly not expert, it was that Alpha Law

12        Firm is a disregarded entity for purposes of Federal taxes.

13   Q.   And I'm not asking why or what the legal reason I'm asking

14        factually is Alpha's losses of income reflected on your tax

15        returns for any year that Alpha made money or lost money?

16   A.   Hopefully to cut straight to the heart of your question the

17        answer is that yes, money that Alpha Law Firm made or lost

18        in any given year would be reflected in some form or fashion

19        on my tax returns albeit lumped in with other sources of

20        income.

21   Q.   Did you play any role in setting up Guava, LLC?

22   A.   I did not.

23   Q.   Do you know who did?

24   A.   I do not.

25                 MR. SHEU:  Your Honor, that's all the questions
```

1     I'm going to have at this time.  I'll just reserve the right

2     to request a renewal of this hearing upon further discovery,

3     further post-judgment discovery.

4               THE COURT:  Thank you.  Mr. Hansmeier, you may

5     step down.  Is there some other statement that you wish to

6     make?

7               MR. HANSMEIER:  Very briefly, Your Honor.  I

8     would just like to make a statement since I don't have an

9     attorney here to perform direct examination that Alpha Law

10    Firm has no remaining assets at this time.  The money that

11    it had at the time that the judgment was entered has been

12    spent down satisfying known debts at the time of

13    termination, paying for appellate costs and other

14    miscellaneous expenses associated with winding down and

15    Alpha Law Firm does not have any ownership interest in any

16    other companies.  It has no insurance policies.  I think

17    another question on the form is fur coats.  It has no furs

18    or any sort of items along those lines and, to the best of

19    my knowledge, Alpha Law Firm has no well, to my knowledge,

20    Alpha Law Firm has no contingency interest, it has no cars

21    or vehicles, it does not own any real estate and Alpha Law

22    Firm's role in this case was to serve as a mailing address

23    and the judgment entered by this Court was not known to

24    Alpha Law Firm at the time of Alpha Law Firm's termination.

25               The record of service or I should say the

1  electronic record of service according to Minnesota Rules of

2  General Practice is the dispositive record of whether or not

3  service occurred and regardless of Mr. Sheu's--

4       MR. SHEU:  Your Honor, this is going beyond

5  anything relevant to the debtor's exam.  This is going to

6  the merits of what's on appeal and so I would object to--

7       MR. HANSMEIER:  Mr. Sheu, this isn't subject to

8  your direct questioning during the--but the question so I'm

9  responding to it as I'm entitled to do as I would be if an

10  attorney was conducting a direct examination.

11       THE COURT:  I'll overrule your objection, Mr.

12  Sheu.  You may continue, Mr. Hansmeier.

13       MR. HANSMEIER:  The electronic record of service

14  is, according to Minnesota Rules of General Practice, the

15  dispositive indicator of whether service occurred and

16  regardless of Mr. Sheu's questions as he alluded to during

17  the June 16th, examination, regarding whether or not I was

18  on the service list or not or whether I was representing

19  Guava or not at the time, there is nothing to prevent an

20  attorney from adding an additional member to the service

21  list and in this case the electronic record with the Court

22  or with the Trial Court Administrator dispositively confirms

23  that I was not provided notice of the Court's Order entered

24  in August 2013 and this point was confirmed by the attorney

25  who did execute the service or who did the service with the

```
 1        electronic system Phillip Gainsley and that's all I have,
 2        Your Honor.
 3                  MR. SHEU:  Your Honor, I have two follow up
 4        questions.
 5                  THE COURT:  Okay you may proceed.
 6   Q.   Mr. Hansmeier, Alpha was an alter ego of you and your other
 7        entities is that right?
 8   A.   No.
 9   Q.   It served no purpose of any sort except as you said a mail
10        drop in Minnesota?
11   A.   Mr. Sheu, that is a gross and frankly time wasting
12        mischaracterization of my testimony.
13   Q.   Well the one client you talked about Alpha having was
14        Midwest Biogas from several years ago, any other clients
15        that Alpha had, any other purpose that Alpha had during its
16        existence?
17   A.   I believe my testimony from the June 16$^{th}$ hearing speaks for
18        itself.
19   Q.   So all the transfers that we talked about the half million
20        dollars to Monyet, LLC, was that for any kind of
21        consideration, exchange between Alpha and Monyet, LLC?
22   A.   Again Mr. Sheu, a distribution to a member of a company or
23        at the direction of a member of a company is not certainly
24        not typically done in exchange for consideration it's not
25        typically done in exchange a for loan, it's a distribution.
```

```
 1        That's why you have companies, you have a company, it has

 2        money--

 3   Q.   But where did Alpha get the money Alpha didn't earn any of

 4        that money that Alpha received was transferred to it by

 5        other entities?

 6   A.   Do you have question?

 7   Q.   Isn't that true?  Alpha didn't receive a penny in settlement

 8        monies from any--this case or any of the other cases that

 9        you've been involved in.  All the money was transferred from

10        Prenda Law, Under the Bridge Consulting or another entity.

11   A.   That sounds like your presenting argument here I don't know

12        what your question is.

13   Q.   Isn't that true did Alpha earn any money in the form of

14        legal fees in the form of receiving settlements from

15        defendants from John Does?

16   A.   You asked about three questions in that statement.  Do you

17        want to break them down for me?

18   Q.   The question is Alpha never received any money except from

19        other entities such as Prenda, such as Under the Bridge

20        Consulting?

21   A.   Well, Mr. Sheu, I think Alpha's bank accounts speak for

22        themselves I don't have anything to add beyond what's in

23        there.

24   Q.   Okay.  You would agree that Alpha never received any income

25        except from other entities such as Prenda or Under the
```

```
 1        Bridge Consulting and that it never received any fee income
 2        or settlement monies, true or false?
 3  A.    I don't know why we have this disconnect here.  Is your
 4        question did Alpha ever receive money?  Yes, it received
 5        money.  Did it receive money from an individual versus an
 6        entity, is that your question?
 7  Q.    Yes.
 8  A.    The money Alpha received is very well documented in its bank
 9        statements which speak for themselves.
10                  MR. SHEU:  Okay, thank you.  No further questions
11        subject to the right to re-examine on further post-judgment
12        discovery.
13                  THE COURT:  Okay.  Do you have any further final
14        statement, Mr. Hansmeier?
15                  MR. HANSMEIER:  I do not, Your Honor.
16                  THE COURT:  I just want to ask just a couple of
17        questions myself because I'm just trying to get clarity.
18        Mr. Dugas worked for Alpha Law Firm, correct?
19                  MR. HANSMEIER:  Not correct.
20                  THE COURT:  Mr. Dugas appeared in court
21        representing Alpha Law Firm?
22                  MR. HANSMEIER:  I don't believe that's correct,
23        Your Honor.
24                  THE COURT:  So Alpha Law Firm represented Guava
25        in the Guava vs. Spencer Merkel case, yes or no?
```

```
 1              MR. HANSMEIER:  No.

 2              THE COURT:  So if our records indicate that Alpha

 3      Law Firm was representing Guava, which we could have only

 4      gotten from Alpha Law Firm, you're saying that that was

 5      incorrect?

 6              MR. HANSMEIER:  I think the point was confusion

 7      arising from the fact that the mailing address for Alpha Law

 8      Firm is an executive suites address in the IDS Center.  In

 9      other words, it's not like the Alpha Law Firm doesn't has a

10      floor in the IDS Center it's a place where a lot of

11      businesses have a mail drop and so in order for Alpha Law

12      Firm to receive the mail there it has to say or I'm sorry

13      the mail has to be addressed Alpha Law Firm.  So in Mr.

14      Dugas' signature block it would show Alpha Law Firm but

15      every other aspect of the signature block was associated

16      with his Prenda Law account or contact information.

17              THE COURT:  Okay, thank you.

18              MR. HANSMEIER:  Thank you, Judge.

19              THE COURT:  You may step down and that will

20      conclude the hearing for today and I'm sure that the

21      attorneys will notify me well, I'm anticipating that I will

22      that either Mr. Sheu will receive these true and correct

23      copies of the settlement agreements assuming that there's no

24      bar of that otherwise by July 21st I will receive in camera

25      review of those documents, I would have received the
```

1      documents to perform an in camera review as were set forth

2      or receive a request for Protective Order with the bases.

3              MR. HANSMEIER:  And Your Honor, if I may ask one

4      point of clarification so that I can explain it to the other

5      side.  What will be the--and I guess my question is there

6      going to ask me what is the Court going to do with these

7      documents is it going to disclose the contents of them in

8      some manner?  I'm assuming the in camera review option right

9      now how will, what would that look like?

10             MR. SHEU:  Your Honor, I think actually you get

11     the documents one way or the other and then you'll, with a

12     motion without a motion, the only way you can consider a

13     Protective Order is by seeing what you're supposed to

14     protect.

15             THE COURT:  Correct.  So your question is what am

16     I going to do in the in camera review?  I'm going to see

17     whether or not they are, these transfers to and from Alpha

18     Law Firm are potentially subjected to further inquiry by the

19     judgment creditors.

20             MR. HANSMEIER:  And if I may narrow my question,

21     I understand that Your Honor.  The specific concern I can

22     see arising from the other side is whether the Court

23     contents of those documents would be disclosed in a

24     subsequent Order or in any other manner?

25             THE COURT:  Well if I have to do an Order I can

1    have it or some portion of it if necessary filed in a sealed

2    manner.

3              MR. HANSMEIER:  That makes sense.

4              THE COURT:  Is what we do if there's a

5    Confidentiality Order.

6              MR. HANSMEIER:  Okay.

7              THE COURT:  So it could be filed like that so it

8    would only be accessible to say the Court and no one else.

9              MR. HANSMEIER:  Okay that might provide some

10   comfort.

11             THE COURT:  Or to the Court and attorneys or

12   something like that.  Typically you know they say the

13   Court's eyes or attorney's eyes only so that you wouldn't

14   let all the clients see it.

15             MR. HANSMEIER:  Sure.

16             THE COURT:  So however you wish to put that in

17   the Protective Order would be fine and the Court will comply

18   with that.  Although hopefully I wouldn't, I don't envision

19   myself giving any kind of details about the confidentiality

20   of settlement agreements in an Order it would only be, I

21   assume, if there was some looks like money that came into

22   Alpha Law Firm but you know and that it was as a result of

23   some legal business or something, but I couldn't foresee

24   going into the details.

25             MR. HANSMEIER:  Thank you, Your Honor.

1          MR. SHEU:  Thank you, Your Honor.

2          THE COURT:  All right thank you, that concludes

3     the hearing.  Thank you, Counsel.

4          MR. SHEU:  Thanks have a good day.

5          (WHEREUPON, the proceedings concluded.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  STATE OF MINNESOTA)

2              )

3  COUNTY OF HENNEPIN)

4

5       I, Lynn R. Burkett, do hereby certify that the above

6  and foregoing transcript is a true and correct transcript of my

7  stenograph notes and is a full, true and complete transcript of

8  the proceedings to the best of my ability.

9

10  Dated:  September 12, 2014      _____

                                    Lynn R. Burkett
11                                 Official Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25