# EXHIBIT H



# BUSINESS ACCOUNT APPLICATION AND AGREEMENT
## CHECKING ACCOUNTS AND SAVINGS ACCOUNTS
### WITH CHECK ACCESS



**TCF BANK**
Since 1923
*Open 7 Days.*
your convenience bank.

| ACCOUNT NUMBER (the "Account"): | ACCOUNT TYPE: |
|---|---|
| ▓▓▓▓▓ | 1195 FREE SMALL BUSINESS CHECKING |

| DATE: | SALESPERSON: | OFFICER # (OPT.): |
|---|---|---|
| 12/28/2010 | | |

**PRODUCT TYPE:**
☐ Premium Commercial  ☐ Small Business Money Market
☐ Premier Business  ☐ Corp. Prime Yield
☐ Free Small Business  ☐ Commercial  ☐ Free Community Group
☐ Business Checking w/Int. (a.k.a. Organizational NOW)  ☐ Select Business

**OWNERSHIP TYPE:**
☐ Public Unit  ☐ Non-Profit Organization
☐ Partnership  ☐ Corporation  ☐ RE Broker Trust
☐ Sole Proprietor(s)  ☐ Limited Liability Partnership (LLP)  ☐ Pension/Profit Sharing
☐ Limited Liability Co. (LLC)  ☐ Business-Related Trust

| BUSINESS NAME "CUSTOMER" | |
|---|---|
| **MONYET LLC** | CORPORATION |

**BUSINESS ADDRESS** (No PO Box - see Statement Mailing Address below)
1201 ORANGE STREET
SUITE 600

| CITY/STATE | ZIP CODE |
|---|---|
| WILMINGTON DE | 19899 |

| BUSINESS TELEPHONE | FEDERAL ID NUMBER/ SOCIAL SECURITY NUMBER |
|---|---|
| ▓▓▓▓▓ | ▓▓▓▓▓ |

| BUILDING, SUITE, ROOM, FLOOR NO. | D.B.A. | ATTN, C/O |
|---|---|---|
| | | |

IF THE STATEMENT MAILING ADDRESS IS DIFFERENT FROM THE ABOVE ADDRESS, PLEASE COMPLETE BELOW. ATTN. C/O:

| ADDRESS | BUILDING, SUITE, ROOM, FLOOR NO. | CITY | STATE | ZIP CODE |
|---|---|---|---|---|
| | | | | |

If this is a pension or profit sharing plan, the entire beneficial interest ☐ is  ☐ is not  held by natural persons.

| Card | 1. Authorized Signer Name (Title) | Date of Birth | Social Security # |
|---|---|---|---|
| ▓ | **PAUL ROBERT HANSMEIER** | ▓▓▓▓ | ▓▓▓▓ |

| Address | 100 3RD AVE S UNIT 404 | City/State | MINNEAPOLIS | MN | Zip Code 55401 |
|---|---|---|---|---|---|

| ID Type | ID Number | ID State / ID Country | Issue Date | Expiration Date |
|---|---|---|---|---|
| D | ▓▓▓▓ | MN | 05/01/2010 | 05/08/2014 |

| Card | 2. Authorized Signer Name (Title) | Date of Birth | Social Security # |
|---|---|---|---|
| | | | |

| Address | | City/State | | Zip Code |
|---|---|---|---|---|
| | | | | |

| ID Type | ID Number | ID State / ID Country | Issue Date | Expiration Date |
|---|---|---|---|---|
| | | | | |

| Card | 3. Authorized Signer Name (Title) | Date of Birth | Social Security # |
|---|---|---|---|
| | | | |

| Address | | City/State | | Zip Code |
|---|---|---|---|---|
| | | | | |

| ID Type | ID Number | ID State / ID Country | Issue Date | Expiration Date |
|---|---|---|---|---|
| | | | | |

CF-PCD-0700 (06/09/10)

Account Number: ▮▮▮▮▮▮▮

| Card | 4. Authorized Signer Name (Title) | | Date of Birth | Social Security # |
|------|-----------------------------------|--|---------------|-------------------|
| Address | | City/State | | Zip Code |
| ID Type | ID Number | ID State / ID Country | Issue Date | Expiration Date |

| Card | 5. Authorized Signer Name (Title) | | Date of Birth | Social Security # |
|------|-----------------------------------|--|---------------|-------------------|
| Address | | City/State | | Zip Code |
| ID Type | ID Number | ID State / ID Country | Issue Date | Expiration Date |

| Card | 6. Authorized Signer Name (Title) | | Date of Birth | Social Security # |
|------|-----------------------------------|--|---------------|-------------------|
| Address | | City/State | | Zip Code |
| ID Type | ID Number | ID State / ID Country | Issue Date | Expiration Date |

## ACCOUNT AGREEMENT

### DEFINITIONS

"**Account**" means the checking or savings account(s) listed above.

"**Account Contract**" means: (1) this Agreement; (2) TCF's *Terms and Conditions for Checking and Savings Accounts* or TCF's *Terms and Conditions for Certificates*, as applicable; (3) TCF's *Deposit Account Services and Prices Schedule*; (4) TCF's *Current Rates and Yields Schedule*; (5) the *TCF Privacy Policy* (if applicable); and (6) any additional agreements between you and TCF and any additional disclosures that TCF may give you. TCF may change your Account Contract from time to time upon notice to you.

"**Affiliates**" means any company directly or indirectly owned by us or TCF Financial Corporation.

"**Authorized Signer**" means the Authorized Signers named on pages one and two of this Agreement.

"**Item**" and "**Non-Cash Item**" have the meaning defined in TCF's *Terms and Conditions for Checking and Savings Accounts.*

"**TCF**," "**TCF Bank**," "**we**," "**us**," and "**our**" mean: TCF® National Bank. We are owned by TCF Financial Corporation.

"**You**" and "**your**" mean each person or entity named above as Customer. If there is more than one Account owner, "you" and "your" mean each owner individually and all owners together.

## YOUR ACCOUNT

You are the legal owner of the Account, which exists as soon as you make a deposit to it. TCF does not have to allow any withdrawals or transfers from the Account until: (1) all Authorized Signers have signed this Agreement and any other documentation that TCF requires, and returned them to us; and (2) all other terms of your Account Contract with TCF have been met.

If you are a sole proprietor, public unit, non-profit organization, or real estate broker trust, you may be eligible for a Business Checking with Interest account (also known as an Organizational Negotiable Order of Withdrawal, or "NOW," account). Otherwise, you are eligible for a demand deposit account, Small Business Money Market account, or a Corporate Prime Yield account.

## ELECTRONIC COMMUNICATIONS

In this section, "you" and "your" mean you, the Customer named above, and each Authorized Signer.

You agree that TCF may send you electronic communications including, but not limited to, emails regarding: your accounts with TCF; TCF products, promotions, services; website updates; and notifications offered by or through TCF that we think may be of interest to you. You may ask us to stop sending promotional information by electronic communications by simply selecting the "unsubscribe" or "opt out" option presented in these types of electronic communication.

CF-PCD-0700 (06/09/10)

Account Number: ████████

## FAIR CREDIT REPORTING ACT AND SHARING OF INFORMATION

In this section, "you" and "your" mean you, the Customer named above, and each Authorized Signer.

You agree to give TCF current information about you and your financial situation when you apply for an Account with TCF (or an account for which you are an Authorized Signer) and whenever TCF asks for this information while you have a business relationship with TCF. You state and agree that all information you give or will give to TCF is true, correct, and complete.

You also give TCF permission to get credit reports (including credit scores, such as FICO scores) and other kinds of financial and personal information about you from credit reporting agencies and other third parties. TCF may get this information when you apply for an Account with TCF (or an account for which you are an Authorized Signer) and at any time while you have a business relationship with TCF.

You give TCF permission to investigate and use in our banking business the information described in this section, such as when we: (1) decide whether to open an account for you or at your request (or an account for which you are an Authorized Signer); (2) review your Account or collect money you owe us on your Account (or an account for which you are an Authorized Signer); (3) assign to your Account a code that we use, along with other information, to determine whether to pay your checks or other transactions; (4) assign your Account to a category that we use to determine whether to make certain deposits available to you sooner than would otherwise be required by your Account Contract; or (5) have other legitimate business reasons to investigate and use the information.

You give TCF permission to share or otherwise disclose the information described in this section, and other information about you and your transactions with us, with our Affiliates, and for our Affiliates to use this information to determine whether to offer you other products and services or for other legitimate business purposes. You also give TCF permission to exchange or otherwise disclose this information with other financial institutions, law enforcement agencies, third party service providers, and other third parties that are not Affiliates. Our reasons for doing so may include, but are not limited to: (1) enabling TCF to conduct our business; (2) protecting ourselves against fraud or other financial loss; (3) offering various products and services directly or through a third party; and (4) answering questions about TCF's credit experience with you.

See *TCF Privacy Policy* for more information about TCF's use of information obtained in connection with products or services used for personal, family, and household purposes.

Initial here on behalf of yourself and the Customer named above if you agree to the terms set forth above in this section called "Fair Credit Reporting Act and Sharing of Information":

1. Initial  ___  2. Initial ___  3. Initial ___  4. Initial ___

## NSF AND OVERDRAFT FEE ACKNOWLEDGEMENT.

TCF charges an NSF/Overdraft fee of $35 each time an Item (such as a check, an ATM or debit card transaction, in-person withdrawal, ACH or other electronic transaction, or other Debit) is submitted to TCF for payment and your Account is overdrawn or would be overdrawn if we paid the Item. We may charge this fee regardless of whether we pay or decline to pay the Item. TCF may add or may change the NSF/Overdraft Fee as permitted in your Account Contract. More than one NSF/Overdraft Fee may be charged against your Account each day, depending on the number of Items submitted for payment from your Account and other withdrawals made from your Account.

TCF may post some or all Debit transactions together and we may post some categories of Debit transactions before others. Either way, we will post Debit Items to your Account in order of highest dollar amount to lowest dollar amount within each category. The order in which TCF posts transactions results in more NSF/Overdraft Fees than if we posted these Items in a different order. TCF currently posts Credits before Debits.

TCF encourages you to use your Account responsibly, and to take steps to avoid overdrafts whenever possible. You should keep track of all your transactions and reconcile your Account records to your monthly statement. Promptly correct your records if you receive notice of an NSF, overdraft, or returned deposit, and remember to deduct any related service charges. To check your balance and recent transactions posted to your Account, you can call TCF at 1-800-TCF-BANK (823-2265) and use the automated service or speak to a customer service representative, or use TCF Online Banking (www.tcfbank.com). Ask us about our overdraft line of credit product, which may be a lower cost alternative to overdrafts.

1. Initial  ___  2. Initial ___  3. Initial ___  4. Initial ___

## CERTIFICATION OF FEDERAL TAXPAYER IDENTIFICATION NUMBER

(In this certification below, "I," "me," and "my" mean the Authorized Signer on behalf of the Account owner.)

Under penalties of perjury, I certify on behalf of the Account owner that:

1. The social security number or employer identification number shown on this form is the Account owner's correct taxpayer identification number (or I am waiting for a number to be issued to Account owner); and

2. The Account owner is not subject to backup withholding because: (a) the Account owner is exempt from backup withholding; or (b) the Account owner has not been notified by the Internal Revenue Service (IRS) that the Account owner is subject to backup withholding as a result of a failure to report all interest or dividends; or (c) the IRS has notified the Account owner that the Account owner is no longer subject to backup withholding; and

3. The Account owner is a U.S. citizen or other U.S. person, as defined below (including a U.S. resident alien).

Note: Certification Instructions. You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return.

Signature of U.S. Person: _____  Date 12/28/10

Definition of a U.S. person. For federal tax purposes, you are considered a U.S. person if you are:
- An individual who is a U.S. citizen or U.S. resident alien;
- A partnership, corporation, company, or association created or organized in the United States or under the laws of the United States;
- An estate (other than a foreign estate); or
- A domestic trust (as defined in Internal Revenue Service Regulations section 301.7701-7).

## STATEMENT OF CHECKING ACCOUNT ACTIVITY
### (FOR MN CHECKING ACCOUNTS ONLY)

In this section, "you" and "your" mean the Customer named above, and each Authorized Signer for this Account.

By signing below, you state that you hold or have held a checking account(s) at the following financial institution(s) in the past 12 months:
TCF

Of these accounts, the following were closed without your consent for the reasons stated here (if this sentence does not apply, state "none"):
N/A

You also state that you ☐ have ☒ have not been convicted of a crime because of the use of a check or similar item within the past 24 months.

Account Number: ███████

## ARBITRATION  AGREEMENT ACKNOWLEDGEMENT

Your Account Contract Includes an arbitration agreement. If there is a dispute between you and TCF and the dispute is covered by the arbitration agreement, then either you or TCF may require the dispute to be resolved by arbitration in front of an arbitrator. This means that you and TCF will not have the right to a jury or court trial to resolve the dispute or the right to pursue a claim as a class action. You have the right to reject the arbitration agreement by giving written notice to TCF within 30 days after the date of this Agreement following the procedures described in your Account Contract. See the section called "Arbitration of Disputes" in TCF's *Terms and Conditions for Checking and Savings Accounts* or TCF's *Terms and Conditions for Certificates*, as applicable, for more information.

1. Initial _____   2. Initial _____   3. Initial _____   4. Initial_____

## ACKNOWLEDGEMENT

By signing below, the Authorized Signers state and agree on your behalf that they have received a copy of: (1) this Agreement; (2) TCF's *Terms and Conditions for Checking and Savings Accounts*; (3) TCF's *Deposit Account Services and Prices Schedule*; (4) TCF's *Current Rates and Yields Schedule*; and (5) the *TCF Privacy Policy*. All of these documents, together with any additional agreements between you and TCF and any additional disclosures that TCF may give you, are part of your Account Contract with TCF. The Authorized Signers agree on your behalf to all the terms of your Account Contract with TCF as it may be amended from time to time. By opening or continuing your Account or using any Account-related service, the Authorized Signers confirm, on your behalf, your agreement to all the terms of your Account Contract with TCF as it may be amended from time to time. The Authorized Signers also state and agree on your behalf that you are requesting Electronic Fund Transfers ("EFT") services, including but not limited to a TCF® *Miles Plus* Business Check Card and/or a TCF ATM Card for the Account indicated above. The Authorized Signers state and agree on your behalf that the Account will only be used for business purposes and not for personal, family, or household purposes, and that you will use your TCF® *Miles Plus* Business Check Card and/or a TCF ATM Card solely to purchase business-related goods and services.

For accounts designated as a real estate broker trust account at the time of account opening, any interest on the account, less allowable service charges, will be paid to the applicable state authority in accordance with the governing state law.

The Authorized Signers agree that the Ownership Type designated on page one accurately describes the company or organization establishing the Account and that the Account is not being opened on behalf of a foreign financial institution as that term is defined under the Bank Secrecy Act.

## AUTHORIZED SIGNATURES (SIGNATURE VERIFICATION)

By:   1. _____   *Manager*
      Authorized Signer          Title

2. _____
   Authorized Signer          Title

3. _____
   Authorized Signer          Title

4. _____
   Authorized Signer          Title

5. _____
   Authorized Signer          Title

6. _____
   Authorized Signer          Title

**TO OPEN AN ACCOUNT, THIS AGREEMENT MUST BE SIGNED OR INITIALED BY THE APPROPRIATE PERSON IN ALL PLACES WHERE INDICATED.**

CF-PCD-0700 (06/09/10)

# Scottrade®
# BROKERAGE ACCOUNT APPLICATION

☐ Web Site or Search Engine
☐ TV or Radio Advertising
☐ Magazine / Newspaper Ad
☐ News Article
☐ Friend Referral / Promotion Code
☐ I am an Existing Scottrade Customer

**Select Account Type**

☐ Custodial (use minor's SSN)    ☐ Individual    ☐ Joint type _____

☐ Investment Club    ☐ Coverdell ESA    ☐ IRA type _____    ☐ Qualified Plan type _____

☐ Non Corporate Organization    ☐ Trust    ☐ Guardianship/Conservatorship    ☒ Partnership type _LLC_

   ☐ Estate    ☐ Corporate type _____    ☐ Update Account # _____

| APPLICANT | CO-APPLICANT (IF ANY) |
|---|---|

**Title of Account (If applicable name of corporation/partnership/trust/etc )**
Monyet LLC

| Mr Mrs Ms | Name | First | Middle | Last | ☒Mr Mrs Ms | Name | First | Middle | Last |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Paul | Robert | Hansmeier |

**Street Address (P O Box or c/o address not permitted)**
1201 Orange St. #600

**Street Address (P O Box or c/o address not permitted)**
100 3rd Ave S #404

| City | State | ZIP plus 4 | City | State | ZIP plus 4 |
|---|---|---|---|---|---|
| Wilmington | DE | 19899 | Minneapolis | MN | 55401 |

| Home Phone Number | Work Phone Number | Cell Phone Number | Home Phone Number | Work Phone Number | Cell Phone Number |
|---|---|---|---|---|---|

**Mailing Address (if different from home address P O Boxes may be used)**

| Social Security or Tax ID Number | Date of Birth | Social Security or Tax ID Number | Date of Birth |
|---|---|---|---|

**Are you a U S Citizen?** ☒YES Skip to Occupation
Non U S Citizens ☐ NO Complete the section below

**Are you a U S Citizen?** ☒ YES Skip to Occupation
Non U S Citizens ☐ NO Complete the section below

**Country of Citizenship** _____

**Country of Citizenship** _____

**Are you a permanent U S Resident?**
☐ YES Alien Registration Number _____
☐ NO Indicate your Visa type _____ AND complete and sign
the U S Visa Holder Statement (form number SF1039)
If you plan on staying in the U S 183 days or less contact our International Department to apply for an account

**Are you a permanent U S Resident?**
☐ YES Alien Registration Number _____
☐ NO Indicate your Visa type _____ AND complete and sign
the U S Visa Holder Statement (form number SF1039)
If you plan on staying in the U S 183 days or less contact our International Department to apply for an account

**Occupation**
☐ Employed (specify occupation) _____
☒ Self Employed ☐ Unemployed ☐ Retired ☐ Homemaker ☐ Student

**Occupation**
☐ Employed (specify occupation) _____
☒ Self Employed ☐ Unemployed ☐ Retired ☐ Homemaker ☐ Student

**Employer (If self employed specify job function)**
Manager

**Employer (If self employed specify job function)**
Attorney

**Employer Address**
N/A

**Employer Address**
80 S 8th St Ste 900 Minneapolis MN 55402

**Please answer the following**

☐ Yes ☒No Is any applicant employed by or affiliated with a securities firm a securities exchange or FINRA? (If yes provide name and address of Compliance Dept )

☐ Yes ☒No Is any applicant a control person or affiliate of a public company as defined by the SEC? This would generally include 10% shareholders members of the Board of Directors and policy making officers (If yes provide trading symbol and company)

☐ Yes ☒No Is any applicant or member of immediate family or business associate a senior foreign political official?

**Type of Account (Choose A or B)**

A) Internet Trading (Requires e-mail address)    E mail Address phansmeier@thefirm, MN    Referred By (Name and/or Referral Number)

☒Internet All securities & proceeds held in account
   Trade confirmations and monthly account statements will be posted to your online account free of charge
   To receive paper copies for a fee check one or both of the following ☐ Mail trade confirmations ($1 each) ☐ Mail account statements ($2 each)

B) Non Internet Trading (Be advised that non Internet Commission Rates will apply )

☐ Safekeeping    Indicate Instructions ☐ Hold Proceeds OR ☐ Mail Proceeds
     ☐ Hold Dividends & Interest OR ☐ Mail Dividends & Interest

**Additional Services**
☐ Margin (IRAs excluded) Sign Margin Agreement below ☐ Options Send me an Options Application & Disclosure Document ☒ Transfer Account to Scottrade Send me the Account Transfer form

Under penalties of perjury I certify that (1) the number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me) (2) I am not subject to backup withholding because (a) I am exempt from backup withholding (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of failure to report all interest or dividends or (c) the IRS has notified me that I am no longer subject to backup withholding and (3) I am a U S person (including a U S resident alien) The IRS does not require your consent to any provision of this document other than the certification required to avoid backup withholding Applicants who are subject to backup withholding must cross out item (2)

BY SIGNING THIS AGREEMENT I ACKNOWLEDGE THAT I HAVE RECEIVED READ AND AGREE TO ABIDE BY THE TERMS OF THE ACCOMPANYING BROKERAGE ACCOUNT AGREEMENT WHICH CONTAINS A PRE DISPUTE ARBITRATION CLAUSE AT SECTION 29

| X | 12/27/10 | X | 12/27/10 |
|---|---|---|---|
| Applicant/Authorized Person's Signature | Date | Co Applicant/Authorized Person s Signature | Date |

**MARGIN PRIVILEGES** SIGN BELOW ONLY IF YOU DESIRE A MARGIN ACCOUNT
By signing this agreement I acknowledge that I have received read and agree to abide by the terms of the accompanying Brokerage Account Agreement including the Margin Account section starting at Section 53

| X | | X | |
|---|---|---|---|
| Applicant/Authorized Person s Signature | Date | Co Applicant/Authorized Person s Signature | Date |

**FOR SCOTTRADE USE ONLY**

Online Application Entry    Registered Rep    Registered Principal    New Accounts Rep    SNAP Approved

SF1000/12 09

# THE OPERATING AGREEMENT OF
# MONYET LLC

This Operating Agreement of MONYET LLC (the "Agreement") is made and entered by and among the Members of the Company, as such term is defined in Section 2.1.M below.

## RECITALS

A.    The Members have formed a Delaware limited liability company (the "Company") in accordance with the Act, for the purposes and on the terms, covenants and conditions set forth herein.

B.    Concurrent with the execution of this Agreement, the Members have caused the Articles of Organization for the Company to be filed with the Secretary of State of the State of Delaware.

C.    The Members have each reviewed this Agreement, in its entirety, and desire to cause the same to be adopted as and for the operating agreement of the Company, in accordance with the Act.

## AGREEMENT

Pursuant to the Act, and in exchange for good and valuable consideration, the sufficiency and receipt of which are hereby acknowledged, the undersigned Members and Manager mutually agree and covenant as follows:

## ARTICLE 1. ORGANIZATION

1.1    Creation.  The Members have formed a Delaware limited liability company pursuant to the provisions of the Act.

1.2    Name.  The business of the Company shall be conducted under the name of MONYET LLC.

1.3    Principal Place of Business.  The principal place of business for the Company shall be at such place or places as the Manager may direct from time to time.

## ARTICLE 2  DEFINITIONS

2.1　　　　　The terms used in this Agreement shall have the following meanings:

A　　Act means the Delaware Limited Liability Company Act as amended from time to time.

B　　Additional Capital Contributions means contributions of cash or other properties to the Company, in addition to the Members' Initial Capital Contributions, by the Members as set forth in Section 6.2 below.

C　　Adjusted Capital Account Balance means, with respect to any Member, the positive balance of the Member's Capital Account as adjusted pursuant to Section 2.1(E).

D　　Adjusted Capital Account Deficit means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant Fiscal Year, after giving effect to the following adjustments:

　　　　(i)　　Credit to such Capital Account any amounts which such Member is obligated to restore pursuant to any provision of this Agreement or is deemed to be obligated to restore pursuant to the penultimate sentences of Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5); and

　　　　(ii)　　Debit to such Capital Account the items described in Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5), and 1.704-1(b)(2)(ii)(d)(6) of the Regulations.

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Section 1.704-1(b)(2)(ii)(d) of the Regulations and shall be interpreted consistently therewith.

E　　Capital Account means, with respect to any Member, the Capital Account maintained for such Person in accordance with the following provisions:

　　　　(i)　　To each Member's Capital Account there shall be credited such Member's Capital Contributions, such Member's distributive share of profits and any items in the nature of income or gain which are specially allocated pursuant to Section 7.2 hereof, and the amount of any Company liabilities assumed by such Member or which are secured by any Property distributed to such Member.

　　　　(ii)　　To each Member's Capital Account there shall be debited the amount of cash and the value of any Property distributed to such Member pursuant to any provision of this Agreement, such Member's distributive share of losses and any items in the nature of expenses or losses which are specially allocated pursuant to Section 7.2

2

hereof, and the amount of any liabilities of such Member assumed by the Company or which are secured by any property contributed by such Member to the Company.

(iii)        In the event any interest in the Company is transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred interest.

(iv)                     _ the amount of any liability for purposes of Sections 2.1E(i) and 2.1E(ii) hereof, there shall be taken into account Code Section 752(c) and any other applicable provisions of the Code and Regulations.

The Members agree that the initial balance of each Member's Capital Account shall be the Initial Capital Account Balance for such Member as set forth on the books and records of the Company. The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Regulations Section 1.704-1(b), and shall be interpreted and applied in a manner consistent with such Regulations. In the event the Members shall determine that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto (including, without limitation, debits or credits relating to liabilities which are secured by contributed or distributed property or which are assumed by the Company or the Members), are computed in order to comply with such Regulations, the Members may make such modification, provided that is not likely to have a material effect on the amounts distributable to any Member pursuant to Section 11.5 hereof upon the dissolution of the Company. The Members also shall (i) make any adjustments that are necessary or appropriate to maintain equality between the Capital Accounts of the Members and the amount of Company capital reflected on the Company's balance sheet, as computed for book purposes in accordance with Regulations Section 1.704-1(b)(2)(iv)(g), and (ii) make any appropriate modifications in the event unanticipated events (for example, the acquisition by the Company of oil or gas properties) might otherwise cause this Agreement not to comply with Regulations Section 1.704-1(b).

F    Capital Contributions means, with respect to any Member, the amount of money and the initial value of any property (other than money) contributed to the Company with respect to the interest in the Company held by such Member pursuant to the terms of this Agreement. The principal amount of a promissory note which is not readily traded on an established securities market and which is contributed to the Company by the maker of the note (or by a Person related to the maker of the note within the meaning of Regulations Section 1.704-1(b)(2)(ii)(c)) shall not be included in the Capital Contribution of any Member until the Company makes a taxable disposition of the note or until (and to the extent) principal payments are made on the note, all in accordance with Regulations Section 1.704-1(b)(2)(iv)(d)(2).

G    Code means the Internal Revenue Code of 1986, as amended.

H    Company means **MONYET LLC**, a Delaware limited liability company.

3

I                                                                    with respect to each Member the Initial Capital Account Balance specified for such Member in the books and records of the Company.

J                              ·                              ·                              of the Company assets, profits, surplus or losses as shown in, and all rights of a Member of a limited liability company under the Act and under this Agreement.

·K  .     .     _                    the meaning set forth in Section 11.3..

·L     Manager(s) means the manager or managers of the Company, as set forth in Section 8.1 below.

M     Member or Members means the Members of the Company as set forth in Section 4.1 below.

N     Nonrecourse Deductions has the meaning set forth in Section 1.704-2(b)(1) of the Regulations.

O     Nonrecourse Liability has the meaning set forth in Section 1.704-2(b)(3) of the Regulations.

P     Ownership Interest means the Ownership Interest in the Company of each Member as set forth in Section 4.1 below.

Q.     Partner Nonrecourse Debt has the meaning set forth in Section 1.704-2(b)(4) of the Regulations, references to "Partner" therein being deemed to refer to the Members.

R     Partner Nonrecourse Debt Minimum Gain means an amount, with respect to each Partner Nonrecourse Debt, equal to the Partnership Minimum Gain that would result if such Partner Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with Section 1.704-2(i)(3) of the Regulations, with references therein to "Partner" being deemed to refer to the Members and to "Partnership" being deemed to refer to the Company.

S     Partner Nonrecourse Deductions has the meaning set forth in Sections 1.704-2(i)(1) and 1.704-2(i)(2) of the Regulations, with references therein to "Partner" being deemed to refer to the Members.

T     Partnership Minimum Gain has the meaning set forth in Regulations Section 1.704-2(b)(2) and 1.704-2(d), with references therein to "Partnership" being deemed to refer to the Company.

U     Person means any individual, partnership, corporation, trust, limited liability company, or other entity.

4

V      Profits Interest means the Profits Interest in the Company of each Member as set forth in Section 4.2.

W      Regulations means the Income Tax Regulations, including Temporary Regulations, promulgated under the Code, as such regulations may be amended from time to time (including corresponding provisions of succeeding regulations).

## ARTICLE 3  PURPOSES

The principal business purpose for which the Company is organized is to buy, own, manage, improve, develop, and sell investment assets and to operate other businesses and joint ventures which shall be developed by the Members and Managers.  The Company may also operate for any other lawful purpose for which a limited liability company may be organized under the laws of the State of Delaware.

## ARTICLE 4  MEMBERS OF THE COMPANY

4.1     Members.  The initial Members of the Company and the ownership interest held by each Member are shown below:

| Member Name | Ownership Interest |
| --- | --- |
| The Mill Trust | 100.00% |

4.2     Profits Interests.  The Company may issue Profits Interests to the Members from time to time pertaining to individual projects depending on the participation of each Member in each particular project.  A Profits Interest does not entitle a person to any equity or capital in the Company, but only to a share of future earnings from a particular project as specifically agreed in a separate writing executed by the Company and the Members.

## ARTICLE 5  LIABILITY OF MEMBERS AND EMPLOYEES

Neither the Members, the Manager nor the employees of the Company are personally liable under a judgment, decree, or order of a court, or in any other manner, for a debt, obligation, or liability of the Company.

5

ARTICLE 6  CAPITAL CONTRIBUTIONS; LOANS

6.1     Initial Capital Contributions. The property and assets initially contributed by the Members as identified on the books and records of the Company shall constitute the Initial Capital Contributions to the Company.

6.2     Additional Capital Contributions. With the consent of the Members, an individual Member may make additional contributions of cash and other properties into the Company which shall constitute Additional Capital Contributions.

6.3     Capital Calls. In the event that the Managers determine that additional capital is required for the operations of the Company, the Managers may give notice to the Members (and to any assignees) of a capital call. The notice shall be given sixty days before the capital call deadline, and the notice shall include the date of the capital call deadline and the amount of capital required of each Member (or assignee). In the event that any Member or assignee fails to contribute the amount of capital required by that person as described in the notice by the capital call deadline, the Member (or assignee) shall have his or her interest diluted proportionally so that those who do meet the capital requirement receive capital interests and ownership interests in proportion with their contributions.

6.4     Withdrawal of Capital Contributions. Except as otherwise expressly provided in this Agreement:

        A       Distributions shall be made only in accordance with Section 7.3 and no Member shall have the unilateral right to withdraw assets of the Company;

        B       No Member shall be personally liable to any other Member for the return of any part of the Members' Capital Contributions; and

        C       Capital Contributions shall not bear interest.

ARTICLE 7  ALLOCATIONS OF
PROFITS AND LOSSES; CASH DISTRIBUTIONS

7.1     Profits and Losses. Except as provided in Section 7.2, Profits and losses shall be allocated as follows:

        A       If all of the Members approve a project which provides for the distribution of profits based on Profits Interests, then any profits from such a project shall be allocated accordingly.

        B       In the event a Member has contributed appreciated property to the Company in kind, and the property is later transferred by the Company (including but not limited to sales or

6

distributions in kind) income, gain, loss or other deductions shall be allocated to the contributing
Member.

C       Otherwise, all profits and losses shall be allocated to Members who have a
positive capital account in proportion with their capital accounts.

D       Finally, if all Members have a capital account balance of zero, profits and losses
shall be allocated in proportion with their Ownership Interests.

7.2    Special Allocations.  The following special allocations shall be made in the following
order:

A       Minimum Gain Chargeback.  Except as otherwise provided in Section 1.704-2(f)
of the Regulations, notwithstanding any other provision of this Article 7, if there is a net decrease
in Partnership Minimum Gain during any Company Fiscal Year, each Member shall be specially
allocated items of Company income and gain for such Fiscal Year (and, if necessary, subsequent
Fiscal Years) in an amount equal to such Member's share of the net decrease in Partnership
Minimum Gain, determined in accordance with Regulations Section 1.704-2(g).  Allocations
pursuant to the previous sentence shall be made in proportion to the respective amounts required
to be allocated to each Member pursuant thereto.  The items to be so allocated shall be
determined in accordance with Sections 1.704-2(f)(6) and 1.704-2(j)(2) of the Regulations.  This
Section 7.2A is intended to comply with the minimum gain chargeback requirement in Section
1.704-2(f) of the Regulations and shall be interpreted consistently therewith.

B       Partner Minimum Gain Chargeback.  Except as otherwise provided in Section
1.704-1(i)(4) of the Regulations, notwithstanding any other provision of this Article 7, if there is
a net decrease in Partner Nonrecourse Debt Minimum Gain attributable to a Partner Nonrecourse
Debt during any Company Fiscal Year, each Member who has a share of the Partner Nonrecourse
Debt Minimum Gain attributable to such Partner Nonrecourse Debt, determined in accordance
with Section 1.704-2(i)(5) of the Regulations, shall be specially allocated items of Company
income and gain for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount
equal to such Member's share of the net decrease in Partner Nonrecourse Debt Minimum Gain
attributable to such Partner Nonrecourse Debt, determined in accordance with Regulations
Section 1.704-2(i)(4).  Allocations pursuant to the previous sentence shall be made in proportion
to the respective amounts required to be allocated to each Member pursuant thereto.  The items
to be so allocated shall be determined in accordance with Sections 1.704-2(i)(4) and 1.704-2(j)(2)
of the Regulations.  This Section 7.2B is intended to comply with the minimum gain chargeback
requirement in Section 1.704-2(i)(4) of the Regulations and shall be interpreted consistently
therewith.

C       Qualified Income Offset.  In the event any Member unexpectedly receives any
adjustments, allocations, or distributions described in Sections 1.704-1(b)(2)(ii)(d)(4),
1.704-1(b)(2)(ii)(d)(5), or 1.704-1(b)(2)(ii)(d)(6) of the Regulations, items of Company income
and gain shall be specially allocated to each such Member in an amount and manner sufficient to
eliminate, to the extent required by the Regulations, the Adjusted Capital Account Deficit of such

Member as quickly as possible, provided that an allocation pursuant to this Section 7.2C shall be made only if and to the extent that such Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Section 7.2 have been tentatively made as if this Section 7.2C were not in the Agreement.

     D     Gross Income Allocation. In the event any Member has a deficit Capital Account at the end of any Fiscal Year which is in excess of the sum of (i) the amount such Member is obligated to restore pursuant to any provision of this Agreement, and (ii) the amount such Member is deemed to be obligated to restore pursuant to the penultimate sentences of Sections 1.704-2(g)(1) and 1.704-2(i)(5) of the Regulations, each such Member shall be specially allocated items of Company income and gain in the amount of such excess as quickly as possible, provided that an allocation pursuant to this Section 7.2D shall be made only if and to the extent that such Member would have a deficit Capital Account in excess of such sum after all other allocations provided for in this Article 7 have been made as if Section 7.2C hereof and this Section 7.2D were not in the Agreement.

     E     Nonrecourse Deductions. Nonrecourse Deductions for any fiscal year shall be specially allocated among the Members in proportion to their then applicable Capital Accounts.

     F     Partner Nonrecourse Deductions. Any Partner Nonrecourse Deductions for any fiscal year shall be specially allocated to the Member who bears the economic risk of loss with respect to the Partner Nonrecourse Debt to which such Partner Nonrecourse Deductions are attributable in accordance with Regulations Section 1.704-2(i)(1).

     G     Code Section 754 Adjustment. To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Section 734(b) or Code Section 743(b) is required, pursuant to Regulations Section 1.704-1(b)(2)(iv)(m)(2) or Regulations Section 1.704-1(b)(2)(iv)(m)(4), to be taken into account in determining Capital Accounts as the result of a distribution to a Member in complete liquidation of his interest in the Company, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specially allocated to the Members in accordance with their then applicable Capital Accounts in the event Regulations Section 1.704-1(b)(2)(iv)(m)(2) applies, or to the Members to whom such distribution was made in the event Regulations Section 1.704-1(b)(2)(iv)(m)(4) applies.

7.3     Distribution of Assets. The Managers may retain in the Company some or all of the Company's assets to be used for current needs or future growth of the business. No Member may unilaterally demand or require distributions from
as determined by the Managers. The Managers may make distributions pro rata in proportion to the capital accounts of the Members or make distributions which are not pro rata if capital accounts are adjusted accordingly.

## ARTICLE 8  MANAGEMENT OF THE COMPANY

8.1     Management.  The business, operations and properties of the Company shall be managed by Paul Robert Hansmeier.  Additional or successor Managers may be appointed by the unanimous vote of the current Managers.  Each Manager shall have an equal vote.  Each Manager shall have authority to act or sign alone on behalf of the Company.

8.2     Personal Service Contract.  In choosing Managers in this Company, the Members are relying upon their knowledge of the character, integrity and business acumen of the Managers. As a result, a Manager's right to manage the affairs of the Company is a personal service contract with the Members which cannot be assigned to any other person or entity.  In the event a Manager's right to manage the Company is voluntary or involuntary assigned, that assignment shall be void and the Manager shall be deemed to have violated its duties under this Agreement and its management rights shall immediately terminate.  In the event that a Manager should die, become incapacitated, or should cease to be a Member of the Company for any reason, the person shall also at that time cease to be a Manager of the Company.

8.3                                         The Managers shall be responsible for the management of the Company's business and activities with all rights and powers generally conferred by law or necessary, advisable or consistent in connection therewith.  No Member shall have any right to act or sign on behalf of the Company or to represent the Company.  The Managers may delegate authority to any one Manager or to any person in a writing executed by a majority of the Managers.

8.4     Specific Powers of the              The Managers shall have all specific rights and powers required or appropriate to the management of the Company business, as conferred by this Agreement, by the Act or otherwise, including by way of illustration and not by way of limitation the following:

        A       To acquire, hold and dispose of any real or personal property, interest therein, or appurtenance thereto, as well as personal or mixed property connected with any real property, including the purchase, lease development, improvement, maintenance, exchange, trade or sale of such properties, at such price, rental or amounts, for cash, securities or other property, and upon such terms, as are deemed by such Manager(s) to be in the best interest of the Company;

        B       To authorize any entity in which the Company holds an interest to acquire, hold and dispose of any real or personal property, interest therein, or appurtenance thereto, as well as personal or mixed property connected with any real property,              the purchase, lease development, improvement, maintenance, exchange, trade or sale of such properties, at such price, rental or amounts, for cash, securities or other property, and upon such terms, as are deemed by such Manager(s) to be in the best interest of the Company;

        C       To borrow money and, if security is required therefore, to mortgage or lien any portion of the property of the Company, to obtain replacements of any mortgage or other security device, and to prepay, in whole or in part, refinance, increase, modify, consolidate, or extend any

9

mortgage or other security device, all of the foregoing at such terms and in such amounts as are deemed by such Manager(s) to be in the best interest of the Company;

D     To authorize any entity in which the Company owns an interest to borrow money and, if security is required therefore, to authorize such entity to mortgage or lien any portion of the property of such entity, to obtain replacements of any mortgage or other security device, and to prepay, in whole or in part, refinance, increase, modify, consolidate, or extend any mortgage or other security device, all of the foregoing at such terms and in such amounts as are deemed by such Manager(s) to be in the best interest of the Company;

E     To place record title to, or the right to use, Company assets in the name or names of a nominee or nominees for any purpose convenient or beneficial to the Company;

F     To acquire and enter into any contract or insurance which the Company deems necessary and proper for the protection of the Company, for the conservation of its assets, or for any purpose convenient, or beneficial to the Company;

G     To employ from time to time persons, firms or corporations for the operation and
                                                     and managing
agents, brokers, attorneys, accountants and other professionals, on such terms and for such compensation as the Manager(s) shall determine;

H     To pay any and all organizational expenses incurred in the creation of the Company;

I     To compromise, arbitrate, or otherwise adjust claims in favor of or against the Company and to commence or defend litigation with respect to the Company or any assets of the Company as the Manager(s) may deem advisable, all or any of the above matters being at the expense of the Company;

J     To borrow money from banks, other lending institutions, and other lenders for any Company purpose including the maintenance of a margin account with any securities broker (except as specifically prohibited by this Agreement), and in connection therewith issue notes, debentures and other debt securities and hypothecate the assets of the Company to secure repayment of borrowed sums; and no bank, other lending institution, or other lender to which application is made for loan by the Manager(s) shall be required to inquire as to the purposes for which such loan is sought, and as between this Company and such bank, other lending institution, or other lender, it shall be conclusively presumed that the proceeds of such loan are to be and will be used for the purposes authorized under this Agreement;

K     To authorize any entity in which the Company holds an interest to borrow money from banks, other     institutions, and other lenders for any purpose of such entity including the maintenance of a margin account with any securities broker (except as specifically prohibited by this Agreement), and in connection therewith issue notes, debentures and other debt securities

10

and hypothecate the assets of such entity to secure repayment of borrowed sums; and no bank, other lending institution, or other lender to which application is made for loan by such entity, as authorized by the Manager(s), shall be required to inquire as to the purposes for which such loan is sought, and as between this Company and such bank, other lending institution, or other lender, it shall be conclusively presumed that the proceeds of such loan are to be and will be used for the purposes authorized under this Agreement;

     L     To maintain, at the expense of the Company, accurate records and accounts of all operations and expenditures and furnish the Members with annual statements of account as of the end of each Company Fiscal Year, together with tax reporting information, and quarterly reports on the operations of the Company;

     M     To purchase, at the expense of the Company, liability and other insurance to protect the Company's properties and business and to protect the Manager(s), his or her agents and employees, and the Members;

     N     To execute instruments, enter into agreements and contracts with parties, and give receipts, releases and discharges with respect to all of the foregoing matters set forth in subsections 8.3A through 8.3M above, and any matters incident thereto as the Manager(s) may deem advisable or appropriate;

     O     To make elections under the tax laws of the United States and other relevant jurisdictions as to the treatment of items of Company income, gain, loss, deduction and credit, and as to all other relevant matters (including without limitation elections under Section 754 of the Code) as the Manager(s) believes necessary or desirable.

8.5    <u>Compensation and Reimbursement</u>.  As determined by the vote of the Members, the Managers may be paid reasonable compensation for services provided to the Company and to reimbursement for reasonable expenses incurred on behalf of the Company.

8.5    <u>Exculpation</u>.  The Managers shall not be liable to the Company or to any of its Members for honest mistakes of judgment or for losses due to such mistakes or to the negligence, dishonesty or bad faith of any employee or agent of the Company; provided that such employee or agent
reasonable care.  The Managers may rely upon the advice of legal counsel to the Company in determining what acts or omissions are within the scope of authority conferred by this Agreement.  The Company shall indemnify and hold harmless the Managers and their agents from and against any loss, expense, damage or injury suffered or sustained by them by reason of or in furtherance of the interest of the Company, including, but not limited to any judgment, award, settlement, reasonable attorneys' fees and other costs or expenses incurred in connection with the defense of any action or threatened action, proceeding or claim, provided that the acts, omissions, or alleged acts or omissions upon which such action or threatened action, proceedings or claims are based were performed or omitted in good faith and not fraudulently, in bad faith, as a result of wanton and willful misconduct or gross negligence.

11

## ARTICLE 9 MEMBERS

9.1 _____ as from time to time designated by the Managers. Such meetings shall be held at such time and place as designated by the Managers, and may be by teleconference or in person.

9.2     Notice of Members Meetings. The Manager shall give written notice stating the place, day, and hour of both regular and special meetings, which shall be delivered not less than (5) nor more than thirty (30) days before the date of the meeting, either personally, by facsimile transmission or by first class mail (postage prepaid) to each Member of record entitled to vote at such meeting. Notice of any meeting of Members, regular or special, shall be given addressed to the Member at the email address, telephone number, or mailing address of such Member appearing on the books of the Company or given by the Member to the Company for the purpose of notice.

9.3     Waiver of Notice. If, under the provisions of the Act, the Articles of Organization, or this Agreement, notice is required to be given to a Member or to the Manager(s), a waiver in writing signed by the person or persons entitled to the notice, whether made before or after the time for notice to be given, is equivalent to the giving of notice.

9.4     Quorum. Members having a majority of outstanding Ownership Interests, represented in person or by proxy, shall constitute a quorum at a meeting of Members.

9.5     Voting. The vote of each Member shall be weighted based on that Member's Ownership Interest in comparison to all other Ownership Interests, and all matters which call for a vote or consent of the Members shall require a majority vote based on Ownership Interests. A formal meeting of the Company shall not be required. In the event, however, that a meeting of the Members is called, written notice of the time and place thereof shall be given to each Member at least ten (10) days prior thereto. At such meeting, a Member may be represented in person or by written proxy.

9.6     Proxies/Power of Attorney. At all meetings of Members, a Member may vote in person or by proxy executed in writing by the Member or by his duly authorized attorney in fact. Such proxy shall be filed with the Company before or at the time of the meeting. No proxy shall be valid after eleven months from the date of its execution, unless otherwise provided in the proxy.

9.7     Action by Manager and not Members. Any acts taken on behalf of the Company shall be carried out by the Manager. ** have no authority to act on behalf of the Company or to take action for the Company.

12

ARTICLE 10 PROHIBITION ON TRANSFER OF COMPANY INTERESTS

10.1    Prohibition on Transfers by Members.  Except with the written consent of all the Managers and Members, no Person shall have authority to sell, assign, transfer, mortgage, · interest in any Interest in the Company.  Individual Members may appoint a beneficiary of their interest upon their death by completing a written beneficiary designation and delivering it to the Manager to keep with the books and records of the Company.  In the event of the death of an individual member, the interests owned by the individual member shall become the property of the designated beneficiary but the designated beneficiary shall not become a substitute Member unless they are accepted as such pursuant to Section 10.5 below.

10.2    Company's Option to Purchase Interests.  If in the discretion of the Managers (voting according to Section 8.1) it is determined that a Member has filed a voluntary petition for bankruptcy, is adjudicated as bankrupt or insolvent, or is the subject of a lien, levy, charging order, or other judgment which, in the discretion of the Managers, has the potential of interfering with the operations, reputation, or success of the Company, the Company shall have an option to purchase the interest of such Member for a purchase price equal to the Member's tax basis in such interest.  The Company shall have the option of paying the purchase price in the form of a promissory note, with interest payable annually at the applicable federal rate, over a term of fifteen (15) years.

10.3    Effect of Prohibited Transfers.  Any Transfer or attempted Transfer by any Member in violation of this Agreement shall be null and void and of no force or effect whatever.  Furthermore, the Company shall not recognize any attempted or purported transfer by operation of law or court order (such as a transfer pursuant to divorce or bankruptcy), without the consent of the Manager and all of the Members.  Each Member hereby acknowledges the reasonableness of the restrictions on Transfer imposed in this Agreement in view of the Company purposes and the relationship of the Members and Managers.  Accordingly, the restrictions on Transfer contained herein shall be specifically enforceable.

10.4  . Substitute Member.  No Person taking or acquiring by whatever means, including without limitation by purchase, operation of law, or any other transfer of any portion of an Interest of a Member in the Company, shall be admitted as a Substitute Member in the Company unless and until:

        A        all the Managers and Members, in their sole discretion, approve in writing the admission of such person as a Substitute Member;

        B        such transferee or assignee agrees in writing to be bound by the terms and conditions of this Agreement; and

        C        all the Managers and Members execute and acknowledge such documents as are necessary to comply with the requirements of the Act.

13

Until such time as all of such conditions have been satisfied, such assignee or transferee shall be entitled only to the rights and benefits of an assignee under the Act, with all other rights associated with ownership of such interest in the Company to remain with and exercisable by the Member from whom the interest was assigned or transferred, during the life of such Member (or until dissolution of the Member, if an entity). Such assignee or transferee shall pay all costs and expenses incurred by the Company in connection with such admission or substitution including, but not limited to, all legal and accounting fees, and the costs of preparing, filing and recording any

## ARTICLE 11  DISSOLUTION AND WINDING-UP

11.1   Waiver of Partition.  No Member shall, either directly or indirectly, take any action to require partition, file a bill for Company accounting or appraisement of the Company or of any of its assets or properties or cause the sale of any Company property, and notwithstanding any provisions of applicable law to the contrary, each Member (and each of his legal representatives, successors, or assigns) hereby irrevocably waives any and all rights it may have to maintain any action for partition or to compel any sale with respect to his Company interest, or with respect to any assets or properties of the Company, except as expressly provided in this Agreement.

11.2   Covenant Not to Withdraw or Dissolve.  Notwithstanding any provision of the Act, each Member hereby covenants and agrees that the Members have entered into this Agreement based on their mutual expectation that all Members will continue as Members and carry out the duties and obligations undertaken by them hereunder and that, except as otherwise expressly required or permitted hereby, each Member hereby covenants and agrees not to (a) take any action to file a certificate of dissolution or its equivalent with respect to itself, (b) take any action that would cause a Voluntary Bankruptcy of such Member, (c) withdraw or attempt to withdraw from the Company, (d) exercise any power under the Act to dissolve the Company, (e) transfer all or any portion of his interest in the Company, (f) petition for judicial dissolution of the Company, or (g) demand a return of such Member's contributions or profits (or a bond or other security for the return of such contributions or profits) without the consent of all the Managers and Members.

11.3   Dissolution and Termination of the Company.  The Company shall be dissolved and terminated only upon the execution of a written termination agreement signed by all the Managers and Members.  Such a termination shall be referred to herein as a "Liquidating Event."

11.4   Effect of Withdrawal, Resignation, Bankruptcy, Death or Incompetency of a Member. The withdrawal, resignation, bankruptcy, death, dissolution, liquidation, termination or adjudication of incompetency of a Member shall not cause the termination or dissolution of the Company and the business of the Company shall continue.  Upon any such occurrence and unless the trustee, receiver, executor, administrator, committee, guardian or conservator of such Member is admitted as a Member of the Company in accordance with the Operating Agreement, the trustee, receiver, executor, administrator, committee, guardian or conservator of such Member shall have the rights specified in Section 10.4 of this Agreement. The transfer by such trustee, receiver, executor, administrator, committee, guardian or conservator of any Company

14

Interest shall be subject to all of the restrictions set forth in this Agreement to which such transfer would have been subject if such transfer had been made by such bankrupt, deceased, dissolved, liquidated, terminated or incompetent Member. Any Member who withdraws or resigns or attempts to withdraw or resign from the Company in violation of Section 11.2 above shall cease to have the rights of a Member under this Agreement, rather such withdrawing or resigning Member shall have the rights specified in Section 10.4 of this Agreement.

11.5    Winding Up. Upon the dissolution of the Company, the Company shall continue solely for the purpose of winding up its affairs in an orderly manner, liquidating its assets, and satisfying the claims of its creditors and no Member shall take any action that is inconsistent with, or not necessary to or appropriate for, winding up the Company's business and affairs. To the extent not inconsistent with the foregoing, all covenants and obligations in this Agreement shall continue in full force and effect until such time as the Property has been distributed pursuant to this Section 11.5 and the Company has terminated. The Manager shall be responsible for overseeing the winding up and liquidation of the Company, shall take full account of the Company's liabilities and Property, shall cause the Property to be liquidated as promptly as is consistent with obtaining the fair market value thereof, and shall cause the proceeds therefrom, to the extent sufficient therefor, to be applied and distributed in the following order:

A       First, to the payment and discharge of all of the Company's debts and liabilities, including debts and liabilities to creditors who are Managers or Members, and to the establishment of reserves for the payment of the debts and liabilities of the Company in accordance with applicable law;

B       The balance, if any, to the Members in proportion with their Capital Accounts, after giving effect to all contributions, distributions, and allocations.

11.6    Final Accounting. The Company shall furnish each of the Members with a statement prepared the Company's accountant which shall set forth the assets and liabilities of the Company as of the date of termination and which shall disclose the sources and applications of Company assets and proceeds thereof during the course of winding up the Company affairs and dissolution. Upon completion of the winding up and termination of the Company, the Members shall execute, acknowledge and cause to be filed Articles of Dissolution of the Company.

ARTICLE 12  BOOKS OF ACCOUNT AND RECORDS

12.1    Accounting Year and Method. The Company shall adopt a calendar year for its financial reporting and federal income tax purposes. The Company shall prepare all financial statements and federal and state income tax reports on a cash basis.

12.2                                          At all times during the existence of the Company, the Manager(s) shall keep or cause to be kept by an agent full and true books of account, in which shall be entered fully and accurately each transaction of the Company. No Company

15

information shall be disclosed to an assignee or other Person without the consent of all the
Managers and Members.

## ARTICLE 13 AMENDMENT

Amendments to this Agreement may be proposed by any Member. The Member
proposing such an Amendment shall submit to the Members a verbatim statement of any
proposed amendment and shall seek the written vote of the Members on the proposed
amendment or shall call a meeting to vote thereon. A proposed amendment shall be adopted and
be effective as an amendment hereto only if it receives approval of all of the Managers and
Members.

## ARTICLE 14 MISCELLANEOUS

14.1    Notices. Except as otherwise expressly set forth herein, all notices under this Agreement
shall be in writing and shall be given to the Member entitled thereto by personal service or by
certified or registered mail, return receipt requested, to the address set forth in this Agreement for
such Member or at such other address as he may specify in writing.

14.2    Title and Captions. Article and Section titles or captions contained in this Agreement are
inserted only as a matter of convenience and for reference and in no way define, limit, extend or
describe the scope of this Agreement or the intent of any provision hereof.

14.3    Counterparts -- Facsimile Transmission. This Agreement may be executed in several
counterparts, and all so executed shall constitute one agreement binding on all parties hereto,
notwithstanding that all the parties are not signatory to the original or the same counterpart.
Signature pages may be detached from the various counterparts and attached to a single copy of
this Agreement to physically form one document. Facsimile (fax) transmission of a signed copy
of this Agreement, and the retransmission of any signed fax shall be the same as delivery of an
original.

14.4    Governing Law. This Agreement and all amendments hereto shall be governed by the
laws of the State of Delaware.

14.5    Survival of Terms and Provisions. The terms and provisions of this Agreement shall be
binding upon and inure to the benefit of the successors and assigns of the respective Members.

14.6            The invalidity or unenforceability of any part of this Agreement shall not
invalidate or affect the validity or enforceability of any other provision of this Agreement, which
shall continue to govern the rights and obligations of the parties hereto as though the invalid or
unenforceable provisions(s) were not a part hereof.

14.7    Further Instruments. The Members agree that they will execute any and all other
documents or legal instruments that may be necessary or required to carry out and effectuate all
of the provisions hereof.

16

14.8   Entire Agreement.  This Agreement constitutes and represents the entire agreement of the Members with respect to the subject matter hereof, and all other prior agreements, covenants, promises and conditions, verbal or written, between the Members are incorporated herein.  No Member hereto has relied upon any other promise, representation or warranty, other than those contained herein, in executing this Agreement.

14.9   Waiver of Lis Pendens and Partition.  The Members recognize that no Member has any direct right in any Company property, but only an interest in the Company which is deemed to be personal property.  Accordingly, because the Company may suffer irreparable financial loss if a lis pendens were filed or an action for partition were brought with respect to Company property by a Member arising out of a Company dispute, each Member does hereby waive any such right to file a lis pendens against any property of the Company or bring an action for partition thereof.

* * *

17

The Manager and Member hereby adopt, accept and agree to be bound by all the terms and provisions of the Agreement.

Dated:                                        **MANAGER:**

                                               Paul Robert Hansmeier

Dated:                                          **MEMBER:**

                                           **THE MILL TRUST**

                                             Padraigin Lane Browne, Trustee

18