1                    IN THE UNITED STATES DISTRICT COURT
                   FOR THE SOUTHERN DISTRICT OF ILLINOIS
2

LIGHTSPEED MEDIA CORPORATION, )
3                              )
                Plaintiff,     )
4                              )
     vs.                       ) No. 12-cv-00889-DRH
5                              )
ANTHONY SMITH, ET AL.,         )
6                              ) November 12, 2014
                Defendant.     )
7

8                        **SHOW CAUSE HEARING**
            **BEFORE THE HONORABLE DAVID R. HERNDON**
9            **CHIEF UNITED STATES DISTRICT COURT JUDGE**

**APPEARANCES:**
10

For the Plaintiff:         Paul A. Duffy, Esq.
11                         Prenda Law, Inc.
                           161 N. Clark St., Suite 3200
12                         Chicago, IL  60601
                           (312) 880-9160
13

                           John L. Steele, Esq.
14                         Paul Hansmeier, Esq.
                           Steele Hansmeier PLLC
15                         161 N. Clark St., Suite 4700
                           Chicago, IL  60601
16                         (312) 880-9160

17  For the Defendant:     Andrew G. Toennies, Esq.
    ComCast                Lashly & Baer PC
18                         714 Locust St.
                           St. Louis, MO  63101
19                         (314) 436-8347

20  For the Defendant:     Daniel G. Booth, Esq.
    Anthony Smith          Jason E. Sweet, Esq.
21                         Booth Sweet LLP
                           32R Essex Street
22                         Cambridge, MA  02139

23  Court Reporter:        Laura A. Esposito, CSR, RPR, CCR

24       Proceedings recorded by mechanical stenography;
    transcript produced by computer.
25

1        *(Court convened)*

2              THE COURT:  Let the record reflect that we're in

3    open court.  We've called the case of *Lightspeed Media*

4    *Corporation vs. Anthony Smith, et al.*  Case No.'s 12-889.

5              So the plaintiffs on this side, who's here on the

6    Lightspeed side?

7              MR. HANSMEIER:  Paul Hansmeier.

8              MR. DUFFY:  Paul Duffy, Your Honor.

9              THE COURT:  All right.  And where's Mr. Steele?

10             MR. HANSMEIER:  Mr. Steele was caught in a

11   snowstorm.  He should be here five, ten minutes.  His plane

12   is just delayed in Denver.

13             THE COURT:  All right.  So who's here on defense

14   side?

15             MR. BOOTH:  Dan Booth, Your Honor.

16             THE COURT:  I'm sorry?

17             MR. BOOTH:  Dan Booth.

18             MR. SWEET:  Jason Sweet.

19             MR. TOENNIES:  Andy Toennies for Comcast.

20             THE COURT:  You're Mr. Steele?

21             MR. STEELE:  Yes, Your Honor.

22             THE COURT:  All right.  Mr. Steele, where was the

23   snowstorm?

24             MR. STEELE:  I'm sorry.  Denver, Your Honor.  I was

25   laid over in Denver and then the plane had a problem with

1    the icing machine.

2              THE COURT:  Got you.  Okay.

3              So we've got two motions pending.  We've got a

4    motion for contempt and motion for sanctions for obstructing

5    discovery, both filed by the Defendant Anthony Smith.

6              Who's going to take up that motion or argue the

7    motion, present evidence, whatever you can do?

8              MR. BOOTH:  I was, Your Honor.

9              THE COURT:  Mr. Booth, right?

10             MR. BOOTH:  Yes.

11             THE COURT:  All right.  So Mr. Booth, proceed,

12   please.

13             MR. BOOTH:  Thank you, Your Honor.

14             We're here to address essentially two different

15   kinds of contempt, the first being direct misrepresentation.

16             THE COURT:  Would you do me a favor?  You can sit

17   down and talk or come to the podium and talk.  Make sure

18   you're talking directly into the microphone.

19             MR. BOOTH:  Do you have a preference?

20             THE COURT:  You can sit down if you want.

21             MR. BOOTH:  So there are two misrepresentations at

22   issue or two kinds of contempt at issue:  First, the

23   misrepresentations made to the Court, and, second, the

24   obstruction to access to evidence.  The misrepresentations

25   are broad and include misstating their roles in this case,

1    their relationship to Prenda Law, and effectively to one

2    another, and their ability to pay the sanctions that were

3    ordered against them.  So they were sanctioned for their

4    direct responsibility in this case, not vicariously as they

5    argued.  And they argued -- Attorney Steele argued here that

6    he was only being sanctioned for his role in his appearances

7    in the court.  In fact, he was sanctioned for his continuing

8    role in this case from the outset, from --

9              THE COURT:  So it really doesn't matter why they

10   were sanctioned.  The fact is, there's a sanction imposed

11   against all three gentlemen, X number of dollars, period,

12   and they haven't paid it yet; right?

13             MR. BOOTH:  They have not.

14             THE COURT:  The last time they were here I kicked

15   on a little extra because they hadn't paid it, and so the

16   fact of the matter is, they -- all three of them owed money;

17   right?

18             MR. BOOTH:  They did.

19             THE COURT:  And there have been representations

20   either in court or in documents to the Court that they can't

21   afford to pay the sanction.

22             MR. BOOTH:  Yes.

23             THE COURT:  And they asked me to take that into

24   account and I've said, *Doesn't matter.  You've got to pay*

25   *the sanction*.  And that's where we are.

1          *MR. BOOTH:*  Right.  So they posted a bond, and once

2     the Seventh Circuit appeal wrapped up.  We've collected on

3     the bond, so those sanctions have not been paid.  However,

4     right before that contempt order was entered we filed a

5     renewed motion for contempt, and that's what's before the

6     Court right now.

7          *THE COURT:*  All right.  And your basis for that is

8     what?  And what's your authority and what's your reason for

9     that contempt?

10         *MR. BOOTH:*  That contempt is based on many of the

11    same facts.  It was the same operative issue.  The question

12    was:  Had they complied substantially with your orders, and

13    your order specifically to back up their inability to pay

14    defense?

15         They made representations to the Court, which you

16    reviewed and decided were not sufficient.  While those were

17    under consideration we were in the middle of discovery

18    because we wanted to figure out for ourselves, not only were

19    they going to be able to meet their burden on that defense,

20    but also, would they -- were they actually misrepresenting

21    things?  They said they couldn't pay but we did discovery

22    and found they actually had millions of dollars coming into

23    their firms in 2011, 2012.  Their position was that that

24    wasn't probative of whether they had enough money to pay in

25    2013.

1          As it turned out, in 2014 they had enough money to

2   post a bond once the contempt motion was -- once the

3   contempt order was entered, and so our evidence showed

4   extensively, here's the money that they have.  They have --

5   Steele had millions of dollars coming in.  He had an income

6   of almost a million dollars in 2011.  From Prenda Law he

7   received over $600,000 in 2012 alone, as did

8   Attorney Hansmeier.  So their protestations both that they

9   were not a part of Prenda or had no ownership interest in

10  Prenda sort of obscured -- the real issue was that they had

11  a significant financial interest in Prenda's cases,

12  including this one and hundreds of others, and that they had

13  been collecting money effectively from the tens of thousands

14  of co-defendants who were paid settlements to Prenda Law and

15  that money wrapped up to millions of dollars.  So despite

16  having those millions, they were arguing here that they

17  couldn't pay a quarter of a million dollars between the

18  three of them, and we felt it was our duty to come up with

19  further evidence to show that that was a materially false

20  representation; not just that they couldn't satisfy the very

21  high burden on the inability to pay defense, but that they

22  were substantially misrepresenting matters.

23          So we also showed that they misrepresented their

24  relationship to Prenda Law, which was sort of the core of

25  their defense to the sanctions motion.  They said, *We never*

1   *got notice*, Steele and Hansmeier said about the sanctions

2   motion because it was almost sent to Prenda.  John Steele is

3   a signatory on the Prenda Iolta [ph.] account we discovered.

4   The Prenda insurance account is a distinction of the Steele

5   Hansmeier firm's insurance account, and in dozens of cases,

6   Steele Hansmeier cases, when Prenda Law came into existence

7   the attorneys filed notices that it was simply a name

8   change, that Steele Hansmeier had now just become

9   Prenda Law, the same basic thing they told the insurance

10  company when their insurance rates went up.  John Steele

11  went to his insurance company and said, *Why is this rate*

12  *going up?  I don't understand.  And there's been no change*

13  *in our firm.*  So they fundamentally misrepresented the firm

14  and misrepresented their finances.

15       THE COURT:  So the -- trying to think of the name.

16  Would you describe the document, the audit accounts or the

17  audited statements from the certified public accountant that

18  I had them file with the Court.  Are those accurate?

19       MR. BOOTH:  Those, we have not seen because they

20  were filed.

21       THE COURT:  They were filed in chambers, weren't

22  they?

23       MR. BOOTH:  That's correct.

24       THE COURT:  I forgot about that.  So where are they

25  keeping the money?

 1          *MR. BOOTH:*  That's the question that they never

 2     answered.  We know that the money went from account to

 3     account, and we saw a paper trail of dozens of accounts

 4     where the money was being shuttled into a freshly opened

 5     account.  It would sit there for a little while and it would

 6     be quickly shuttled, dozens of accounts with many, many

 7     banks.  So just at an initial cut we found we were looking

 8     at thousands of documents and the paper trail was vaster

 9     than we could even begin to come up with an answer.

10          Where is the money now?  We found plenty of

11     accounts that had been closed but we don't have any

12     information as to where that money is now.  And partly

13     that's because we gave them notice of, *These are the banks*

14     *we're seeking discovery from*.  Those banks no longer have

15     their funds, and any time we got closer to the truth they

16     started barking the loudest, they got the angriest and most

17     upset, and we started to get more motions to quash and more

18     attempts to obstruct discovery, which gets into the second

19     issue.

20          *MR. STEELE:*  Your Honor, may I address those claims

21     that are being made?

22          *THE COURT:*  In a minute.  So the documents that you

23     filed that you attached to your motion, do they -- are they

24     documents that substantiate what you allege in your motion?

25          *MR. BOOTH:*  They do.  They substantially

```
 1    substantiate it.  Our motion alleges that there were -- that
 2    they had millions of dollars, that they had received
 3    millions of dollars, and so they were not being fully
 4    forthcoming to the Court.  They were telling the Court, We
 5    can't pay.  We are fundamentally unable to pay.  This would
 6    be a crippling financial burden on us.  The discovery we
 7    found speaks very much the opposite, and nothing that
 8    they've come up with to rebut it suggests anything to the
 9    contrary.  Nothing that they've come up to rebut or --
10    nothing they've come up with rebuts the evidence that we
11    found.  They don't have -- pointed to evidence that the
12    documents are inaccurate.
13         THE COURT:  So your second motion that you filed
14    has to do with your efforts to discover these issues?
15         MR. BOOTH:  Yes, which we made extensive efforts
16    and they did many things to try to obstruct discovery and to
17    avoid discovery.
18         The first thing we did, we wanted to -- we sought
19    discovery directly from them.  We sent them interrogatories,
20    requests for basic information that were repeatedly ignored
21    and rebuffed and refused in one form or another.  They claim
22    that they hadn't gotten our discovery requests, though we
23    had sent them -- along with the subpoenas that we sent them,
24    we sent them copies of the third-party subpoenas we were
25    sending out, along with our first-party discovery requests,
```

1   so they were able to quickly move to quash those third-party

2   subpoenas, and they claim that they hadn't received the

3   documents that were sent in the same envelope where we

4   sought first-party discovery.  So they made frivolous

5   arguments that they couldn't respond to discovery because

6   they hadn't been served, and then we re-served them and sent

7   them copies by e-mail.  We hear, *We don't accept service by*

8   *e-mail.*

9         Then with the third-party discovery requests, we

10  did two waves of that.  The first wave they filed a

11  frivolous two-page motion to quash, raising three issues,

12  none of which was significant, as the Court ruled, and then

13  discovery went forward.  After the Court ordered that

14  discovery -- the motion to quash was denied.  Mr. Duffy sent

15  a copy of their motion to quash to a bank, to JP Morgan, I

16  believe, as if the motion was still standing in front of

17  this Court, though it was sent two weeks after the Court had

18  rejected their motion to quash.  Then Attorney Steele faxed

19  another order of the Court to a bank in an attempt to

20  convince the bank not to cooperate with discovery, to

21  Sabadell Bank.

22         The Court ordered a stay of any further sanctions

23  once they had posted their bond.  The initial order for the

24  bond -- the initial order had said if they don't come up

25  with the money and make full payment or post bond promptly

1   then there would be additional weekly sanctions imposed.

2   That was stayed, and so they sent a copy of that stay --

3   John Steele sent a copy of that stay order to Sabadell Bank

4   for no clear reason as far as we can tell, other than to

5   obstruct discovery.  Sabadell, receiving this stay, takes it

6   as a stay of discovery despite our information that, no,

7   that's not the case, and so Sabadell still has not provided

8   us the discovery that we requested back in winter.

9            So then after that, though there was no pending

10  motion to quash, another motion to quash was filed by

11  Attorney Hansmeier, and the Court just recently determined

12  and ruled that that motion would not be granted.  So for the

13  course of a year almost these discovery requests that we

14  started in January, we still haven't gotten discovery

15  directly from these three attorneys and there are still

16  banks that haven't provided us with the documents that we've

17  requested because of their obstructive efforts.

18       *THE COURT:*  So, Mr. Steele, why would you suggest

19  to these banks that -- you're going to have to talk into a

20  microphone.  Why would you suggest to these banks that the

21  orders of the Court have been stayed?

22       *MR. STEELE:*  I absolutely never did that,

23  Your Honor.  Absolutely never.

24       *THE COURT:*  So you just sent them a stay order

25  hoping that they would interpret it in that fashion?

1          MR. STEELE:  No.  I called the bank and asked them

2     if they received any motions -- any discovery requests

3     because opposing counsel just routinely did not send, you

4     know, requests like that to me.  They said they did and they

5     asked me, is there any orders from the Court, and I said

6     there's one, and they asked me to e-mail it to them or fax

7     it to them.  I did.  I did not tell them anything in the

8     e-mail.  I'm sure -- the e-mail made it clear.  All I said

9     was, *Please find attached the order.*  That's it.  I didn't

10    tell them what to do, I didn't ask them.

11         And I would remind the Court, this is -- first of

12    all, I would like to address one quick -- there is no

13    document in their possession showing that I had millions of

14    dollars at the time the sanction order was placed.  Half of

15    what was just said is completely unsupported by any document

16    that they have with them.  I have my bank statement with me

17    for the month of the issue you had ordered me to pay.  I

18    have just over $2,000 in it.  So if a law firm two years

19    before you ordered a sanction had total income coming in --

20    or not even income, but settlements coming in for their

21    clients for several million dollars, that doesn't mean

22    John Steele has several million dollars in his bank account,

23    which is supported by my bank statements.

24         But I think the really important thing is, this

25    Court's, I think, main concern is, as you mentioned, how are

 1    we able to pay the sanction order?  Your Honor ordered us to

 2    pay when we were here, when we said we could not, and you

 3    said, well -- in the order shortly after you said, *Well, you*

 4    *have a certain number of days to pay.*  I believe it was on

 5    or about April 1st of this year.  And I still didn't have

 6    any way to pay and these gentlemen still didn't have a way

 7    to pay, so my sister and a friend of mine made direct

 8    payment from their accounts on my behalf, which I have

 9    actual documentation, signed documents showing that that

10    wire, those wires didn't actually occur from the accounts

11    I'm saying.  I brought proof with me.  Those payments were

12    made and I owe these people this money now.  I don't have --

13    still don't have that money.  So there's a lot of wild

14    accusations casually thrown out.

15         I mean the insurance thing, as if that's -- yeah,

16    we used Pearl Insurance when we started Steele Hansmeier

17    years ago.  When Mr. Duffy, who's the only owner of

18    Prenda Law, wanted insurance, I said, *Hey, we have great*

19    *insurance company called Pearl.  I'll introduce you to the*

20    *lady.*  I forget her name.  And I arranged for the two of

21    them to deal with insurance.  There's no like mischievous

22    evil intent to help someone out who's taken over our old

23    clients to have a good insurance company.  That's all the

24    e-mail says, that's all.  If Your Honor would read it, it

25    will say -- and I do -- with all due respect, filing a

 1   motion to quash is not obstruction; it's filing a motion to

 2   quash.  Your Honor denied it.  They got extensive discovery,

 3   most of which they published on the internet, including my

 4   wife's Social Security number, and so they have no

 5   problem -- they have no problem putting out all this

 6   information.

 7        And they've collected -- the real question is:  Why

 8   do they still need it?  We satisfied Your Honor's demand to

 9   pay this money even though we didn't have it.  The real

10   issue here is, this is a business model.  This is -- they're

11   just going to keep filing motions for sanctions for things

12   that, besides being moot, aren't even true.  Does Mr. Steele

13   have millions of dollars?  No, Mr. Steele does not have

14   millions of dollars.  And Mr. Steele did earn money in 2012,

15   and Mr. Steele, as they well know, bought a home prior to

16   any sanction order coming out from any court in this country

17   against me.  I did not know of any upcoming sanction order,

18   there was none pending, and I bought a home.

19        And then orders came out to this Court and another

20   court have sanctioned us and we had to post bonds which took

21   all of the money we had.  So these are the facts.  These are

22   the facts that my bank account statements and my sworn

23   statements from the two people that had to put up this money

24   on short notice on my behalf.  This is the facts.  And this

25   casual reference into trying to withhold information from

 1    banks, that's simply -- they will not be able to present a

 2    piece of paper or any evidence showing that I told someone

 3    or tried to get someone to withhold discovery.  They will

 4    not be able to show any documentation showing that I had

 5    millions or -- I don't know about Mr. Hansmeier, Mr. Duffy,

 6    but I can guarantee you they will never show a document to

 7    the effect that I have millions of dollars at the time this

 8    Court ordered me to pay that money.  That is a fact, I

 9    promise the Court.

10         *THE COURT:*  Is that your complete response to these

11    motions or do you have something else you'd like to argue,

12    Mr. Steele?

13         *MR. STEELE:*  I was just addressing the claims that

14    were mentioned by opposing counsel.  I absolutely have not,

15    as far as obstructing justice -- obstructing of discovery, I

16    have not obstructed discovery.  I have not received certain

17    documents and requests from opposing counsel.  I've

18    repeatedly told them I have not.  This is a practice they've

19    done in other cases as well as this case.  They just don't

20    send this information.  And it's been very difficult for us

21    to fight subpoenas, not as much this case, but in other

22    cases because we don't even know about it until after

23    information is sent out.

24         I don't have anything to hide, information, and I

25    believe if asked counsel will admit that they have

 1    extensive -- as he said, thousands of pages.  They have

 2    subpoenaed every financial institution that I know of and

 3    they have information.  And, Your Honor, if they had a

 4    documents, if they had proof that I had this millions of

 5    dollars sitting away in my accounts or that I quickly closed

 6    accounts with lots of money right after the order,

 7    Your Honor, this would be attached as an exhibit in three

 8    seconds.  They have nothing to show that I was actually

 9    quickly closing accounts or transferring money.  None of

10    this is true.

11         Now, I have my bank statement showing what my

12    actual -- at the time right before you ordered me to pay the

13    sanction order was just over 2,000.  I have, you know,

14    proof.  They do not.  To replace the proof, they make these

15    accusations that I'm obstructing frivolous -- that I have

16    millions of dollars hiding away.  Simple fact of the matter

17    is, I don't.  Counsel has plenty of my bank statements, I

18    know he does, and he's subpoenaed all them, and he knows

19    from looking at them that I don't have that money.

20    Otherwise, Your Honor would be seeing those bank statements,

21    I can assure you.  And, of course, I'll -- if any other

22    acquisitions or allegations come up, I would like to

23    approach them.  I'm sure Mr. Duffy and Mr. Hansmeier have

24    something to say on their behalf.

25         *THE COURT:*  Do you know what the CPA was talking

 1    about when he talked about omitting substantially all

 2    disclosures required by general accepted accounting

 3    principles in the financial statements that were submitted

 4    to the Court?

 5            MR. STEELE:  Are you asking me, Your Honor?

 6            THE COURT:  Yeah.

 7            MR. HANSMEIER:  Your Honor, could I address that?

 8    I have more information about that than Mr. Steele might.

 9            THE COURT:  Sure.

10            MR. HANSMEIER:  Judge, based on my understanding,

11    and what we talked about with the CPA after the Court issued

12    its order, the Court had concern about that disclaimer.

13    What the CPA informed us was that, either your statement's

14    strictly conform with gap, meaning, for example, how do you

15    report a house?  Well, one way to do a gap on a state of

16    individual financial condition, as I understand it, you have

17    to receive an appraisal.  Then if you have a mortgage you

18    have to make certain disclosures about the mortgage, about

19    what the term is, and other information along those lines,

20    what the interest rate is, and whether it's a balloon

21    payment or so forth and so son.  You would have to say what

22    your accrued taxes were on it.  You would have to say any

23    other incumbrances or potential incumbrances on the

24    property.  If you don't follow gap, meaning if you omit one

25    disclosure at all, that is the boilerplate disclaimer that

 1   gets put on the statements.

 2          And as a matter of practicality, there was no way

 3   on earth that we were going to be able to get an appraisal

 4   of our house or go through the mortgage page-by-page and get

 5   every single one of these disclosures down on the statement.

 6   That doesn't mean that we made up a value for the house.

 7   The value I used is the tax appraisal for the county I live.

 8   We think it's a reasonably fair estimate of the value of the

 9   house but not done with strict conformity with gap.

10          What a disclosure is, if you read the financial

11   statement, companies that are publicly traded companies

12   produce annual reports, and attached is footnotes to the

13   annual reports where Footnote 1 might describe calendar year

14   taxpayer vs. a fiscal year taxpayer.  We are -- and it would

15   go down the list along those lines.  What's our exposure to

16   the Euro?  What's our risk there?  What is our basis for

17   coming up with this value?  And those footnotes are

18   disclosures.  So when the CPA's referring to disclosures,

19   he's referring to the footnotes that provide more

20   explanation as to the line items, not to say that we failed

21   to disclose assets.  Those are two completely different

22   things.

23          *THE COURT:*  You know what I mean when I say

24   "offshore accounts"?

25          *MR. HANSMEIER:*  Yes.

1          *THE COURT:*  So in what places do you personally

2    have, you or your wife have offshore accounts?

3          *MR. HANSMEIER:*  None whatsoever.

4          *THE COURT:*  And that's at the present time?

5          *MR. HANSMEIER:*  That's for my whole life.

6          *THE COURT:*  So that includes last year?

7          *MR. HANSMEIER:*  That includes last year, yes.

8          *THE COURT:*  Never have had any offshore accounts

9    where you kept money?

10          *MR. HANSMEIER:*  Absolutely not.

11          *THE COURT:*  And so any allegations to that extent

12   would be completely false?

13          *MR. HANSMEIER:*  Categorically false.

14          *THE COURT:*  And so, for example, when you suggest

15   that you have a bank statement that shows a modest amount of

16   money, that would be the only bank in which you have monies

17   deposited?

18          *MR. HANSMEIER:*  That's correct.

19          *THE COURT:*  You understand that it's possible for

20   people to have any number of financial institutions in which

21   they have money deposited?

22          *MR. HANSMEIER:*  Sure.

23          *THE COURT:*  So for a person to make a

24   representation that, *This is my bank statement and it shows*

25   *I have a modest amount of money and insufficient amount of*

 1     *money to meet a certain financial obligation,* doesn't

 2     necessarily mean that that's the only money they have being

 3     held as an asset.

 4         MR. HANSMEIER:  Okay.  If I may, I would just point

 5     out that banks take very, very good records, and they've

 6     traced the money going from one bank account to another bank

 7     account to another bank.

 8         THE COURT:  Who's "they"?

 9         MR. HANSMEIER:  The attorneys, Booth and Sweet.

10     They've presented a ton of financial information, attached a

11     ton of financial information to their various filings in

12     this case.  I understand, from an attorney they've hired in

13     Minnesota, that he received PDF's worth of information.  The

14     files are so large they can't physically e-mail it on an

15     individualized basis; they had to split it up to eight

16     different files.  That's how much information they have.

17         And if I may present two brief arguments.

18         THE COURT:  Sure.

19         MR. HANSMEIER:  I just want to emphasize two

20     points.  The first point I want to emphasize is that the

21     nature of the motion that's pending before the Court, or the

22     two motions before the Court are inherently individualized

23     inquiries.  My personal finances are personal to me.  I

24     don't know what Mr. Steele or Mr. Duffy put on their

25     statements, and that's their business.  I know what I put on

1    my statement.  I know what my CPA prepared.  And what they

2    have not done in any of their filings is make allegations

3    that are specific to me, with the possible exception of a

4    brief allegation in the financial motion, but their motion

5    focused primarily on Mr. Steele and included such extraneous

6    information as what blog he reads or what his e-mail service

7    is, items I don't think are -- they make general statements

8    about us making a lot of money in 2011 and 2012.  I'm fully

9    happy to say that I had successful financial years in 2011

10   and in 2012; probably not as successful as they thought but

11   reasonably successful.  But then just as 2011 and 2012 are

12   successful, 2013 was disastrous from a professional

13   standpoint, a personal standpoint across the board.  Not

14   only that I stopped making any money, stopped having any

15   revenues come in for the most part -- very, very minimal

16   revenues coming in, but had enormous expenses, whether it's

17   posting the bond for Judge Wright's case, quarter of a

18   million dollars.  I contributed half of that.  That's a lot

19   of money for me to put up.  That certainly drained my cash.

20   Then I hired appellate attorneys out there.  That's

21   expensive to do an appeal to the Ninth Circuit.  And I had

22   several other significant expenses and poor timing when I

23   brought my house, frankly.  Went under contract January 1st,

24   2013.  That evaporated a lot of my -- disclosed the assets

25   on my -- when you have a house and paid 20 percent down in

1    this economic climate, you're not going to be able to get

2    additional money out of it.  It's not very realistic.

3          The second point I want to emphasize is where the

4    burden of proof lies.  In this case they're the one moving

5    for contempt so it's their burden and their obligation to

6    show, by clear and convincing evidence, that what they are

7    alleging is, in fact, true.  So, for example, for the

8    financials.  As I understand it, the essence of their motion

9    is that we did not accurately present the CPA statement of

10   financial position.  We've heard from them today make an

11   admission that they don't know how much money we have, or

12   maybe more adequately, the Court said, *Where's the money?*

13   They said, *I don't know.*  They think there's this money but

14   they don't know where it is and they haven't proven or

15   established the fact that this money even exists, which to

16   me suggests that they've fallen far short of meeting the

17   burden of proof that applies to their motion.  This isn't a

18   case where it's our burden of proof to show inability to

19   pay.  We failed and now they're saying it's inaccurate.  Now

20   it's their turn to come up with information.  We don't need

21   to put up the evidence; they need to put up the evidence,

22   and they haven't gotten to first base that can even rebut.

23         It's irrelevant to my financial position what

24   e-mail -- as it relates to the discovery motion, I would

25   emphasize the point that I tried to emphasize in my brief,

 1   and that is, they don't accuse me of doing anything.  They

 2   have two items of charged conduct in their motion.  The

 3   first item of charged conduct is Paul Duffy communication

 4   with Chase Bank, which I'm sure he's going to address after

 5   me.  That's his deal.

 6          The second item of charged conduct is John Steele's

 7   faxing of the order to Sabadell Bank.  Neither of those acts

 8   in any way implicate me nor do they allege that I had

 9   anything to do with them, nor would I because I have no

10   accounts at Chase and -- I guess Steele Hansmeier had

11   accounts at Chase several years ago, and I certainly have no

12   accounts at Sabadell Bank.  Never heard of it until I'd been

13   sanctioned for obstructing their discovery.

14          Burden of proof, I don't think they met it,

15   particularly not with respect to me.  And it's an

16   individualized inquiry.  Their pleadings just say

17   plaintiffs' counsel, plaintiffs' counsel, but we each

18   submitted financial statements to the Court, took different

19   actions in responding to the discovery that they served and

20   didn't serve on us depending on who you believe.

21          Those are my points.  Thank you, Judge.

22          *THE COURT:*  So, Mr. Duffy, your response?

23          *MR. DUFFY:*  Thanks, Your Honor.

24          I just want to address a couple points.  As

25   Mr. Hansmeier, my name only came up a couple of times in

 1   these motions.  The first is in connection with the claim

 2   that I sent a motion -- I believe was a motion to quash or

 3   whatever it was, to Chase Bank.  There's not any admissible

 4   evidence of that.  I think they produced an affidavit by one

 5   of the attorneys who's here today.  I wrote the affidavit

 6   and related a conversation with someone at Chase.  I did

 7   send a motion to quash.  It was in error.  I don't know why

 8   a bank would lie, a motion to quash nor granting a motion to

 9   quash.  I don't know if there's anything that hasn't been

10   produced in connection with that account.  I'm not aware of

11   that.  I'm not aware of millions of dollars that Prenda had.

12   They include information that I'm not familiar with that I

13   don't believe has been authenticated, and I don't think it's

14   properly admissible evidence and I don't know if it has any

15   connection with reality.  I'm not sure what that document

16   is.  I don't know where it came from and I don't think it's

17   been properly authenticated to produce to the Court.

18           Over and above that, the claims, you know, that

19   they've claimed that Mr. Steele and Mr. Hansmeier made

20   $600,000 in 2011, I was not doing work with Steele Hansmeier

21   in 2011, so I don't know what they ran.  And as

22   Mr. Hansmeier said, I don't know anything about their

23   personal finances other than what they've said today.  I

24   have no interest in what their -- I certainly didn't get

25   paid $600,000 a year.  I get paid a fraction of that.  They

1    have no evidence whatsoever or can they ever have any

2    evidence.  I'd be in a much better condition if that was the

3    case.  Unfortunately, it isn't.  They have no information

4    that I made anywhere remotely close to that figure in any,

5    even several of the last -- the last several years combined

6    wouldn't even be close to that.

7         The fact that we all three must be found to be

8    hiding money just because two of us made a lot of money

9    doesn't make sense.  It's not logical.  It's not something

10   that should give rise any time to sanction.  My disclosure

11   was completely accurate.  I don't have -- you know, my house

12   in foreclosure, no equity in it.  I don't have any offshore

13   accounts.  I have small amounts in banks in my neighborhood

14   primarily, but there's --

15        *THE COURT:*  Have you ever had any offshore account?

16        *MR. DUFFY:*  Not to my knowledge.

17        *THE COURT:*  What do you mean "not to your

18   knowledge"?

19        *MR. DUFFY:*  I've had American banks.  I've never

20   had an offshore account.

21        *THE COURT:*  You've never personally opened an

22   account in an offshore bank or financial facility?

23        *MR. DUFFY:*  I never have.

24        *THE COURT:*  Okay.

25        *MR. DUFFY:*  That's pretty much it.  The only --

1    those are the only two places my name came up in connection

2    with any of this conduct, and there's nothing to any of

3    those allegations, so I request the Court to deny the

4    motion.

5         THE COURT:  So what has your history been as far as

6    your professional work?  At some point in time you were --

7    when were you first related professionally with

8    Mr. Hansmeier and Mr. Steele?

9         MR. DUFFY:  I believe it was around November of

10   20 -- when Prenda was formed.  The years are blunting

11   together.  I think it was November 2011.  I was associated

12   with them until Prenda stopped filing lawsuits, I believe --

13   it's not an exact date -- roughly around January 2013, I

14   believe.

15        THE COURT:  Okay.  And then was that about the time

16   the three of you split up and went your separate ways?

17        MR. DUFFY:  Prenda basically stopped doing business

18   at that point.  This California matter that came out pretty

19   much prohibited -- pretty much prevented them from

20   continuing to pursue lawsuits.  I believe they dismissed

21   most of the cases that weren't already submitted, and Prenda

22   basically stopped doing business in early 2013.  It

23   dissolved as a corporate entity in mid-year 2013.  And I

24   don't know -- address that too.  I don't know about closing

25   accounts and opening accounts and moving funds from one to

1     another.  I recall a couple of instances were Prenda changed

2     banks from Chase Bank to Fifth Third, and Fifth Third didn't

3     work out.  I believe they went back to Chase, but I don't

4     know.  And the allegations that, you know, running and

5     closing accounts consistently is something I'm not -- I

6     don't have any knowledge of.

7          THE COURT:  When you say Fifth Third didn't work

8     out, what do you mean?

9          MR. DUFFY:  They were a difficult bank from the

10    customer service side to deal with.  It was difficult to --

11    you know, it was -- they had -- I can't remember exactly

12    what it was but Chase was just easier to deal with from a

13    customer relationship standpoint.

14         THE COURT:  Who made those kind of decisions in the

15    law firm?

16         MR. DUFFY:  I believe, you know, I made them along

17    with John Steele.

18         THE COURT:  Along with John Steele?

19         MR. DUFFY:  Yeah.

20         THE COURT:  So you and John Steele made the

21    decisions about where the firm would do their banking?

22         MR. DUFFY:  Yes.

23         THE COURT:  And did your personal banking follow or

24    did you separately personally bank at a different place?

25         MR. DUFFY:  My wife has always had a Chase Bank

 1  account, small Chase account, which is a joint account, so I

 2  did have an account at Chase, but other than that -- I

 3  believe my other account is at Fifth Third, but there's no

 4  connection between the accounts.

 5         THE COURT:  All right.  Okay.  Thanks.

 6         MR. STEELE:  May I briefly approach regarding --

 7         THE COURT:  I was going to ask you to anyway.  But

 8  I want to ask you about offshore accounts.  Do you now have

 9  any offshore accounts?

10         MR. STEELE:  I want to be completely clear with

11  Your Honor.  I've never ever had a single penny go overseas.

12  I've never had an overseas account.  I don't even know how

13  to open one.  I've never had any money transferred overseas.

14  I'll state --

15         THE COURT:  And "offshore" includes -- I'm talking

16  about including Caribbean accounts.

17         MR. STEELE:  Yes, Your Honor.  I've only worked

18  with American banks.  I believe in the last -- since I've

19  been an attorney, the only banks I've ever dealt with are

20  Fifth Third, Chase, and Sabadell.  I can guarantee this

21  Court unequivocally that I have never opened an account or

22  transferred money to an overseas bank of any type.

23         THE COURT:  Now, I forget how to spell this, what

24  is it, "Salvadel"?

25         MR. STEELE:  It's a bank based out of Miami.

1    That's where I live.

2         THE COURT:  Does it have a branch or a satellite

3    facility in the Caribbean?

4         MR. STEELE:  I have no idea.  Absolutely not to my

5    knowledge.

6         THE COURT:  Not one that you've dealt with or

7    worked with?

8         MR. STEELE:  Absolutely not.  In fact, I've only

9    went to one branch in my entire life and that's in Miami

10   Beach, Florida.

11        Just want to quickly mention, all of the money that

12   I earned from the time I passed the bar to today has been

13   detailed and listed in my IRS statements, and the same

14   accountant who provided the accounting to this Court did my

15   taxes, you know, and knew all about my finances and put

16   together the document that was presented to Your Honor under

17   seal, and that is an accurate representation, to the best of

18   my knowledge, the best of my -- I guess knowledge of my

19   financial situation.  There is no untold money that was

20   hidden from the representation I made to Your Honor.  And my

21   disclosure is completely accurate.

22        I would hope that Your Honor would allow me to

23   present -- I do have, if Your Honor wants, the affidavits

24   from the two people to prove that, you know, they paid the

25   sanction on my behalf and the wire transfer statements and

1    so on from these various accounts showing not only -- no

2    money came from me.  And I didn't have any other accounts to

3    my knowledge during the exact time that you had asked me to

4    pay the sanction.  I wasn't saying, oh, here's my account

5    with 2,000, I have this other account with millions in it.

6    That was simply not accurate.

7         THE COURT:  So when you're saying, for example, the

8    representation you made earlier that, *My bank account has*

9    *$2,000 in it*, that's the only bank you have with assets in

10   it?  There are no other banks that have assets on file?

11        MR. STEELE:  At that time, because I believe -- I'm

12   sorry, at that time.  After that I opened up at Sabadell.

13   There's a minimal amount in there.  I would say, off the top

14   of my head, probably less than $2,000 in it right now.  I

15   say the average is pretty low.  I'll be corrected if I'm

16   wrong.  No way it was any significant amount of money that

17   Your Honor would say, oh, here's millions of dollars that

18   you misled us on.  Absolutely not.

19        THE COURT:  You keep saying $2,000.  That seems to

20   be your figure of choice.  Is that a coincidence?

21        MR. STEELE:  I was just reviewing the bank

22   statement from that month and it said $2,107, but it

23   fluctuates.  I'm trying to create an average.  I don't want

24   to be off by a hundred dollars in one month or a thousand in

25   one month.  The point I'm trying to emphasize to the Court

 1    is that I didn't have hundreds of thousands of dollars in

 2    liquid cash to put forward.

 3           And similar to Mr. Hansmeier, ironically enough, I

 4    purchased my home, I believe it was March 15th of 2013.  At

 5    that time there was no sanction order or any obligation on

 6    me.  I could have spent my money any way I wanted to.  So

 7    the money that I did earn in 2012, I'm here openly telling

 8    the Court that I used that money to buy a home.  And three

 9    weeks later, unfortunately, a sanction order came down from

10    California with Judge Wright that we were obligated to come

11    up with money, which we did.  It was very difficult and

12    we've had a lot of legal fees and a lot of costs associated

13    with this past year-and-a-half.  I was, of course, living

14    and other things.

15           And the important thing is, we didn't mislead the

16    Court on our financial -- and it's kind of -- it's

17    frustrating because opposing counsel is saying we're

18    misleading the Court on our financial statement that we

19    provided the Court that they haven't even seen.  So I find

20    it difficult for them to know beyond a -- for them to know

21    that we misled the Court when they haven't even seen them.

22    My financial statement is accurate as of the date of that

23    financial statement.  That's just a fact.  There will be no

24    documentation that they're going to be able to pull up now

25    all of a sudden and say, *A-ha, Your Honor, here's proof that*

1       *they have millions of dollars.*

2              And I think if you listen carefully to what they're

3       saying, *Prenda Law made millions of dollars.*  No, Prenda Law

4       didn't -- unless I don't know everything.  And neither did

5       Steele Hansmeier because what happened was that when there's

6       a settlement, it's not like I just take all the money from

7       the settlement, put it in my pocket.  It's a law firm.  And

8       so it's disingenuous to say, oh, this law firm had a total

9       accounts receivable in the bank of a certain year of a

10      million dollars.  Oh, Mr. Steele must have made $500,000.  I

11      mean by its very -- on its face that's absurd.  The clients

12      receive money; other people, employees receive money; we

13      receive money, and so on.  And every dime that I've ever

14      earned since I was an attorney is clearly listed on my tax

15      returns, and we've never hidden any of the money in any bank

16      account other than the ones clearly listed that opposing

17      counsel knows all about.

18              *THE COURT:*  Okay.  So, Mr. Booth, you want to wind

19      it up?

20              *MR. BOOTH:*  Sure.  I take exception to a number of

21      things that we've heard here.  I'll try to enumerate them,

22      starting with the -- most recently we've heard about the tax

23      returns.  That may be true.  He maybe accounted for the

24      money he's personally received on his IRS returns.  We asked

25      for those in discovery.  He hasn't disclosed those to us.

1    That's almost a year ago.  So he and Attorney Hansmeier and

2    Attorney Duffy are trying to change the issues here.  The

3    issue here isn't offshore; the issue is candor to the Court.

4    Issue isn't whether we are able to prove definitively, here

5    is exactly how much money each of them individually had when

6    they told the Court they had an inability to pay.  The issue

7    is whether they could meet their burden of proof on ability

8    to pay, and they failed to.

9         We know that they were substantially noncompliant

10   just on the matter of they weren't complying with generally

11   accepted accounting principles, but we know more than that.

12   They made specific misrepresentations as to their

13   relationship together and we know that they failed to

14   satisfy -- they failed to answer the question that still

15   lingers in the Court's mind after all this time:  Where did

16   the money go?  This is a question you were asking, and you

17   shouldn't have to ask.  If they had complied, you would

18   know, if they had been able to give you the substantial

19   disclosures they were supposed to.  Attorney Steele says

20   that they weren't able to do so in ten days.  They just

21   didn't have enough time to submit gap compliant disclosures.

22   But they didn't ask for an opportunity to have more time.

23   They didn't tell the Court at the time that's not enough

24   time, and they haven't since then submitted gap compliant

25   disclosures or until now suggested that they have

 1   disclosures, they would be able to make disclosures that

 2   would have satisfied their inability to pay defense and

 3   their burden.

 4        At the hearing in February the Court inquired, *Why*

 5   *is it that you didn't tell me before that you needed more*

 6   *time?  Why didn't you raise this issue about your finances*

 7   *before?*  And the same issue's happened here.  They didn't

 8   tell you until now, *Oh, this is something we could have come*

 9   *up with.*  So even though -- the offshore issue has come up

10   and we raised the issue for several reasons.  First off, we

11   know that they switch from having legitimate clients they

12   were suing on behalf of and occasionally disbursing some

13   settlement payments to creating fictional clients and then

14   suing on their behalf, appropriating the identities of

15   people and using them and forged documents to support cases.

16        *MR. STEELE:*  Objection.

17        *MR. BOOTH:*  This is something that has been raised

18   in our motion.

19        *THE COURT:*  Objection's overruled.  Go ahead.

20        *MR. BOOTH:*  And those fictional clients were

21   offshore clients, so their interest in putting money

22   offshore and using offshore accounts has been addressed in

23   the sanctions order in the Northern District of

24   California -- excuse me, the Central District of California,

25   that Judge Wright issue.  He specifically said -- several

1    issues on this:  First off, the fact that they're using

2    these offshore companies means they don't pay any taxes on

3    this money, so if their tax statements don't reflect this

4    money, there's a reason.  Second, if they -- he said that,

5    because they're using these offshore entities, it's likely

6    that significant sanctions, they'd never comply with them

7    anyway because they'd shuttle the money offshore and claim

8    inability to pay.

9         We don't know exactly where the money went but we

10   do know that Attorney Steele was quite interested in

11   companies that specialized in helping people send money

12   offshore.  We raised that issue only on the question of what

13   sort of sanction might be appropriate, not on the question

14   of whether we can prove they off-shored millions of dollars.

15   It seems possible.  We don't know where the money is.  They

16   haven't told us where the money went.  They've said that the

17   money was all spent up, but if you look at the numbers, it

18   just simply doesn't add up.

19        It's not just about their personal finances; it's

20   about the finances of the many shell companies and many

21   paper entities that they created to shuttle money between.

22   And the paper trail is -- I believe the burden on their

23   inability to pay was on them to show how much they have and

24   to comply with the Court's order to give legitimate answers

25   to the question.

 1            You know, it's fascinating to me some of the

 2    answers that we got from them just now.  I don't understand

 3    why John Steele would be telling Paul Duffy, who's the

 4    ostensible sole owner and employee of Prenda Law, where to

 5    put his money, where to put Prenda Law's money.  I don't

 6    understand why Attorney Duffy refers to Prenda and its cases

 7    as "them", not "us".  I still don't understand why

 8    Attorney Duffy, as he says, made not nearly as much money

 9    from Prenda Law as John Steele and Paul Hansmeier, when it's

10    supposedly his business.  If you look at the numbers just in

11    2012, numbers that they don't dispute, they made more than

12    25 times what he made.  It doesn't add up.

13            So their representations to the Court that they

14    were not related to Prenda seem obviously false.  If it were

15    true, it wouldn't explain why Attorney Hansmeier was using

16    his Alpha Law Firm accounts to pay Prenda Law's payroll.  It

17    wouldn't explain why John Steele's credit cards in 2013 were

18    being paid by the Prenda Law operating account.  These are

19    things we are do discovery we submitted to the Court that we

20    haven't rebutted that don't make sense.

21            For the same reason, their claims of poverty made

22    no sense and were facially insufficient at the time,

23    demonstrated to the Court, as we thought it was our duty.

24    In our discovery we've seen payments of millions of dollars,

25    Prenda Law, Media Copyright Group, other related entities,

1    suggests at the very least that they were not just failing

2    to meet their burden but actually misrepresenting matters

3    that they were putting money somewhere other than where they

4    were accounting for it.

5        THE COURT:  Okay.  Thanks.  I'll take those -- I'll

6    admit those exhibits and --

7        MR. STEELE:  Your Honor, may I address the new

8    issues raised?

9        THE COURT:  Sure.

10       MR. STEELE:  Your Honor, I listed in disclosure

11   statement all the companies and entities.  I don't own any

12   offshore companies, never have in my entire life.  I told

13   Mr. Duffy where I was now going to be banking and, quite

14   frankly, I did the accounting, most of it, for Steele

15   Hansmeier during the transition period.  Yeah, I give

16   Mr. Duffy advice and told him how we were doing things back

17   at Steele Hansmeier plenty of times.  Doesn't make me a

18   de facto owner of Prenda Law.  And my credit cards, I --

19   just like almost every attorney who ever did any work with

20   Prenda Law, we had to pay things like filing fees and so on,

21   and we got reimbursed, and that's I think a pretty standard

22   business practice.  I'll submit this to your clerk.

23       THE COURT:  Thanks.  Okay.  Well, I'll take the

24   matter under advisement so I can look a little more closely

25   at those exhibits that were filed with the motion.  So if

1    there's nothing else, matter stands submitted, and we're

2    adjourned.

3        *(Court adjourned)*

4                            *   *   *   *

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                      **REPORTER'S CERTIFICATE**

2

3        I, Laura A. Esposito, RPR, CRR, CCR(MO), Official Court
Reporter for the U.S. District Court, Southern District of
Illinois, do hereby certify that I reported in shorthand the
4  proceedings contained in the foregoing 37 pages, and that
the same is a full, true, correct, and complete transcript
5  from the record of proceedings in the above-entitled matter.

6        Dated this 23rd day of September, 2015.

7

8                                          Digitally signed by Laura
                                           Esposito
       *Laura A Esposito*                  Date: 2015.09.25 15:47:35
                                           -05'00'
9      _____
       LAURA A. ESPOSITO, RPR, CRR, CCR

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25